**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**COVINGTON DIVISION**

| | | |
|---|---|---|
| **KENNY BROWN, individually and in his official capacity as the Boone County Clerk, et al.,** | ) ) ) ) | **ELECTRONICALLY FILED** |
| **Plaintiffs,** | ) | **Civil No. 2:13-cv-00068** |
| **v.** | ) | **DJB-GFVT-WOB** |
| | ) | |
| **THE COMMONWEALTH OF KENTUCKY, et al.,** | ) ) ) | |
| **Defendants.** | ) | |
| **MARTIN HERBERT, et al.** | ) ) ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civil No. 3:13-cv-00025** |
| **v.** | ) | **DJB-GFVT-WOB** |
| | ) | |
| **KENTUCKY STATE BOARD OF ELECTIONS, et al.,** | ) ) ) | |
| **Defendants.** | ) | |

**DEFENDANT LEGISLATIVE RESEARCH COMMISSION'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' JOINT MOTION FOR SUMMARY JUDGMENT**

The Kentucky Legislative Research Commission ("LRC") comes and states in Response to Plaintiffs' Joint Motion for Summary Judgment (Record No. 67):

**I.      STANDARD FOR SUMMARY JUDGMENT**

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Federal courts are "required to seek to uphold the constitutionality of state statutes where possible so as to refrain from interfering with the democratic functioning of a state's representative government." Northland Family

Planning Clinic, Inc. v. Cox, 487 F.3d 323, 339 (6th Cir. 2007). The Supreme Court has recently reiterated states' plenary power over their elections and federalism, stating "the Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections." Shelby County, Ala. v. Holder, 133 S. Ct. 2612 (U.S. 2013) (internal citations omitted). As a sovereign state, "[e]ach State has the power to prescribe the qualifications of its officers and the manner in which they shall be chosen." Id. The Supreme Court has refused to remove or "oust" duly elected Kentucky state officers, or make determinations contrary to settled state law. Taylor v. Beckham, 56 S.W. 177, 178 (Ky. 1900); 178 U.S. 548 (1900).  The Sixth Circuit held, in dismissing a challenge to a state's method of electing officers on First and Fourteenth Amendment claims that voters had an interest in electing particular legislators, that the state has an interest in preserving the orderly administration and the finality of its elections, thus:

> our decision rests on the State's sovereign interest in structuring its government. It is an interest recognized by both the text of the Constitution and the spirit of federalism.

Citizens for Legislative Choice v. Miller, 144 F.3d 916, 925 (6th Cir. 1998) (citing Taylor v. Beckham, 178 U.S. at 570-71). However, the General Assembly, not individual state officers or individual litigants, set the election law requirements. Since the principles of federalism limit the power of federal courts to intervene in state elections, district courts are wary of taking jurisdiction over these issues. Warf v. Bd. of Elections of Green County, 619 F.3d 553, 559 (6th Cir. 2010). Additionally, the U.S. Supreme Court has held that federal courts do not look into legislative motivations for actions, and legislative bodies are privileged to act within the legislative sphere. Tenney v. Brandhove, 341 U.S. 367, 377 (1951).

Legislatures redistrict, and unless there is "evidence that these state branches will fail timely to perform that duty, a federal court must neither affirmatively obstruct state

reapportionment nor permit federal litigation to be used to impede it." <u>Growe v. Emison</u>, 507 U.S. 25 (1993). Plaintiffs have presented no such evidence. Plaintiffs must show that a Defendant injured them as to substantially affect their legal interests. Relief is not available from the federal courts unless there is a tangible right to be enforced, but if "no comparable common-law right exists and no such constitutional or statutory interest has been created, relief is not available judicially." <u>Joint Anti-Fascist Refugee Comm. v. McGrath</u>, 341 U.S. 123, 152-153 (1951). Ripeness is a core component of Article III standing and requires that "an injury in fact be certainly impending." <u>National Treasury Employees Union v. United States</u>, 101 F.3d 1423, 1427 (D.C. Cir. 1996). In addition to these essential constitutional requirements, and even if a case is technically "ripe", prudential considerations counsel judicial restraint. See <u>Valley Forge Christian College v. Americans United for Separation of Church and State</u>, 454 U.S. 464, 471 (1982). These include whether: 1) the complaint falls within the zone of interests protected by the statute or constitutional provision at issue; 2) the complaint raises abstract questions as generalized grievances more appropriately resolved by legislative branches; and 3) the plaintiff is asserting his or her own legal rights and interests rather than those of third parties. <u>Allen v. Wright</u>, 468 U.S. 737, 751 (1984).

Federal courts will not interfere with ongoing redistricting efforts because, "in the reapportionment context, the Court has required federal judges to defer consideration of disputes involving redistricting where the State, through its legislative or judicial branch, has begun to address that highly political task itself." <u>Growe v. Emison</u>, 507 U.S. 25, 33 (1993). As here, where there are ongoing efforts to redistrict, the Federal Courts do not step in to preempt the legislature and other actors, such as the Governor, from taking steps in that process. The standard under <u>Reynolds v. Sims</u> is that the State has a "reasonably conceived plan for periodic

readjustment of legislative apportionment." 377 U.S. 533, 583-584 (1964). Judicial relief is only appropriate when a legislature "fails to redistrict according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." Id. at 586. Redistricting " 'is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court.' Chapman v. Meier, 420 U.S. 1, 27 (1975); see also Scott v. Germano, 381 U.S. 407, 409, (1965) (noting preference for both state legislature and state court to federal courts as agents of apportionment)." Pileggi v. Aichele, 843 F. Supp.2d 584, 592-93 (E.D. Pa. 2012).

Even if the basic allegation, as here, is that an older plan was used, courts "have recognized that no constitutional violation exists when an outdated legislative map is used" for a subsequent election, so long as there are ongoing efforts to redistrict. Garcia v. 2011 Legislative Reapportionment Commission, 2013 WL 1401788, *7 (E.D. Penn. April 8, 2013); citing Reynolds, 377 U.S. at 583-84. Where the mere complaint is that officials "failed to properly execute [their] duties in a timely fashion", such conclusory claims will be dismissed. Garcia, at *8; citing Graves v. City of Montgomery, 807 F.Supp.2d 1096 (M.D. Ala. 2011). Where a claim is "insubstantial", the judge may properly dismiss them without convening a three-judge court. Garcia, at *12, citing Duckworth v. State Admin. Bd. Of Election Laws, 332 F.3d 769, 772-73 (4th Cir. 2003). The Courts will dismiss claims for injunctive relief when there is no substantial question. Maryland Citizens for A Representative General Assembly v. Governor of Md., 429 F.2d 606, 611 (4th Cir. 1970). It would be "repugnant to principles of federalism and separation of power to interfere with the General Assembly's or governor's prerogatives" to intervene, where it was shown that Virginia's Legislature had agreed upon redistricting in the past ten years, even where the legislative elections were to be held in 4 months:

As there is no reason to suspect that Virginia's lawmakers will fail to enact appropriate redistricting legislation in a timely manner, there is no basis for the requested relief. Moreover, as the Constitution leaves states with the primary responsibility for the apportionment of state legislative districts, Growe v. Emison, 507 U.S. 25, 24 (1993), it would be repugnant to principles of federalism and the separation of powers to interfere with the General Assembly's or governor's prerogatives now.

Carter v. Virginia State Bd. of Elections, 3:11-CV-7, 2011 WL 665408 (W.D. Va. Feb. 15, 2011).  It was inappropriate to convene a three-judge panel as the matter was not ripe. Id.

When issues of material fact are disputed, courts do not entertain summary judgment. There are several factual allegations of Plaintiffs that are in dispute, thus summary judgment is inappropriate. Plaintiffs ask for a declaration that the 2002 maps ordered by the Kentucky Supreme Court violate the Fourteenth Amendment, and an injunction barring their use in future elections. The case is moot, because the issue of the 2012 elections has been adjudicated. Also, the Full Faith and Credit statute, 28 U.S.C. § 1738, requires a federal court to "accord a state court judgment the same preclusive effect that the judgment would have in a state court." Corzin v. Fordu, 201 F.3d 693, 703 (6th Cir.1999). Also, the test of Abbott Laboratories v. Gardner is not met because it is not ripe. 387 U.S. 136 (1967). There is no challenged governmental action that is final, as the process of redistricting is underway and ongoing, and there are two legislative sessions nigh. The challenged action has not created a direct and immediate dilemma. There are no elections in 2013 with a present right to vote for a candidate.

## II.     PLAINTIFFS HAVE NO STANDING

Article III of the U.S. Constitution provides that parties seeking federal court jurisdiction must allege an actual case or controversy, and must have sustained or be in immediate danger of sustaining some direct injury that is real and immediate and not "conjectural" or "hypothetical." Miyazawa v. City of Cincinnati, 825 F. Supp. 816, 818 (S.D. Ohio 1993), aff'd, 45 F.3d 126 (6th Cir. 1995). Plaintiffs here, as in Miyazawa, merely assert a "general complaint" that a candidate

that they may want to vote for may not be eligible to run for that office, thus they have "suffered no harm, nor will [they] suffer any greater harm than that of any other voter . . . that would provide [them] standing herein." Miyazawa v. City of Cincinnati, 45 F.3d 126, 127-28 (6th Cir. 1995); see also Burnette v. Bredesen, 566 F.Supp.2d 738, 742 (E.D. Tenn. 2008).

The Plaintiffs want to rush the process of redistricting, due to their erroneous and legally unsupported allegation that redistricting must take place prior to November 4, 2013.  No court has mandated that the General Assembly undertake redistricting on a particular timetable in Kentucky, and Plaintiffs cite no case where a Kentucky state or federal court has ruled that the redistricting must occur before the residency date for the legislature. The General Assembly has plenary power over elections deadlines and responsibilities of elections officers, under Section 153 of the Kentucky Constitution. Plaintiffs have no "right" to accelerate the legislative redistricting process. The November 4, 2013 alleged "deadline" is a false flag hoisted by the Plaintiffs. Indeed, courts have held that legislatures, not federal courts, are the proper forums to weigh particular interests, political judgments and arrive at decisions. Perry v. Perez, 132 S.Ct. 934, 941 (2012). The County Clerk alleges that he will have to work to meet any possibly changed deadlines, but ministerial election officers must execute the laws as they are passed as part of their duties. Potter v. Campbell, 160 S.W. 763 (Ky. 1913). It is speculative, as a new law may be passed that may alleviate any such concerns, as has been done in the past. There is no allegation of injury with respect to the State Courts' decision to run the 2012 elections under the 2002 law. Plaintiffs agree that they have no damages. Kentucky's courts held that the 2012 elections should operate using 2002 redistricting, in direct contravention of the laws passed by the General Assembly. The only "injury" that Plaintiffs attempt to describe is amorphous, alleging "confusion" and "not receiving enough tax moneys." Brown Plaintiffs' Response to

Defendant Grimes' First Set of Interrogatories, page 6 (Exhibit 1). This is not sufficient. See LRC's Motion to Dismiss, Record 68, incorporated by reference.

### III.    PLAINTIFFS DO NOT MEET THE STANDARD FOR DECLARATORY JUDGMENT OR INJUNCTIVE RELIEF

Even if other grounds for abstention do not exist, federal district courts have discretion to determine whether to consider declaratory relief. AmSouth Bank v. Dale, 386 F.3d 763, 784 (6th Cir.2004); cited in Persley v. Lee, 794 F. Supp. 2d 728, 732-33 (E.D. Ky. 2011). The Declaratory Judgment Act is "an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." Wilton v. Seven Falls Co., 515 U.S. 277, 287 (1995). Courts look at four factors in declaratory judgment actions:

> (1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for *res judicata;*" (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy that is better or more effective.

Grand Trunk W. R.R. Co. v. Consol. Rail Corp., 746 F.2d 323, 326 (6th Cir.1984). In Persley, state actions were ongoing so the court declined to take jurisdiction. Courts decline declaratory relief where it would serve no useful purpose. Id. Additionally, no declaratory relief is available where it impinges on the legitimate legislative activities of a sovereign legislative body or its members. See Supreme Court of Virginia v. Consumers Union of the United States, 446 U.S. 719, 734 (1980).

A judgment would overstep the bounds of this Court's stated purpose: to enable the General Assembly to redistrict at either the 2013 or 2014 sessions. It will not settle the controversy over which plan will be passed next, but courts do not "trip up" state legislatures in their duties. Kentucky's courts have already decided this issue, and mandated the use of the old

lines. To decide contrary to that result would be to re-adjudicate that dispute and cause friction. There is no basis to do so, as the next legislative elections do not occur until 2014. The General Assembly can either redistrict in 2013 or 2014, this is the remedy, and there is simply no need for this declaration. There is a reasonably conceived plan for periodic readjustment of legislative representation in Kentucky, and that legislative process is ongoing. However, if the court overturns the decision of the state court, it should also issue a finding that 2012 House Bill 1 as passed by the General Assembly comported with the federal court precedents in interpreting the requirements of the Equal Protection Clause, and find it acted in conformity with federal law.

Plaintiffs also do not meet the injunctive relief standard. No injunctive relief may be given as against a legislative body, because of legislative immunity, nor against legislators. See Supreme Court of Virginia v. Consumers Union of the United States, 446 U.S. 719, 734 (1980). The Sixth Circuit recognizes that absolute immunity extends to "legislators and their aides when performing acts of a legislative nature." Cullinan v. Abramson, 128 F.3d 301, 308 (6th Cir. 1997), citing Gravel v. United States, 408 U.S. 606 (1972). However, Plaintiffs wish for the injunctive relief to apply to statutes enacted by the General Assembly in 2002, and ask that they not be used in the future. However, "as the Court concluded in Younger, 'the possible unconstitutionality of a statute 'on its face' does not in itself justify an injunction against good-faith attempts to enforce it,' especially absent "any showing of bad faith, harassment, or any other unusual circumstance that would call for equitable relief." Fieger v. Thomas, 74 F.3d 740, 750 (6th Cir. 1996) (quoting Younger v. Harris, 401 U.S. 37 (1971). There is not even a claim it would be enforced in the future. The equities, as stated above, mitigate against an injunction. Even if the Court found a violation, the courts permit the legislature to devise a remedy. United States v. Brown, 561 F.3d 420, 435 (5th Cir.2009).

## IV.    THERE IS NO VIOLATION OF EQUAL PROTECTION

Even assuming that courts will step in and adjudicate a dispute over continuing redistricting efforts, there is no magic number for invalidity, and courts must consider states' efforts to preserve political subdivision boundaries and other valid state concerns. Although Plaintiffs argue that "plans with a total deviation of greater than 10 percentage points create a prima facie case of an Equal Protection violation and are presumptively invalid," this is not necessarily the case. This ignores the fundamental precept of the state legislature as an independent body, as "legislative reapportionment is primarily a matter for legislative consideration and determination." Reynolds v. Sims, 377 U.S. 533, 586 (1964). Reynolds only requires "some reasonable plan for periodic revision of their apportionment schemes.… In substance, we do not regard the Equal Protection Clause as requiring daily, monthly, annual or biennial reapportionment, so long as a State has a reasonably conceived plan for periodic readjustment of legislative representation." Id. At 583.  Kentucky has engaged in that periodic readjustment, and is still in this process.

Plans for state legislatures require only "substantial" population equality. Gaffney v. Cummings, 412 U.S. 735 (1973). Deviations may be necessary to permit states to pursue other legitimate and rational state policies. See Reynolds, 377 U.S. at 577–81; see also Mahan v. Howell, 410 U.S. 315, 321–22 (1973). These policies include "making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives." Karcher v. Daggett, 462 U.S. 725, 740 (1983). Plans may have a greater total deviation in excess of ten percent, and it is reversible error not to consider whether a valid state interest exists in preserving political subdivision boundaries. Voinovich v. Quilter, 507 U.S. 146 (1993) (district court erred in concluding state legislative districts with

population deviations in excess of 10% from ideal invalid without first determining whether deviation necessary to preserve political subdivision boundaries). The U.S. Supreme Court upheld an 89% maximum deviation from equality and 16% average deviation to maintain integrity of political subdivisions and permit compact contiguous districts. Brown v. Thomson, 462 U.S. 835 (1983). The inquiry focuses on whether:

> the legislature's plan "may reasonably be said to advance [a] rational state policy" and, if so, "whether the population disparities among the districts that have resulted from the pursuit of this plan exceed constitutional limits."

Brown v. Thomson, 462 U.S. 835, 843 (1983). The legislature has flexibility in constructing legislative districts. Strict mathematical equality among district populations has never been required. Mahan v. Howell, 410 U.S. 315, 322 (1973). Instead, the standard has been referred to as the "goal of substantial equality." Brown, at 845. Kentucky's courts ruled that use of the 2002 plan was necessary to meet an interpretation of Kentucky Constitution Section 33's county integrity requirements, a result advocated for by litigants in privity to the Plaintiffs. Clearly, the plan still in place now is a result of the state court's determination of this "rational state policy" to respect county boundaries under Section 33. Federal court intervention is "a serious intrusion on the most vital of local functions." Miller v. Johnson, 515 U.S. 900, 915 (1995). The Supreme Court has carefully observed and reinforced principles of federalism and judicial restraint. Even when population disparities exist, if required by particular state constitutional concerns, courts have affirmed plans. See Brown, 462 U.S. at 843-44 (affirming plan in which county seat was underpopulated by 60% below the mean). Meeting the Section 33 county integrity requirement is the definition of a rational state policy. However, if this court finds that the state court decision does not meet the federal standard, it can find that the General Assembly's passage of 2012 House Bill 1 did meet this standard. The General Assembly will act either in the 2013 or 2014 sessions, the history of the General Assembly acting to protect equal protection concerns is clear,

so there is no need for summary judgment at this time. Under <u>Reynolds</u>, there is a reasonably conceived plan for readjustment that is ongoing.

## V.   HISTORY, TIMING, AND CONTEXT OF LEGISLATIVE REDISTRICTING

In the interest of providing the court with some perspective, historical information about Kentucky legislative redistricting is appropriate. The General Assembly has traditionally operated under the provisions of Kentucky and Federal law with respect to equal population. Plaintiffs state there is only a requirement of a "honest and good faith effort," to redistrict. <u>Reynolds v. Sims</u>, 377 U.S. 533 (1964). This standard has been met. The legislative timetable for redistricting should not be overstepped, as there is no indication that the General Assembly is not acting. The U.S. Supreme Court has held that the federal courts do not interfere with state legislative processes. <u>Tenney v. Brandhove</u>, 341 U.S. 367, 377 (1951).

The General Assembly has historically acted in good faith to pass redistricting legislation. The General Assembly has passed redistricting legislation 23 times since the advent of the current Kentucky constitution[1]. During the 69 years from 1894 to 1963, legislation to redistrict was enacted 6 times, or on average every 11.5 years. From 1963 to 2012, redistricting has passed an average of every 3 years, with 16 redistricting laws passing over 49 years. If one considers the 118 years since the first completion of redistricting, 1894, to the last passage of redistricting legislation, 2012, and divides this by the 22 times legislation has been passed since 1894, the General Assembly has averaged only 5.4 years between redistricting efforts. If this timetable is extended to 2014 (120 years), even if there is no redistricting until the 2014 Regular Session, the General Assembly will have averaged redistricting every 5.2 years.

---

[1]1893-1894, 1906, 1914, 1918, 1930, 1942, 1963, 1971, 1972, 1976, 1978, 1980, 1982, 1984, 1986, 1991, 1992, 1994, 1995, 1996, 2000, 2002, 2012.  This includes House only and Senate only amendments.  See attached Exhibit 2 with Ky. Acts Chapters, for additional reference.

The General Assembly undertook "major" redistrictings in 1893-1894, 1906, 1918, 1930, 1942, 1963, 1971, 1972, 1978, 1982, 1991, 1995, 1996, 2002, and 2012, passing comprehensive House and Senate legislative redistricting 14 times since 1894. Thus, over 118 years, until 2012, the General Assembly will have averaged passing major comprehensive redistricting every 8.4 years. If one extends this to 119 years through 2013, the General Assembly will still have passed redistricting legislation on average every 8.5 years, even if no legislation is passed in the 2013 special session. Assuming legislation passes in the 2013 special session, the redistricting frequency will rise to 15 times over the past 119 years, for an average of 7.9. If legislation is passed in the 2014 regular session, again, bringing the frequency to 15 times over 120 years, the average is 8 years between plans. Clearly, there is not any reluctance to redistrict, nor any long stretches of time between redistricting as were found wanting in <u>Baker</u> and <u>Reynolds</u>, nor any viable contention that the political process does not work. Allegations that General Assembly has "failed to do its duty" are without factual basis. It has always done its duty.

The LRC took the position in the 2012 state court litigation that the Equal Protection Clause, not county subdivisions, should govern the essential question of legislative redistricting, although the county subdivisions should be observed where practicable if not unduly violative of relative population equality. This has been the approach of the Kentucky General Assembly since the U.S. Supreme Court's rulings on Equal Protection in the early 1960's. In fact, the other southern states' fealty to "county integrity" was the primary reason offered in defense of redistricting lawsuits based on the Equal Protection Clause. Kentucky's legislature has always striven to give proper weight to county subdivisions, but under an approach that permits it as an independent body the ability to make those crucial policy-making decisions.

Plaintiffs cite no case requiring redistricting prior to the one year residency date for

legislative office. This erroneous, irrelevant and legally unsupported contention, that somehow the November 4, 2013 date mandates court involvement, is incorrect. No court or General Assembly has ever taken into account the residency requirement as a linchpin of a redistricting timetable. As a matter of law, hinging of General Assembly action upon this imaginary deadline, a political deadline, would violate the fundamental right of the General Assembly as the legislative body to set elections policy for the state under the Tenth Amendment. There is no right to know by November 4, 2013, what the district is, so that potential candidates can move to or from those districts. Any person who is a resident of that district as it exists, at the moment they file, can file for office, starting November 6, 2013 and ending January 28, 2014, unless these dates are modified by law. When the districts change as a result of redistricting, of course geographical area will change, and every candidate can file in the district which he or she had residence for a year prior to the regular election, in that new district. However, there is no legal requirement that a particular numbered district and its territory be in place by a year prior to the election, and Plaintiffs have asserted no court cases to this effect. They try to bootstrap a claim from the one-year residency requirement of Kentucky Constitution Section 32.  However, there is no right to be a candidate. Clements v. Fashing, 457 U.S. 957 (1982); Carver v. Dennis, 104 F.3d 847, 851 (6th Cir. 1997). Therefore, there is no injury. Any person will be able to run in any one of the Senatorial Districts or Representative District up for election.  Additionally, the claim is also that other "Plaintiffs" might "be drawn into a different district" and be "denied a right to stand as a candidate." Kentucky Courts have held that a candidate has no "right" to run in a particular numbered district.  Anggelis v. Land, 371 S.W.2d 857 (Ky. 1963). That is purely a political consideration, of which the courts properly take no notice. Further, it is fundamental jurisprudence that this contention, even if it had merit, is not ripe at this time as a matter of law.

A residency requirement is, and should be, separate and distinct from the filing deadline. The first is a Constitutional requirement which may be assessed at any time by the Senate or House, the second, a statutory requirement that only sets a timetable for when people may begin and end their filing for candidacy. There is no right to identify with a particular district number, as "the district designations are merely conveniences in defining voting areas, and they have no intrinsic purpose such as would furnish a basis for requiring a candidate to be identified with a district as a numbered unit as distinguished from being identified with the geographical area defined by the district boundaries." McConnell v. Marshall, 467 S.W.2d 318, 320 (Ky. 1971). See also Anggelis v. Land, 371 S.W.2d 857 (Ky. 1963). Additionally, the Plaintiffs' asserted right would result in the General Assembly never having the authority to redistrict in a session that occurs in an election year, as every session begins in January and would by result always occur after the cutoff date for the residency requirement. This is not only an absurd result and an abridgement of the General Assembly's constitutional authority to redistrict, but also is contrary to its common past practice and that of every state legislature that redistricts in a similar fashion.

Also, the timetable for decennial redistricting may have begun in 1894, so even if a strict "10 year rule" was applied for state legislative redistricting, the next "deadline" for redistricting under the state Constitution would be 2014. Also, since the first redistricting after the initial lines were set was in 1906, an argument could be made that it is "ten years" after that date. In any event, the Franklin Circuit Court determined that there was no hard and fast deadline imposed upon the General Assembly. Exhibit 3. Kentucky's legislature has plenary discretion to set this timetable, under Reynolds.

Legislative redistricting has not been the subject of a federal court ruling since 1971, and the state court challenges from the 1990's and 2012 were premised only upon Section 33

considerations of county integrity. Legislative redistricting in the 1990's and 2012 did not violate federal Equal Protection. No federal district court in Kentucky has ever taken upon itself to redistrict the Kentucky legislature, nor to step in and create a timetable. Doing so now would be contrary to the principles of democracy, and would strip the General Assembly of its independence. The General Assembly enacted 2012 HB 1, which met Equal Protection standards. There has been a consistent and timely redistricting, even more frequently than every ten years. There is no need for this court to loose the bounds of judicial restraint and jump in to the political fray now. State courts used previous redistricting as a "remedy" if a plan is found to be unconstitutional on county-splitting grounds and have permitted the elections to run under previously-enacted legislation. The decision by the Kentucky courts in 2012 should be given appropriate weight, it makes the issue of "constitutionality" moot, as it already has been decided by that state court, and is therefore res judicata. The General Assembly has two opportunities to redistrict either in the 2013 special session or the 2014 regular session, and there is no legal reason why the General Assembly should not be permitted to do so. There are no regularly scheduled legislative elections in 2013. This ability to pass laws is essential to self-government through the legislative process, which is guaranteed under the U.S. Constitution, Article IV, Section 4, and U.S. Constitutional Amendment 10 and 11, and federal common law. The political process must be allowed adequate time and space to work out its differences.

This issue of the whether or not the current 2002 lines are "unconstitutional" has been addressed by the Kentucky Supreme Court and is res judicata. However, if the Court wishes to rule that this decision was not res judicata as to all the issues presented in the state court, then the fundamental question of whether the Kentucky Supreme Court was correct in "overruling" prior federal rulings, and abridging state separation of powers, to mandate a strict mathematical

standard that begins redistricting at the outer limits of the Equal Protection Clause by placing primacy on county integrity, may be determined by this court, under the federal law. It could hold that the Supreme Court's rulings in <u>Fischer II</u> and <u>LRC v. Fischer</u> impermissibly disregarded federal court rulings, in violation of the Supremacy Clause. Therefore, if the court wishes to make a declaratory judgment, then the LRC would submit that the General Assembly's 2012 legislation met the equal protection provisions as applied by this Court in <u>Upton</u> and <u>Hensley</u>, and the Court may permit it to be used for future elections. However, even under the Plaintiffs' contentions, there is no "litmus test" for constitutionality that would be appropriate at a summary judgment stage, and this Court should reject it.

### a. Kentucky's Constitution and Past Redistricting Efforts-The General Assembly Has Diligently Done its Duty.

Kentucky has had four state constitutions, and the current Constitution was adopted in 1891. Sections 27 and 28 provide for strict separation of powers among the branches of Kentucky Government, one of the most stringent in the nation. <u>Legislative Research Commission v. Brown</u>, 664 S.W.2d 907 (Ky. 1984). This separation has been unchanged in the four constitutions adopted since 1792. Section 15 provides that "no power to suspend laws shall be exercised unless by the General Assembly or its authority." Section 29 vests legislative power in the General Assembly, which has authority to set public policy through its enactments. Section 32 provides the qualifications for legislative membership, including residency requirements. <u>Grantz v. Grauman</u>, 302 S.W. 364 (Ky. 1957).  Section 38 provides that each House of the General Assembly is the judge of the qualifications, elections and returns of its members, each house may judge contested elections, and "the Courts are without jurisdiction to review its solemn determination." <u>Raney v. Stovall</u>, 361 S.W.2d 518, 523-24 (Ky. 1962); see also <u>Taylor v. Beckham</u>, 56 S.W. 177, 184, appeal dismissed, 178 U.S. 548 (1900). Section 152 provides "No

person shall ever be appointed a member of the General Assembly, but vacancies therein may be filled at a special election, in such manner as may be provided by law." Section 153 provides that the General Assembly has the power to regulate elections.

Redistricting of the state legislative body is a legislative function, not a judicial function, as is the passage of laws regulating elections. Unlike other states that may permit courts or unelected commissions to redistrict or regulate timetables for elections, Kentucky's constitution places this power with the General Assembly, and the power cannot flow over the "high wall" of separation. Fletcher v. Com., 163 S.W.3d 852, 872 (Ky. 2005). Section 33 of the Kentucky Constitution provides:

> The first General Assembly after the adoption of this Constitution shall divide the State into thirty-eight Senatorial Districts, and one hundred Representative Districts, as nearly equal in population as may be without dividing any county, except where a county may include more than one district, which districts shall constitute the Senatorial and Representative Districts for ten years. Not more than two counties shall be joined together to form a Representative District: Provided, In doing so the principle requiring every district to be as nearly equal in population as may be shall not be violated. At the expiration of that time, the General Assembly shall then, and every ten years thereafter, redistrict the State according to this rule, and for the purposes expressed in this section. If, in making said districts, inequality of population should be unavoidable, any advantage resulting therefrom shall be given to districts having the largest territory. No part of a county shall be added to another county to make a district, and the counties forming a district shall be contiguous.

Kentucky currently has 120 Counties.[2] Under the original 1891 Constitution, legislative elections were held in odd-numbered years. After adoption of Section 33 in 1891, the General Assembly redistricted itself in 1893, in May for the House and June for the Senate. Ky. Acts 235 (1891-1893). Stiglitz v. Schardien, 40 S.W.2d 315, 318 (1931). In 1894, the Senate allocated itself into short and long terms to enable Senatorial elections to be staggered, so that half of the Senate was elected every two years, completing the districting process. See 1894 Senate Journal, page 127; Anggelis v. Land, 371 S.W.2d 857, 858 (Ky. 1963); Combs v. Matthews, 364 S.W.2d 647, 649

---

[2] At the time of the writing of the present Constitution, Kentucky had 119 Counties.

(Ky. 1963). The first redistricting under Section 33, under the "every ten years thereafter" provision, was in 1906. Stiglitz, at 318. The next redistricting legislation was passed in 1918, 1930, and 1942. In 1906 and 1930, the state courts struck down redistricting on the basis of Section 33's population requirements, ordering the use of previous redistricting plans despite those plans being drawn based upon the previous Census counts. Ragland v. Anderson, 100 S.W. 865 (1907); Stiglitz, at 318 (1931). The last redistricting prior to the Baker v. Carr "modern era" of redistricting was in 1942. The average length of time between redistricting efforts of the General Assembly from 1894 to 1942 was 9.6 years[3]. Again, this was even before the advent of the equal protection jurisprudence of federal courts.

Notably, there was no federal or state court case that had to be filed in order to undertake legislative redistricting in response to the new federal jurisprudence. In 1963, in response to the Supreme Court's 1962 decision in Baker v. Carr, 369 U.S. 186, the Governor called a special session to address redistricting. Despite the Commissioner of Finance's contention that the redistricting could not be done until 1964 because the laws for redistricting were finalized in 1894, the legislators could convene in 1963 for that stated purpose. Combs v. Matthews, 364 S.W.2d 647, 649 (Ky. 1963). The General Assembly was currently in the special session. Although Kentucky had a hiatus of 21 years between 1942 and 1963 redistricting, the Kentucky court emphasized the contrast to Tennessee and other southern states, and the situation which led to the decision in Baker:

> The failure of Tennessee to reapportion its legislature since 1901 caused the Supreme Court, on March 26, 1962, to deviate from its historic policy of refraining from deciding so-called political questions on the ground they were non-justiciable.

Combs. Even noting this hiatus, the court merely noted that "promptness" was the key in determining the efficacy of legislative actions. To meet the Equal Protection mandate, now

---

[3] 1893-1894, 1906, 1914, 1918, 1930, 1942  redistrictings, for 48 years (1942-1894), divided by 5.

recognized as the primary concern, the legislature could disregard Section 33's prohibition against joining more than two counties in a redistricting plan, which "may include more than two (2) counties in a representative district if it deems that it is necessary in order to effect a reasonable equality of representation among respective districts." Id. A similar emphasis on reasonable promptness and reasonable equality was echoed in the Reynolds decision, which followed the next year. Again, there is a stark contrast with Kentucky's General Assembly, which had undertaken redistricting even more frequently than every ten years on average, and which, by the time of the issuance of the Reynolds opinion, had already acted to redistrict itself. Nowhere in Reynolds is there a strict 10 year requirement for redistricting.

In the 1970's, additional questions arose about issues with respect to Section 33's continued viability, in light of the developing federal law that emphasized Equal Protection. Senator Charles Upton filed a declaratory judgment action in the Eastern District of Kentucky, requesting an opinion on the extent of Section 33, and its interaction with the Equal Protection Clause. The unpublished 1971 decision, Upton v. Begley, later cited in Hensley v. Wood, 329 F. Supp. 787 (1971), held that the prohibition against splitting counties in Section 33 of the Kentucky Constitution was unconstitutional to the extent that it prevented compliance with the "one person, one vote" mandate of the U.S. Constitution. See Upton v. Begley, attached as Exhibit 4. The judgment stated:

> Section #33 of the Kentucky Constitution contravenes the 14th Amendment to the Constitution of the United States to the following extent and the following portions thereof are declared unconstitutional:
>
> That portion of the first sentence of said constitutional provision which reads as follows: "Without dividing any county"; and
> That portion of the last sentence of said Constitutional provision which reads as follows: "No part of a county shall be added to another county to make a district."

The District Court held that the Equal Protection Clause requires that a state:

make an honest and good faith effort to construct districts in both houses of its legislature, as nearly as equal population as is practicable. The overriding objective of any re-apportionment plan must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal to that of any other citizen in the state, but mathematical exactness is not a constitutional requirement. Reynolds v. Sims, 377 U.S. 533 (1964).

The court held that legislative districts were malapportioned, and that they must be "reapportioned within a reasonable period of time using as the basis the population figures resulting from the 1970 census." The Court went on to say that population deviations were acceptable if done under a rational state policy. However, it also said that "population must always be the controlling consideration in apportionment of seats in a legislature, and cannot be submerged to other principles, including a policy of preserving geographic boundaries in composing legislative districts." The court said that equality of population simply "could not be accomplished" by following the policy in Section 33 of the Kentucky Constitution, and there was an "unavoidable conflict". The Supremacy Clause, therefore, mandated that Section 33 be declared invalid. The court did not set a deadline for redistricting, or state what a "reasonable period of time" would be, leaving it up to legislative discretion.

In 1971, following the passage of a redistricting plan by the General Assembly with a stated aim of equal representation, the federal court in Hensley v. Wood struck down the legislative redistricting plan enacted as violative of the Equal Protection Clause, as the overall range of the House plan was 25.5% and 18.92% for the Senate Plan. 329 F.Supp. 787 (E.D. Ky 1971).  The court stated:

It is true that there is no inflexible mathematical criteria for determining the constitutionality of reapportionment schemes. ***It is not permissible for a State to arbitrarily select a certain percentage of population deviation and then strive to meet or at least not exceed that mathematical variation of population.***

Id. at 793 (emphasis supplied). However, the federal court allowed that plan to be used for the upcoming legislative elections which were, at the time, held in the odd years.  Redistricting and amendments thereto were then passed by the General Assembly in 1972, 1976, 1978, 1980, 1982, 1984, and 1986, applying this federal standard as established by Upton and Hensley. In 1979, a constitutional amendment was adopted by the people of Kentucky, to change legislative elections to even years, which would start in 1984. 1978 Acts Ch. 440, adopted Nov. 6, 1979.

### b.  State Courts' Revival of Section 33's Prohibition on County Splits.

The General Assembly again redistricted in 1991 in special session, with an amendment in 1992. A challenge to the law was brought on the basis of Section 33, and the Kentucky Courts ruled this could be brought in Campbell Circuit Court. Fischer v. State Board of Elections, 847 S.W.2d 718 (Ky. 1993) ("Fischer I"). In 1994, on remand, the Campbell Circuit Court held that the redistricting law was constitutional. However, the Kentucky Supreme Court reversed, ruling that the redistricting law did not meet Section 33's requirements against county splitting, essentially reviving that provision against the previous Federal court's order of 1971. There was no claim that the redistricting act "violate[d] any provision of the United States Constitution. In fact, [Plaintiff] admits that the Act would pass muster under the Constitution of the United States and relies entirely on Section 33 of the Constitution of Kentucky." Fischer v. State Bd. of Elections, 879 S.W.2d 475, 478 (Ky. 1994) ("Fischer II"). Neither the General Assembly nor the LRC were parties at this point in the lawsuit.

The Kentucky Supreme Court stated that it was creating a new standard for legislative redistricting based upon its interpretation of federal caselaw:

> Federal decisional law has long acknowledged the right of states to allow significant deviation from strict "one man, one vote" principles, absent invidious discrimination, to achieve important state policy. A total deviation of 16.4% was upheld in Mahan v. Howell, on the grounds that the State of Virginia had a substantial interest in preserving

the integrity of its political subdivisions. Likewise, a total deviation of 89% was upheld in Brown v. Thomson, "on the basis of Wyoming's long-standing and legitimate policy of preserving county boundaries." While the federal courts have not abdicated their duty to require compliance with the Constitution of the United States in matters of state legislative apportionment, a presumption of validity has emerged and it is safe to say that so long as the maximum population deviation does not exceed −5% to +5%, and provided any such deviation is in furtherance of state policy, no violation of the Constitution of the United States will be found. Gaffney v. Cummings, and Connor v. Finch, supra.

Id. (citations omitted) The Court held that: "The mandate of Section 33 is to make full use of the

maximum constitutional population variation as set forth herein and divide the fewest possible

number of counties." Id. at 479. Despite the State Board of Elections' reliance upon Upton v.

Begley and Hensley v. Wood, which the Kentucky General Assembly had used as the lodestone

for redistricting since 1971, the Court held that it would not follow the federal courts' opinions:

> In support of their argument directed to the merits of this case, appellees have cited and rely on a 1971 unpublished decision of the United States District Court for the Eastern District of Kentucky, Upton v. Begley (Docket No. 364). This decision purports to declare unconstitutional under the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States, that portion of Section 33 of the Constitution of Kentucky which prohibits dividing any county in legislative apportionment. It is asserted that the General Assembly considered this opinion in formulating its reapportionment plan, thereby indicating its good faith. Appellant answers that this unpublished decision is erroneous, not binding on this Court, and that good faith is virtually irrelevant to the inquiry.
>
> We agree with appellant that the Upton decision is erroneous. It failed entirely to take account of this Court's decisions in Ragland v. Anderson, Stiglitz v. Schardien, and Combs v. Matthews, which placed appropriate priority on equality of representation for all citizens. It also failed to properly apply then controlling federal authority, Reynolds v. Sims. Of course, subsequent federal decisions which elaborate on the right of states to consider other important state law factors in the process of apportionment were not yet available. Whatever precedential value Upton v. Begley may ever have had has been seriously eroded by subsequent decisions of the Supreme Court of the United States.

Id. at 480 (internal citations omitted). The Court held that it would, however, delay the effective

date of its decision until January 3, 1995 and allow the 1994 elections to run under the

redistricting law which it had found unconstitutional under the county splitting provisions, in

order to give the General Assembly opportunity to redistrict. Id. Interestingly, the attorney for

22

the Plaintiffs in the <u>Hensley</u> case who successfully challenged 1971 state redistricting on federal Equal Protection grounds was Donald C. Wintersheimer. As a state Supreme Court Justice, he filed a dissent in <u>Fischer II</u>:

> I must respectfully dissent from the majority opinion because the reapportionment acts of 1991 and 1992 represent a legitimate exercise of legislative discretion in developing an apportionment plan based on the principle of equality of population as a primary factor. I agree with the holding of the circuit court that equality of population is the most important element in apportionment. It is clear from any fair reading of Section 33 of the Kentucky Constitution that the integrity of the county unit when considered in an apportionment context is secondary to equality in population. . . . ***The Federal Constitution provides that the overriding consideration in any appointment plan is equality of population in state legislative districts. <u>Reynolds v. Sims</u>. Population remains the controlling criterion. All parties to this litigation concede that the current redistricting plans would pass Federal constitutional muster.***
> . . .
> The most recent Federal case on the subject provides instruction on how to approach such a situation. <u>Hensley v. Wood</u>, 329 F.Supp. 787 (1971), held that regardless of the legitimate desire to preserve the integrity of political subdivision units, the primary concern of the legislature with respect to apportionment must be the equal weight of the vote of each citizen. Some divergence from the population equality standard is permissible if it is necessary based on a legitimate consideration incident to the effectuation of a rational state policy. A reapportionment statute that was based on political sentiments and traditional subdivisions, violated the one-person one-vote principle, and did not conform as nearly as practicable to the standard. <u>Hensley</u>, supra.
> Any plan should not simply benefit a local or state government unit or further the career of any individual candidate.

<u>Fischer</u>, at 481-82 (Wintersheimer, Dissent) (emphasis supplied).

In August 1995, the legislature enacted both Senate and House redistricting plans, but the House bill was vetoed by the Governor after the House had adjourned sine die. The Campbell Circuit Court found the Senate plan unconstitutional on the ground that it was not accompanied by a House plan, and was therefore incomplete. A member of the House then resigned and the State Board of Elections petitioned to permit the filling of the vacancy via a special election, as required by the Kentucky Constitution. However, the Kentucky Supreme Court refused to allow the election. The Court held that when the districts' use was enjoined effective January 3, 1995:

> Upon our determination that such was unconstitutional, there is no legal theory whereby it or any portion of it could be used to establish a district for the purpose of filling a vacancy. As of January 3, 1995, there were no legislative districts as that concept is normally understood. There was but a single House district and a single Senate district comprising the whole of the Commonwealth of Kentucky.

State Board of Elections v. Fischer, 910 S.W.2d 245, 246 (Ky. 1995) ("Fischer III"). The LRC was a party to this lawsuit, and argued that the court should not permit the district to go unrepresented. The court rejected the view that anyone was "unrepresented" by virtue of not having a particular legislator in that district:

> Although a Senator [or Representative] is required by Section 32 of the Kentucky Constitution to be a resident of the district from which he is elected, once he is elected he represents generally all the people of the state and specifically all the people of his district as it exists during his tenure in office. Certainly no one would suggest that a Senator [or Representative] represents only those persons who voted for him.

Id. at 247, quoting Anggelis v. Land, 371 S.W.2d 857 (Ky. 1963). Therefore, the Kentucky Supreme Court refused to permit the election under the plan which was, admittedly, completely in compliance with the Equal Protection Clause. The General Assembly redistricted in 1996, and the law was upheld in Jensen v. State Board of Elections, 959 S.W.2d 771 (Ky. 1997). The court reiterated that the previous redistricting was struck down on the basis of the Court's newly stated rule that required maintaining a *maximum* population variation of plus-or-minus 5%, in order to ensure that the minimum number of counties were split. Id. at 772. The Court approved the plan because it split the minimum number of counties possible and that it "made full use of the maximum population deviation" required by the court in Fischer II of plus or minus 5%. The Jensen Court rejected a claim that the plan was "politically gerrymandered," stating that "[A]pportionment is primarily a political and legislative process. Our only role . . . is to ascertain whether a particular redistricting plan passes constitutional muster, not whether a better plan could be crafted." Id.

In 2000, the federal Census took place with Census information being received in 2001. State and Federal lawsuits were filed in 2001 to try and accelerate the enactment of redistricting, however, no court intervened to affect the General Assembly's redistricting timetable. 2002 House Bill 1 was passed on January 31, 2002. http://www.lrc.state.ky.us/recarch/02rs/HB1.htm The Act had a maximum population deviation of 10% for the House plan and 9.53% for the Senate.  The Act also changed the filing deadline for legislative office to February 1, 2002.

### c. The Current Cycle of Kentucky Legislative Redistricting: The Legislative Process Takes Time, As it Should, and Is Currently Ongoing.

The Plaintiffs' summary judgment motion states assumptions and speculation as "fact" regarding the supposed timetable for redistricting and actions taken or not taken by the General Assembly. However, this determination of what is a "reasonable time" is fundamentally a legislative one, that is appropriate not for courts to make, but for legislatures to make. See, Philpot v. Haviland, 880 S.W.2d 550, 553 (Ky. 1994); Tenney v. Brandhove, 341 U.S. 367, 377 (1951). Courts do not presume what a "reasonable time" is in terms of the timely introduction or passage of legislation, and leave this to the legislative body in the application of its rules and procedures. See Philpot. Additionally, legislatures are permitted sufficient time to investigate and to make value judgments as to the legislation to enact:

> This investigatory power, therefore, constitutes an extremely important function of the legislative process. It helps prevent unwise legislation, and it enables the enactment of statutes which serve the current needs of society.

1 Sutherland Statutory Construction § 12:1 (7th ed.).  This process is ongoing, as part and parcel of the legislative process, including the legislature's and legislators' ability to inform themselves about the data underlying possible legislation, effects of court cases on current legislation, drafting legislation, and to act collectively at an appropriate time. Plaintiffs conclude that districts were legally "mal-apportioned" in March, 2011, which is not true.  Since the last

redistricting was accomplished in January, 2002, the ten year period for redistricting, even assuming there is such a thing, would not have even run as of 2011.  Also, Combs v. Matthews, *supra*, cites 1894 as the starting date for the legislative redistricting under the new Kentucky Constitution. Therefore, it may be permissible for the General Assembly to redistrict itself in 2014, under a reading of the "every 10 years" provision of Section 33.

On March 17, 2011, Kentucky got raw census numbers from the Census Bureau. Exhibit 5. However, Plaintiffs attempt to draw the pejorative conclusion that "despite the availability of this information in March, 2011," the Governor of Kentucky "decided not to call the General Assembly into special session that year to correct the mal-apportioned districts." This statement appears to conclude that all the "information" was available to the General Assembly in order to redistrict in March, 2011.  All the "information" necessary to redistrict was not "available" to the General Assembly in March, 2011, and the General Assembly still is able to assimilate information in aid of its work in progress. Exhibit 5. The mere "availability" of the raw Census data on March 17, 2011 did not mean that it could be used for the purposes of redistricting. In any event, it acted in 2012 to redistrict, and is about to go into a special session and work is ongoing. Exhibit 5. Additionally, there may be other information that the General Assembly may or may not choose to use in the future, and the courts have said that this is valid. City of Detroit v. Franklin, 4 F.3d 1367 (6th Cir.1993).

The 2011 General Assembly did not have time to act even if it the data had been ready for use in Kentucky. The General Assembly had to adjourn the Regular Session sine die by March 30, 2011 according to the Kentucky Constitution, Section 42. On March 17, 2011, the General Assembly was in its veto recess, having used 28 days of the 30 days allotted to it in for the    "short"    regular    session.    See    2011    Legislative    Calendar

http://www.lrc.ky.gov/sch_vist/11RS_calendar.pdf. Exhibit 6. Even if the General Assembly would have decided then and there to redistrict, it had insufficient legislative days to do so. As noted below, the information was not ready for use. Also, given the complexity of legislative redistricting, the staff time and preparation necessary, deliberations and discussion required, time for legislative input and understanding of the redistricting bills, constituent input, as well as other the time necessary for discussion and compromise, five days generally may not be a reasonable amount of time to decide upon, draft, meet in committee, deliberate, consider, read and pass the bill in question. Also, there are 138 members of the General Assembly, any one of whom may request that a bill be drafted for the General Assembly's consideration, and there are finite legislative resources that may be expended upon such efforts. The same is true for any session.

Also, the expense and time constraints of a special session were of concern to many lawmakers, given the Commonwealth's budget issues. A special session costs approximately $60,000 per day. Also, after the General Assembly adjourned in March, 2011, they had absolutely no power to convene in a special session. The Governor is not required to, nor can he be commanded to call a special session on a given topic. In Kentucky, the Governor has power to determine whether and when to call a special session, and for what purposes, and this is up to his or her complete discretion. Geveden v. Com., 142 S.W.3d 170, 172 (Ky. App. 2004) (denying State Legislators' motion for injunctive relief requiring the Governor to call a special session). Even though legislators may want a session to be called, they cannot require the Governor to do so, nor can the courts order a session. Id.

Additionally, such timing issues as when to best address redistricting, and when the General Assembly determines that it has sufficient information to undertake this weighty topic, is also governed by the intensive work that must be done to prepare for redistricting by the

legislative branch. It is also informed by the other legislative responsibilities, such as the time necessary to pass a budget and deal with other legislation. The legislative process of creating and analyzing bills with legislative redistricting plans takes significant time, as part of this legislative function of deliberation and decision-making.  Exhibit 5. Since the Kentucky Supreme Court has reinvigorated the county split rule upon redistricting in such exacting terms, attempting to require the General Assembly to justify a minimum number of county splits, despite the federal court rulings referenced above, the process for drawing the maps is subject to even greater amounts of work that must take place. Additional time was necessary to ensure that the bill drafting system of the General Assembly was ready to draw up legislative bills relating to redistricting. Id.

Kentucky has 120 counties. The concerns with accuracy and communication with the bodies that must at some point carry out any redistricting legislation are paramount, and this also takes time. Id. Each of these counties has a county clerk. The precinct lines are maintained by the counties under KRS 117.055 and 117.0557. In order to even begin the process of placing data in a map format in order that it can be used for redistricting, each clerk must be contacted to make sure that the information, including the precinct lines that might have been altered by those counties since the previous redistricting, is correct. Id. In order for the mapping to be correct, these precinct lines must then be verified and put into the redistricting system for the use of the General Assembly. Id. Since Kentucky has 3,578 precincts and 161,672 census blocks, this process is time-consuming and exhaustive. Id. Additionally, there was an increase of 218 precincts and 29,373 census blocks from the previous redistricting, which meant that additional time had to be taken. Id. There was a concern about improving the accuracy of the county clerks' submissions as the return rate from County Clerks was only 60 percent in the previous round of redistricting in 2002. Id. It took until May 4, 2011 to create precinct layers for each county. See

Minutes of Interim Joint Committee on State Government, August 11, 2011, (Exhibit 7) http://www.lrc.ky.gov/minutes/st_gov/110824OK.HTM, and Exhibit 5.

However, due to the diligence of LRC staff and increased response from county clerks, from May 25, 2011 and July 19, 2011, all 120 county clerks did return precinct verification maps to LRC. Id. Out of the 120 county clerks contacted by LRC, 60 counties required corrections to be made in their maps. Id. Changes had to be made to Jefferson, Kenton, Campbell, and Boone Counties' maps. Exhibit 5. Based on this information, as confirmed by the County Clerks, then LRC was able to create a statewide precinct layer for the maps by July, 2011, by assigning population data to precincts. Exhibits 5 and 7. After this, in order for the General Assembly to properly make decisions on redistricting and receive public input, the information was placed on the LRC website. See http://www.lrc.ky.gov/gis/Redistricting%202010.htm Additionally, a redistricting computer was made available to the public with the data. Id. Public input was welcomed, both at the legislative committee meetings held during the interim, and also through interactions with state legislators. Exhibits 7, 8, 9, 10. During this interim meeting process, legislators were informed of the issues with redistricting and given information. Exhibit 5. Additionally, other groups, including one represented by Plaintiffs' Counsel, Dale Ho, were able to present information about the redistricting process. See http://www.lrc.ky.gov/minutes/st_gov/elec_ca/110823OK.HTM (Exhibit 8). This information as noted above was made available to the public through LRC publications. Notably, no Plaintiffs, or Mr. Ho, expressed concern about a supposed pressing issue with having districts drawn in November before the election year.

Following this process of data gathering, information sharing, conversation, bill drafting, and communication with legislators and the public, the 2012 Regular Session began January 3,

2012. Under Kentucky's constitutional process, any bill must have 3 readings on 3 separate days in each house, and each bill must be reported by a committee. The 2012 session was also a budget session. 2012 House Bill 1 was introduced in the House on the first day of the session, it passed the House on January 12 after being reported favorably from the House Standing Committee on State Government. Then, it was subsequently sent to the Senate, which also passed it out of the Senate Standing Committee on State Government, and passed by the Senate on January 19, 2012, signed by the presiding officers and enrolled, on the 11th legislative day. http://www.lrc.ky.gov/record/12rs/HB1.htm. On January 20, 2012, the Governor signed HB 1 into law as 2012 Acts Ch. 1. http://www.lrc.ky.gov/Statrev/ACTS2012RS/0001.pdf    The law has a 10% variance for the House plan and a 9.84% variance for the Senate's. http://www.lrc.ky.gov/record/12rs/HB1/RS.pdf    Exhibit 11.  Therefore, the General Assembly passed a redistricting law that comported with the federal constitution provisions for Equal Protection, and gave due weight to the county splits. Because House Bill 1 was passed prior to the January 31, 2012 filing deadline, the filing deadline did not have to be altered from its original date, set in KRS 118.165, and interested candidates began filing their nomination papers for the primary election, so they could be listed on the ballot for the primary to be held in May, 2012.

Thursday, January 26, 2012, three members of the Kentucky House, House Minority Leader and LRC member Jeff Hoover, Representatives Joseph Fischer and Kim King, and other citizens, filed a lawsuit in Franklin Circuit Court, 12-CI-109. They sued the Secretary of State, State Board of Elections, and Maryellen Allen, Interim Director of the State Board of Elections. The lawsuit alleged that 2012 House Bill 1, with respect to the House Districts, violated Section 33 of the Kentucky Constitution, and the Fourteenth Amendment's Equal Protection Clause because it

was "partisan" and "violated the population ranges," that it deprived them of their Federal Freedom of Association rights by penalizing Republican voters and Representatives solely because of their political affiliation and beliefs, and that it violated 42 U.S.C. § 1983. Senator Kathy Stein and other citizens intervened in the lawsuit as "Intervening Plaintiffs," claiming that 2012 House Bill 1, with respect to the Senate Districts, violated Section 33 of the Kentucky Constitution, the Fourteenth Amendment's Equal Protection Clause, 42 U.S.C. § 1983, and alleged that the Senate plan could not move one district number to another. The LRC intervened in the case.

On February 7, 2012, Franklin Circuit Court issued a temporary injunction against the Secretary of State and State Board of Elections, keeping the same districts in place for the 2012 elections, and enjoining the use of the new districts under 2012 HB 1. Exhibit 3. LRC, on appeal, asserted that 2012 House Bill 1 met the primary federal requirement of redistricting--the Equal Protection Clause--while adequately addressing the issue of county splits under Section 33 of the Kentucky Constitution. Exhibit 12.  On February 24, 2012, the Kentucky Supreme Court's order upheld the lower court's determination that the prohibition against county splits was violated, enjoined the implementation of HB 1, and ruled that the districts as enacted in 2002 would remain in place for the 2012 elections. 2012 WL 952983 (Ky. Feb. 24, 2012). Although the Court stated in its order that a full opinion would follow, which would have given guidance as to the reasoning behind the order, none followed for the pendency of the legislative session. This order was issued on the 34th day of the legislative session, and after the last day for legislative bill requests could be made under legislative rules. Then, on April 26, 2012, after the General Assembly had adjourned sine die, the Court issued a full opinion and stated:

> *Fischer II* requires division of the fewest number of counties mathematically possible in reapportionment plans. The LRC contends this is a judge-made standard not mandated by the

Kentucky Constitution and that this standard should be replaced with a good faith requirement to divide only the fewest number of counties as is politically possible. We disagree.

The text of Section 33 is clear that "as between the competing concepts of population equality and county integrity, the latter is of at least equal importance. The probability of population inequality is acknowledged, but the command with respect to the division of any county is absolute." And complying with Section 33's prohibition against split counties would violate equal protection principles. So we recognized in *Fischer II* that Kentucky avoided federal preemption because our earlier decisions construed Section 33 to give primacy to population equality. But we firmly stated that "total destruction of county integrity is not required and should be balanced with population equality to accommodate both." We reaffirm this assertion today.

Legislative Research Com'n v. Fischer, 366 S.W.3d 905, 911-12 (Ky. 2012). As noted above, this statement that a state court decision "requires division of the fewest number of counties mathematically possible", is in direct conflict with the Upton decision from 1971. However, this is the decision that was made by the state court.

Following this, the 2013 Regular Session ensued. The timeframe for the session was short, as it was only a 30 day session. As there were no regular elections for General Assembly members in 2013, the issue of redistricting was discussed and debated, but was not resolved. Consequently, a special session has been called for this purpose. As noted above, given the complexity of legislative redistricting, the timetable for a special session may vary, and sufficient time is necessary to address the pending questions.  However, as the special session has been called for August 19, 2013, the legislative process is ongoing and active, and the legislative process should be allowed to work. Exhibit 5. All of the necessary time for the work that went into the 2012 and 2013 sessions will also need to take place in subsequent sessions in order to pass legislation, including compromise, conciliation, information gathering, discussion, deliberation, and voting.

Therefore, it is incorrect that the General Assembly has not acted in good faith, nor is it

true that they would "fail to act", given either the opportunity in the upcoming 2013 special or a 2014 legislative session, given the history. The legislative activity regarding redistricting is ongoing, and federal courts, as stated above, do not intervene where such ongoing efforts at redistricting are taking place. Of course, at the extraordinary session which has been called for the purpose of addressing redistricting, Plaintiffs are welcome to attend, give opinions and input on redistricting, and contact their Representatives and Senators to urging any plan that they believe would be beneficial to the Commonwealth of Kentucky.

## VI.    RES JUDICATA MANDATES AGAINST A FINDING OF UNCONSTITUTIONALITY IN A DECLARATORY JUDGMENT ACTION

The Plaintiffs ask for a declaration that the 2002 maps are "unconstitutional." This has already been litigated to conclusion by the same parties or privies in a lawsuit over the same issues. Additionally, the Full Faith and Credit statute requires the federal court to observe the finality of that opinion. The Supreme Court's February 24, 2012 order in that case adjudicated the same issues.  The court's full opinion delineates the reasons for the Court's previous order. Legislative Research Commission v. Fischer, 366 S.W.3d 905 (Ky. 2012). Additionally, as this lawsuit sought to join "all the members of the Senate and the House" by virtue of suing the Senate President and the House Speaker, and the LRC, all are therefore parties to this case as well, including the original Plaintiffs in the state court case. The Plaintiffs activate the prohibitions of res judicata and collateral estoppel, and they bar this requested relief.

Res judicata prevents a party from raising a claim that has already been decided. Four elements are necessary for res judicata to apply: (1) a final judgment; (2) rendered by a court of competent jurisdiction; (3) the parties or those in privity with them must be identical; and (4) the same causes of action. Gustafson v. Johns, 434 F.Supp. 2d 1246 (S.D. Ala. 2006); aff'd, 213 F. App'x 872 (11th Cir. 2007).  There was an order by the Supreme Court on February 24, 2012 in

the case, which required the holding of the 2012 elections under the previous law, and a subsequent opinion. Legislative Research Commission v. Fischer, supra. 2012 WL 952983 (Order of Kentucky Supreme Court, 2012-SC-091; 2011-SC-092, February 24, 2012); Legislative Research Commission v. Fischer, 366 S.W.3d 905 (Ky. 2012).

Federal courts have held that prior court judgments involving the same or substantially the same plaintiffs in redistricting cases, and involving the same causes of action, operate as res judicata, and subsequent federal suits may not be brought on the same claims, as they "involve the same cause of action." Gustafson, at 1255-56. In Gustafson, the court held that all the redistricting claims arose from a common nucleus of fact, thus the state court suit was res judicata as to the federal suit, and it could not be brought, as they could have been raised in the first suit and arise from a common nucleus of fact. Gustafson, at 1254-55. Although the Plaintiffs in that case argued they were not "the same," the Court held that redistricting lawsuits should not continue ad infinitum, and that the citizen parties would be considered to be the same parties for purposes of res judicata, where they raise issues of "public law" and do not have different private rights "not shared in common with the public", so that continued challenges to the same issue would not "assume immortality." Id. at 1257-58. Therefore, "a state should not face an endless stream of lawsuits after each redistricting," and res judicata was applied. Id.

The parties were the same here, as the LRC was a party, the Legislators who brought the state court suit are purported Defendants herein, and the Secretary of State and State Board of Elections are Defendants, as they were in the state court suit. Even if the legislative members are removed, the same principles apply. Any other Plaintiffs in the state court suit, as "citizens," are in privity with the current Plaintiffs, as they alleging the same types of public law questions as were alleged in the 2012 state litigation. These were the exact same issues raised and dealt with

by the Supreme Court. Therefore, Plaintiffs are completely precluded from their claims based on issues that were subsumed in the state court action.

Collateral estoppel would operate to bar the adjudication of any further relief, including attorneys fees. All the issues were raised regarding the constitutionality of the 2012 redistricting, and a judgment was made. Therefore, these issues cannot be re-litigated in a subsequent lawsuit. Montana v. United States, 440 U.S. 147, 153 (1979); Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 (1979). The same issues were resolved in the Kentucky Supreme Court case, and the persons "for whose benefit" a cause of action is litigated are bound by the decision.  Montana, at 154. In this part of the case, this is a question about the identical issue that was litigated in the state court, and this precludes relitigation of each ground that might have been presented as well as those actually presented. See Cromwell v. County of Sac, 94 U.S. 351 (1876).

**VII.    THE CLAIMS OVER THE USE OF 2002 LAW ARE MOOT**

A moot action also does not present a justiciable case or controversy within the meaning of Article III, or give rise to cognizable claims. Ashcroft v. Mattis, 431 U.S. 171, 172-73 (1977); Church of Scientology Flag Service Org. v. City of Clearwater, 777 F.2d 598, 604 (11th Cir. 1985). A case is moot when the issues are no longer "live." House Bill 1 enacted in the 2012 Regular Session was prevented from going into effect by the February 24, 2012 order of the Kentucky Supreme Court.  It mandated that legislative elections occur based upon the old law. Any claims that were available at that point died with the election of those members to the General Assembly, who were seated by their respective bodies as of January, 2013.

The passage of time prevents even cognizable claims from being asserted as courts uphold a state's interest in proceeding with elections in a timely fashion, and courts would not step in even if it were only 94 days after its passage. Courts require claims to be "pressed expeditiously. As

time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made, and the candidate's and party's claims to be a serious candidate and a serious party who have received a serious injury become less credible by them having slept on their rights." Libertarian Party v. Davis, 601 F. Supp. 522, 525 (E.D. Ky. 1985). Thus, any claims relating to the passage of the 2012 House Bill or the 2002 House Bill, even if there were any, were moot, and the Plaintiffs sat on their rights and should be barred by laches from asserting any claims.

Mootness is "sufficient ground for denying the convocation of a three-judge court." Barnes v. Tarrytown Urban Renewal Agency, 338 F. Supp. 262, 271 (S.D.N.Y. 1972). There are no claims with respect to the 2012 elections that are not mooted by the passage of time.  Where the lawsuit involves the alleged lawfulness of an election and persons elected to office thereunder, a failure to bring such a suit until after that election is over moots it. Benton v. Clay, 233 S.W. 1041 (Ky. 1921). Despite an allegation of "unconstitutionality" of acts, where an allegedly improper Treasury payment had already been made, courts have refused to render a declaratory judgment, because it was moot. Coke v. Shanks, 291 S.W. 362, 366 (1927). A justiciable controversy does not include questions "which are merely advisory, or are academic, hypothetical, incidental or remote, or which will not be decisive of any present controversy." Curry v. Coyne, 992 S.W.2d 858, 860 (Ky.App.1998). Where there is "no more than an academic dispute concerning certain general legislative or executive powers of the defendants" to happen in the future, courts would "not decide speculative rights or duties which may or may not arise in the future, but only rights and duties about which there is a present actual controversy presented by adversary parties, and in which a binding judgment concluding the controversy may be entered." Veith v. City of Louisville, 355 S.W.2d 295, 297 (Ky. 1962), citing Axton v.

Goodman, 265 S.W. 806 (Ky. 1924). Specifically, the rights of parties in the future, where there was "no present right to vote on a question" would not be a proper declaratory judgment action. Kelly v. Jackson, 268 S.W. 539 (Ky. 1925). Where there was no present election going on, courts do not adjudicate rights as to the propriety of a possible candidate, as it was merely an "academic exercise". Revis v. Daugherty, 287 S.W.28, 29 (Ky. 1926). The 2012 election occurred, legislators have been sworn into office, and seated by their respective bodies. There are no claims with respect to the usage of the 2002 redistricting bill that have not been mooted by the passage of time. Also there are no present elections. Additionally, the 2013 special session has not happened which may resolve this issue.

## VIII.  FINDING THE USE OF THE 2002 DISTRICTS UNCONSTITUTIONAL WOULD VIOLATE THE ROOKER-FELDMAN DOCTRINE.

Plaintiffs' complaint with respect to the 2012 redistricting arises from the Kentucky Supreme Court order that the 2012 elections be held based on the 2002 law. This is the source of their grievance. However, a party aggrieved by a state-court decision cannot attack this decision collaterally by an independent suit here, essentially "appealing" that decision, under the Rooker-Feldman Doctrine. Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923); District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983). A party "aggrieved by a state-court decision cannot appeal that decision to a district court, but must instead petition for a writ of certiorari from the United States Supreme Court." DLX, Inc. v. Kentucky, 381 F.3d 511, 516 (6th Cir. 2004). Where the Plaintiffs are alleging that the action taken by the state courts caused their injury, and the injury "resulted from the state court judgment", this doctrine "precludes federal court jurisdiction where the claim is a specific grievance that the law was invalidly-even unconstitutionally-applied." Id.   The Plaintiffs to this action are in privity with the Plaintiffs in the Fischer action in 2012 as stated above and are bound by its result. Com. ex rel. Dummit v.

Jefferson County, 189 S.W.2d 604, 606 (1945); citing Tait v. Western Maryland Railway Co., 289 U.S. 620 (1933).

## IX.   PLAINTIFFS' CLAIMS BASED ON THE 2012 REDISTRICTING ARE BARRED BY THE STATUTE OF LIMITATIONS

An action for declaration of rights for an alleged violation of constitutional rights is subject to a one-year statute of limitations. Hill v. Thompson, 297 S.W.3d 892 (Ky.App. 2009). "Section 1983 actions in Kentucky are limited by the one-year statute of limitations found in section 413.140(1)(a)." Collard v. Kentucky Bd. of Nursing, 896 F.2d 179, 182 (6th Cir.1990). The statute of limitations "begins to run when the plaintiff knows or has reason to know of the injury which is the basis of his action and that a plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence." Id. at 183, citing Sevier v. Turner, 742 F.2d 262, 272 (6th Cir.1984). Plaintiffs state in their Complaint that they are aggrieved by the passage of 2012 Regular Session House Bill 1, which was passed by the General Assembly and then signed into law on January 20, 2012, and the subsequent use by the Kentucky courts of the previous law from 2002. 2012 Ky.Acts Chapter 1. The Kentucky Supreme Court in an order dated February 24, 2012, ordered that the 2012 legislative elections take place under the 2002 law, based on a finding that it violated Section 33. Legislative Research Commission v. Fischer, 2012 WL 952983 (Ky. February 24, 2012) (Order of Kentucky Supreme Court, 2012-SC-091; 2011-SC-092, February 24, 2012). Therefore, any possible claims that Plaintiff has for any action relating to the passage of 2012 Regular Session House Bill 1, which became law on January 20, 2012, is barred by the statute of limitations. Since the last act of the General Assembly was passage of this law on January 20, 2012, then the one-year statute of limitations began to run then. Even if this Court gives Plaintiff the benefit of the doubt and considers the statute of limitations as running on February 24, 2012, which is the date that the

Kentucky Supreme Court issued its Order mandating that 2012 elections had to be held using the 2002 law, when it enjoined the implementations of the new legislative districts for the 2012 elections, the statute of limitations on their damages claim, even assuming there is one, ran on February 24, 2013. Obviously, Plaintiffs knew of the actions of the Kentucky Supreme Court in mandating that candidates run under the old districts. The statute of limitations has run.

## X.    THE GENERAL ASSEMBLY PASSED A PLAN THAT WAS CONSTITUTIONAL UNDER THE PLAINTIFFS' STANDARD, IN THE 2012 REGULAR SESSION

2012 House Bill 1, passed by the General Assembly and signed into law on January 20, 2012, is still the law in Kentucky, although the use of that law was enjoined by the Kentucky courts for the 2012 elections. The only reason that the Court found it unconstitutional and enjoined its use was under Section 33 of the Kentucky Constitution's prohibition against county splits. Plaintiffs allege as "fact" that: "Given the failure of the Kentucky General Assembly to pass a constitutional and lawful map in the 2011, 2012, or 2013 sessions … it is substantially certain that such condition will continue through November 4, 2013 and into and through the 2014 session." Again, the General Assembly did not fail to act, it **did** act in 2012 Regular Session to pass a redistricting law. The 2012 General Assembly enacted a legislative redistricting law, 2012 Regular Session House Bill 1, that the Governor signed into law on January 20, 2012. 2012 Ky. Acts Ch. 1; http://www.lrc.ky.gov/Statrev/ACTS2012RS/0001.pdf. The Legislative Record provides the daily summary of the actions of the General Assembly, and may be judicially noted just as the Act above. 2012 House Bill 1's "Population Summary Report" for the enacted version, which is provided to members and the public, may also be judicially noted. http://www.lrc.ky.gov/record/12RS/HB1/RS.pdf. Ex. 12. The Population Summary Report shows that the overall range of the House Districts under 2012 HB 1 was 10%, and the overall

range of the Senate Districts was 9.84%. Id. The law used the 2010 Census numbers. KRS 5.010, as amended by 2012 Ky. Acts. Ch. 1. If the court disregards the other considerations raised herein, such as mootness, lack of ripeness, and other bars to the court's consideration of this claim at this time, the courts should hold that this Act is constitutional under Equal Protection.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' Summary Judgment Motion.

Respectfully submitted:

s/Laura H. Hendrix___
Laura H. Hendrix
General Counsel
Legislative Research Commission
State Capitol, Room 104
Frankfort, Kentucky 40601
Telephone:  (502) 564-8100
Fax: (502) 564-6543
Email: Laura.Hendrix@lrc.ky.gov
Attorney for Legislative Research Commission

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2013, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by electronic mail.  Parties may access this filing through the Court's electronic filing system.

s/Laura H. Hendrix
Laura H. Hendrix