# DEFENDANT LRC'S EXHIBIT 9

Case: 2:13-cv-00068-WOB-GFVT-DJB   Doc #: 75-11   Filed: 07/25/13   Page: 1 of 11 - Page ID#: 1369

**DEFENDANT LRC'S EXHIBIT 9**

# INTERIM JOINT COMMITTEE ON STATE GOVERNMENT

Minutes of the 1st Meeting
of the 2011 Interim

June 29, 2011

### Call to Order and Roll Call

The first meeting of the Interim Joint Committee on State Government was held on Wednesday, June 29, 2011, at 1:00 PM, in Room 154 of the Capitol Annex. Representative Mike Cherry, Co-Chair, called the meeting to order, and the secretary called the roll. Senator Damon Thayer, Co-Chair, and Representative Cherry jointly chaired the meeting.

Present were:

Members: Senator Damon Thayer, Co-Chair; Representative Mike Cherry, Co-Chair; Senators Walter Blevins, Jr., Gerald Neal, R. J. Palmer II, John Schickel, Dan "Malano" Seum, and Johnny Ray Turner; Representatives Linda Belcher, Kevin Bratcher, Dwight Butler, Larry Clark, Leslie Combs, James Comer, Jr., Tim Couch, Will Coursey, Joseph Fischer, Danny Ford, Jim Glenn, Derrick Graham, Mike Harmon, Melvin Henley, Martha Jane King, Jimmie Lee, Mary Lou Marzian, Brad Montell, Sannie Overly, Tanya Pullin, Tom Riner, Carl Rollins II, Steven Rudy, Sal Santoro, John Will Stacy, John Tilley, Tommy Turner, and Brent Yonts.

Guests: Representative Jim Gooch; Crit Luallen and Brian Lykins, Office of Auditor of Public Accounts; Jennifer Elliott, Kentucky Retirement Systems Board of Trustees; William Thielen, Kentucky Retirement Systems; and Cathy McCully, U. S. Census Bureau.

LRC Staff: Judy Fritz, Brad Gross, Karen Powell, Bill VanArsdall, Greg Woosley, and Peggy Sciantarelli.

### Auditor's Examination of Kentucky Retirement Systems (KRS)
Guest speakers were State Auditor Crit Luallen; Brian Lykins, Director of the Office of Technology and Special Audits; Jennifer Elliott, Chair, KRS Board of Trustees; and William Thielen, KRS Interim Executive Director. Ms. Luallen reviewed the KRS special audit, which was released June 28, 2011.

The audit makes 92 recommendations to strengthen the Board of Trustees' oversight and governance of KRS. The report did not identify any matters that appear to have impacted KRS' financial condition. The audit focused on the specific questions

surrounding the use of placement agents, the internal audit process, and a broad review of Board policies and governance. A team of six auditors, led by Mr. Lykins, conducted more than 40 interviews, reviewed thousands of documents, and spent over 2,000 hours in the review. Based on the information reviewed, auditors saw no evidence of a "pay to play" scheme involving placement agents, no evidence of conflicts of interest that benefited KRS officials, and no evidence that KRS incurred any additional cost through the use of placement agents. However, the audit points out several troubling aspects regarding the use of placement agents and will be referred to the U. S. Securities and Exchange Commission (SEC), which has the authority to determine if further investigation is needed.

While the audit did not substantiate any specific evidence of wrongdoing, it pointed out a number of areas where the KRS Board could improve communications, accountability, and transparency. The audit recommendations offer numerous steps that KRS could take to strengthen Board governance.

After questions were raised regarding the use of placement agents, an internal audit was initiated at KRS and presented to the Board in August 2010. Placement agents are intermediaries—or third-party marketers—paid a fee by investment managers to solicit and secure potential investors. The internal audit found no wrongdoing in the use of placement agents, but KRS trustees questioned the internal audit process, as well as the fees that had been paid to placement agents. In August 2010, Governor Beshear sent a letter to the then-chair of the Board, suggesting that the Auditor of Public Accounts conduct an independent review of the adequacy of the internal audit process and other matters related to Board oversight. Subsequently, the Board of Trustees voted to request the review by the State Auditor's office. The audit found that the use of placement agents lacked transparency and may not have been in the best interest of KRS. One placement agent had an unusually close working relationship with KRS' former chief investment officer (CIO). That placement agent received a high percentage of the investment contracts, participated in seven of the 13 investment agreements in which placement agents were used, and could have earned a minimum of $1.3 million in fees on KRS investments. Additionally, firms with which he was affiliated could earn an additional $3 million from those investments. He appears to have acted as a representative of KRS, setting up appointments and making travel arrangements for the former investment officer. The relationship appears to have been different than that of other placement agents who typically contract with investment managers. In August 2009, the former CIO participated in the development of a placement agent disclosure policy, which was adopted by the Board of Trustees. Even after that policy was adopted to bring more transparency, the former CIO did not disclose the use of this same placement agent in a significant investment, thereby violating the new policy. The audit is being referred to the SEC primarily because of the questionable relationship and interaction between that placement agent and the former CIO. Both the former CIO, who resigned in July 2010, and the placement agent in question declined to be interviewed by the auditors, nor did

the auditors have access to their personal financial records. The SEC has been conducting a review of placement agents around the country and has initiated an informal inquiry in Kentucky.

The audit recommends that the KRS investment staff and the Board's investment committee ensure consistent compliance with all established investment policies; that all information required by the placement agent disclosure policy be presented to the Board in a clear and transparent manner; and that disclosure statements include political contributions within the past two years by placement agents. The report further recommends that the General Assembly consider requiring placement agents to register as lobbyists with the Executive Branch Ethics Commission and that the Board's investment committee receive detailed information on all recommended investments.

Auditors followed up on allegations that meetings set up by the Governor's Office may have resulted in undue influence on KRS officials. Interviews and analysis of documentation found no evidence of pressure to use specific firms, and no firms identified as having contacts made on their behalf received business from KRS.

State auditors found that the internal audit had insufficient involvement from the Board, lacked transparency, and resulted in confusion and suspicion among the trustees. Auditors found no evidence that information from the internal audit was withheld or delayed with an intent to hide fraud or wrongdoing. The fact that executive staff sat in on certain meetings of the internal audit staff diminished the perception of independence of the internal audit, but there was no evidence that this influenced the outcome. It is recommended that the audit committee of the Board develop and approve detailed procedures for special audits and that the KRS Division of Internal Audit conduct all of its audit field work in an independent manner, separate from the influence of KRS management.

The audit includes numerous recommendations relating to Board governance and operational policies, with specific recommendations to strengthen policies governing budget, conflict of interest, travel, spending, anonymous reporting of concerns, and bringing consistency to the board member selection process. The Board should revise the conflict-of-interest policy to require the CIO, investment directors, and general counsel to file annual conflict-of-interest statements, and penalties should be established for breach of board policy. Materials provided to the Board should be more informative and valuable in providing oversight, including quarterly investment and budget-to-actual investment expenditure reports, as well as an annual report of executive staff salaries.

The audit recommends that the enacted budget should include all aspects of expenditures except benefits. Currently, and historically, certain expenditures for the health care portion of the budget are not included in the enacted budget. Term limits should be established for the board chair and vice-chair. The audit found that the Board

3

could benefit from additional external auditing services, including scheduling of performance, compliance, and management audits, which is being done in many other states. Steps should be taken to make the board election and appointment process more consistent and stronger. Qualifications for gubernatorial appointees are dictated by statute, but there are no qualification requirements for elected trustees. The same disclosure requirements and application process should be followed for both elected and appointed board members. Applicants should be required to detail how their specific qualifications prepare them to be an effective trustee. Elected trustees should authorize a background check prior to appointment, which is already required of gubernatorial appointees. All of this information should be made available to the Governor and the trustees as part of the election process.

Although the purpose of the audit was not to examine KRS financial statements or investment performance, the report includes a detailed background section on the history and financial viability of KRS. This can be a valuable tool for policymakers when addressing issues relating to the long-term viability and financial status of the funds. The audit emphasizes that the long-term viability of KRS has been dramatically impacted by the state's consistent underfunding of the employer contribution since 2003. Beginning in 1993, the employer contribution was not fully funded for 12 of 17 years. The reforms passed by the General Assembly in 2008 will be helpful to ensure future viability of the system, but it is critical that future governors and legislators honor the commitment in that pension reform legislation to continue increasing the employer contribution to fully fund the systems. Strong board oversight of KRS assets is absolutely critical. The audit provides a roadmap for the Board to ensure proper transparency and accountability in its critical fiduciary role.

Concluding her overview, Ms. Luallen said that her office looks forward to working with the State Government Committee on aspects of the audit report that may be implemented through legislative change.

Ms. Elliott thanked the Auditor and her staff for their fair and thoughtful report. She said that the Board and members of the KRS executive staff embrace the audit and in a month or so will be looking closely at the recommendations with the full intent to implement them as much as possible.

Representative Cherry explained that HB 480, which passed the House but was not enacted in the 2011 regular session, addressed ethics, term limits for all board members, transparency, and use of placement agents. He plans to introduce it again in the next regular session and will maintain an open door policy for working on the legislation.

When asked by Senator Schickel, Ms. Luallen explained the role of placement agents, pointing out that their fees are not paid by KRS. The placement agent in question appeared to be "shopping" KRS to a number of different investment managers, rather

4

than being on contract with a particular investment manager, and may have been suggesting placements primarily based on his fees rather than the best interest of KRS. In California and New York, there have been scandals regarding placement agents involved in "pay to play" schemes.

Ms. Luallen confirmed Representative Cherry's statement that placement agents are now required to register with the SEC. The SEC had considered banning placement agents but instead adopted new guidelines to oversee their use. The SEC prohibits placement agents from receiving compensation in a state where they have contributed to certain elected officials or candidates for office in the past two years.

Responding to a question from Representative Yonts about placement agents' fees, Ms. Luallen explained that a comparison of KRS investments that were made both with and without placement agents indicated no apparent higher cost associated with the use of placement agents. In fact, after the placement agent controversy arose, KRS re-negotiated one particular investment to a lower level, which also lowered the placement agent's fee. Mr. Thielen added that KRS has no contracts with placement agents—that contractual arrangements are only between the investment manager and the placement agent.

Representative Bratcher expressed concern about funding of the system and asked whether there have been previous audits. Ms. Luallen said that each year KRS requests approval from the State Auditor's Office to hire an outside auditor for the annual financial audit. Her office typically grants this approval, monitors the process, and reviews the completed audit. A few years ago, her office also participated in a review conducted by a private CPA on contract with KRS relating to a land transaction controversy. Mr. Thielen added that the Auditor's office conducted a special audit of KRS' investment program about 15 years ago.

Ms. Luallen said her office is small, given the magnitude of the public funds spent in Kentucky, and must constantly decide which large audits would best be performed by internal staff versus the private CPA community. It was determined that the KRS financial audit was relevant and appropriate, comparable to other pension systems around the country. Representative Cherry noted that House Bill 480, as originally written, would require a state audit at least every five years, a provision which Ms. Luallen said she supports.

When Representative Gooch expressed doubt that requiring placement agents to register as lobbyists would sufficiently promote full disclosure, Ms. Luallen noted that the audit suggests ways to strength the Board's current placement agent disclosure policy. Ms. Elliott acknowledged that there may a need for additional policy improvements but said that, on suggestion by the new chief investment officer, KRS has strengthened a number of policies—including those related to conflict of interest and placement

agents—to require everyone doing investment business with KRS to disclose any relationship with KRS staff or trustees, financial or otherwise.

To answer questions from Representatives Fischer and Lee, Mr. Thielen, Ms. Luallen, and Mr. Lykins discussed the general role of private placement agents and their use relative to KRS investment decisions. They noted that KRS is looking at the rate of return on investments involving the use of agents and that alternative investments usually comprise about 11 percent of the total portfolio. Ms. Elliott said that KRS has contracts with two outside consultants, and they are now being asked to sign off on all recommended investments. She said the Board has established guidelines for the percentage allocation of KRS fund investments.

Mr. Thielen said that, to his knowledge, placement agents have never made a presentation to the KRS Board or investment committee. Typically, an investment management company would dictate the amount of investment, to some extent, and look for a minimum investment of $50-100 million. The KRS Board has delegated to its five-member investment committee the authority to make investment decisions, but the Board must ratify the decisions.

Senator Thayer said the audit should help strengthen House Bill 480 when it is introduced in 2012 and that he looks forward to working with Representative Cherry and the Auditor's Office to move the legislation forward. He said that the actuarially recommended contribution (ARC) percentage since 2003 has increased 32.69 percent; yet 27.97 percent of that increase occurred for some reason other than the General Assembly not funding the recommended employer contribution rate. He stressed that there are multiple reasons for the underfunding. As noted in the audit, the reasons include investment return below the 7.75 percent assumed rate of return; changes in actuarial assumptions; higher than anticipated retirement rates; unfunded retiree COLAs (cost of living adjustments); and high medical inflation rates. Since 2003, when the General Assembly started to not make the full ARC payment, there is not a year where the General Assembly funded the system lower than what the Governor recommended; in fact, in FYs 2007, 2008, 2009, and 2010, the ARC was funded higher than the Governor's recommended rate. The full ARC payment was not affordable during those years, and it does not appear to be realistic that the ARC schedule set out in House Bill 1 can be met in the future, considering that the unfunded liability of the system during the past three years alone has grown by $3 billion.

Senator Thayer said that he and the majority of the Senate believe that KRS needs to move toward a 401K style plan. The Senate is committed to providing the benefits promised to current retirees and employees, but it is clear it will be a challenge to continue meeting the House Bill 1 ARC schedule. Adding new employees into a system where the state carries all the risk will increase the unfunded liability if investment returns are not met. He thanked the Auditor for the excellent work of her office and said

he looks forward, at a future interim meeting, to a full discussion of the pros and cons of a 401K type benefit plan for future employees.

Representative Cherry said he is open to hearing both sides of the 401K issue but that it has not been proven that the retirement system would be better off with a defined contribution plan. He said that, at best, this is undetermined and will continue to be greatly debated. He agreed with Senator Thayer that there are multiple reasons for the system's underfunding.

Representative Cherry thanked the speakers. He also recognized Randy Overstreet, former KRS Board Chair, and acknowledged his hard work and contribution to the system during his tenure as chair.

**Redistricting and Related Topics**
Senator Thayer assumed the chair for the remainder of the meeting. Guest speaker was Cathy McCully, chief of the U. S. Census Bureau's Census Redistricting Data Office in Suitland, Maryland. Ms. McCully provided the Committee with the following handouts: copy of her PowerPoint presentation entitled "2010 Census Redistricting Data/What You Should Know"; two-page document entitled "Determination of Covered Areas for Voting Rights Bilingual Election Materials"; a July 2010 brochure entitled, "Strength in Numbers/Your Guide to 2010 Census Redistricting Data from the U. S. Census Bureau;" and a copy of "Voting Rights Act Amendments of 1992, Determinations Under Section 203," from the Federal Register, Vol. 67, July 26, 2002 (Census Bureau Director's determination as to which political subdivisions are subject to the minority language assistance provisions of Section 203 of the Voting Rights Act).

Ms. McCully's presentation included information relating to the 2010 Census; 2010 resident population of the United States; apportionment of the U. S. House of Representatives based on the 2010 Census; numeric change in resident population for the 50 states, the District of Columbia, and Puerto Rico from 2000 to 2010; 2010 census data; Public Law 94-171, enacted in 1975; P. L. 94-171 support products and summary files; map files for the 2010 census; block assignment files; process for P. L. 94-171 data delivery; American Community Survey (ACS); advanced group quarters file; voting rights tabulations; release of 2010 census data through 2013; Section 203 language determinations; Phase 4 - collection of post-2010 census redistricting plans; and Phase 5 - evaluation and recommendations for 2020 Census. Following are key elements of Ms. McCully's presentation.

The Census is basically the "R & R"—"representation and revenue"—of the federal government and serves as a basis for apportionment of Congress, reapportionment of state legislatures, federal and state funding, and also the redrawing of county, city, and school district boundaries. Based on the numbers, Kentucky will retain six congressional districts. Michigan was the only state, along with the Commonwealth of Puerto Rico, that

lost population between 2000 and 2010. It is estimated that $400 billion is distributed annually based on the federal Census.

Public Law 94-171, passed in 1975, requires the Census Bureau to work closely with state legislatures. Delivery of summary files to the states was completed March 24, 2011, before mandated delivery date of April 1. Block assignment files are files for non-TIGER (Topologically Integrated Geographic Encoding and Referencing) users who want to learn which blocks are associated with particular geographies. Map files for the 2010 Census include county block maps—which are the most detailed for association with data; voting district/state legislative district (VTD/SLD) reference maps; census tract reference maps; and—new for this Census—school district reference maps. Kentucky historically does not provide its voting districts to the Census Bureau, but the Bureau has maps that support the state's legislative boundaries prior to the 2010 Census. Block assignment files are assembled for congressional, state legislative, voting, and school districts, as well as incorporated places, census defined places, and American Indian (AIANNH) areas.

Summary files contain 100 percent enumeration data for multiple levels of geography. The data categories are: race alone; race combined with Hispanic/Latino origin; race alone 18+ (voting age); race combined with Hispanic/Latino origin 18+; and housing (counts of vacant and occupied units). By law, data is delivered in a nonpartisan manner to governors, majority and minority leaders of both parties, and also to commission directors and redistricting committees, if known. Data delivered to Kentucky reflects population growth of about 7.5 percent.

The American Community Survey (ACS) is an ongoing survey of 250,000 households every month. It replaces the traditional Census long form and plays an important role in the administration of federal programs. In December 2010, ACS five-year data for 2005-2009 was released, containing nationwide small-level demographics for legislative districts. Starting in December 2012 or 2013, via the ACS, legislators will be able to look at census data for newly drawn districts on an annual basis.

In addition to the maps, shapefiles and data, the Bureau has agreed to release the Advanced Group Quarters File, a table on group quarters that will facilitate redistricting and the Count Question Resolution Program. Group quarters include school dormitories, nursing homes, and prisons. Prison-based gerrymandering has become a national issue. Maryland, New York, and Delaware have passed laws to reallocate prisoners to their home area, and other states are also looking closely at the location of and demographics within their prisons. These data were made available to all the states in early 2011.

The Department of Justice asked the Bureau to prepare a special tabulation of citizenship by voting age/by race. This CVAP table was delivered in late January, 2011, and is now available on the Bureau's web site (www.census.gov/rdo/data).

Census data for 2010 will be released through 2013. Summary File 1, which contains detailed data down to the block level, is coming out now and will be delivered to Kentucky shortly. Summary File 2 will be released from December 2011 to April 2012. After the new congressional and legislative boundaries are drawn, the Bureau will retab the data and deliver new products for the newly-defined boundaries based on the 2010 Census numbers. This data will be rolled into the ACS.

Section 203 of the Voting Rights Act of 1965 provides for language assistance at the polls. Covered language minority groups are Hispanic, Asian, and American Indian. Since American Indian languages are not ordinarily provided in written format, counties that are covered under the American Indian provisions must provide translators in voting precincts. Minority group data will be available in the form of a <u>Federal Register</u> notice at the end of August. In 2002, Kentucky was not covered under the minority language assistance provision; however, because there are demographic changes in Kentucky, there is a possibility that there will be coverage in Kentucky in late August. This data will come from the ACS and is independent of the 2010 Census data.

Ms. McCully concluded her presentation with an overview of the Bureau's web site. She said that the Bureau this summer will begin an evaluation of how well the data was collected and how well it meets the needs of the states as they begin to redraw boundaries.

When Representative Cherry asked about Kentucky's lack of participation in the voting district data program, Ms. McCully said she does not think this puts Kentucky behind in any way and that Kentucky has never provided its voting district precincts for inclusion in that program. She said the precinct data layer is probably available in LRC's GIS internal files but is just not available through the census products for the public to use. Kentucky has all the other levels of geography available, including the census block, which is the tiniest piece of geography for which data is provided.

Representative Graham said that the 2010 Census undercounted the city of Frankfort by about 1,800, and he questioned how this could happen. Ms. McCully said it could have occurred for a number of reasons. Prior to the Census, the Bureau sends maps to the highest elected city officials in order to validate boundaries. It is possible that Frankfort city officials failed to notice that the map incorrectly portrayed the boundaries. The data—based on housing units, not persons—can be reallocated through the Count Question Resolution Program, but the process requires approximately four months from start to finish. For redistricting purposes, she usually advises proceeding as if the data had been correctly depicted, with the knowledge that the ensuing legislation will be appended with the new official counts subsequently provided by the Bureau. She cautioned, however, that it is essential that the correction be found valid. Also, the Bureau's report

9

through the Count Question Resolution Program would only provide new housing unit and group quarter totals but not demographic characteristics.

There was discussion of states that lost congressional seats as a result of the Census. Representative Pullin noted that Ohio, which borders her community, lost two seats.

Representative Montell asked when the General Assembly expects legislative and congressional redistricting to take place. Senator Thayer stated his preference to do it during the 2012 regular session. He said that at this time he does not feel it necessary, nor the expense justified, to have a special redistricting session. Representative Cherry said that conducting redistricting during the regular session can be impacted by the election filing deadline. He said he has no problem with doing it during a special session, if agreeable to the Senate, and that he personally prefers a special session. Senator Thayer said that the January filing deadline is not until the 31st and that if an agreement is in place, he feels it would be better to redistrict in January rather than incur the cost of a special session. He noted, however, that the November 2011 gubernatorial election and the need to pass a budget in the next regular session are also issues to be considered. Senator Thayer thanked Ms. McCully for traveling to Frankfort to participate in the meeting.

**Subcommittee Report and Adjournment**
A motion was passed by unanimous voice vote to adopt the subcommittee report of the Task Force on Elections, Constitutional Amendments, and Intergovernmental Affairs. Business concluded, and the meeting was adjourned at 2:55 p.m.