# DEFENDANT LRC'S EXHIBIT 10

# INTERIM JOINT COMMITTEE ON STATE GOVERNMENT

## Minutes of the 2nd Meeting
## of the 2011 Interim

## July 21, 2011

### Call to Order and Roll Call

The second meeting of the Interim Joint Committee on State Government was held on Thursday, July 21, 2011, at 1:00 PM, in Room 149 of the Capitol Annex. Senator Damon Thayer, Co-Chair, called the meeting to order, and the secretary called the roll.

Present were:

Members: Senator Damon Thayer, Co-Chair; Representative Mike Cherry, Co-Chair; Senators Walter Blevins Jr., Jimmy Higdon, Gerald Neal, R.J. Palmer II, John Schickel, Dan "Malano" Seum, and Johnny Ray Turner; Representatives Linda Belcher, Dwight Butler, Tim Couch, Will Coursey, Joseph Fischer, Danny Ford, Derrick Graham, Mike Harmon, Melvin Henley, Martha Jane King, Brad Montell, Sannie Overly, Darryl Owens, Tanya Pullin, Tom Riner, Carl Rollins II, Steven Rudy, Sal Santoro, John Will Stacy, John Tilley, Tommy Turner, and Brent Yonts.

Guests: Representative Tom Kerr; Tim Storey, National Conference of State Legislatures (NCSL); Mark Sipek, Kentucky Personnel Board; Dinah Bevington and Mary Elizabeth Harrod, Personnel Cabinet.

LRC Staff: Judy Fritz, Bill VanArsdall, Alisha Miller, Karen Powell, Brad Gross, Kevin Devlin, and Peggy Sciantarelli.

### Approval of Minutes

The minutes of the June 29, 2011, meeting were approved without objection, upon motion by Representative Rudy.

### Legislative and Congressional Redistricting

Guest speaker was Tim Storey, Senior Fellow in the Legislative Management Program, National Conference of State Legislatures, Denver, Colorado. Using a slide presentation entitled "Redistricting Overview," Mr. Storey discussed the basic elements of redistricting. His presentation is summarized as follows.

Mr. Storey began by showing illustrations of congressional districts in Illinois (Cook County) and Arizona, and a state senate district in Massachusetts, all of which were oddly drawn for specific reasons. He went on to explain that the U. S. Constitution requires redistricting to be done every 10 years, following the decennial census.

Technically speaking, redistricting is the process of drawing district lines, whereas reapportionment—which is only done by the Clerk of the U. S. House of Representatives—is the process of assigning congressional seats to the states, based on the Census. In the 1960s there was a series of Supreme Court decisions triggered by a 1962 Tennessee case, *Baker v. Carr*, which said that redistricting was justiciable, thus enabling federal courts to intervene. Tennessee and a number of states had gone decades without redrawing districts, and their districts were wildly malapportioned. Prior to 1962, federal courts had essentially stayed out of redistricting.

Apportionment data was delivered to the President by December 31, 2010. In March and April 2011, P. L. 94-171 data was delivered to the states. In all 50 states redistricting must be finalized prior to 2012 elections. Maine and Montana prefer to redistrict after the year 2012, but a judge has ruled that Maine must draw its congressional districts before 2012 elections. For the first time, California is not gaining any seats in the U. S. House. Seventeen states have completed either legislative and/or congressional redistricting. Kentucky is not one of the 16 states covered by Section 5 of the Voting Rights Act; those states are required to submit their redistricting plans to either the Department of Justice or the district court in Washington, D.C. for approval before they can become law. In 37 states the legislature draws legislative lines, and 13 states use a board or commission for redistricting. U. S. House districts are drawn by the legislature in 38 states and by a board or commission in seven states. Arkansas is the only state in which a three-person board (governor, attorney general, and secretary of state) redistrict for the legislative branch. California, through a voter initiative, adopted a new commission system this decade. Iowa has a unique model in which the nonpartisan staff of the legislature draw the plans. After the 2000 Census, redistricting brought litigation in more than 40 states, and the courts drew or revised plans in about a dozen states.

There are different population equality standards for congressional and legislative districts. Congressional districts must be as nearly equal in population as "is practicable," or capable of being done. To play it safe, most states draw districts that are almost exactly the same in population. In the 2000 round of redistricting only about 13 state congressional plans had a zero population variance; in the current redistricting cycle, 10 states already have drawn congressional plans with a zero variance. The courts generally allow a 10 percent deviation from ideal district size for legislative plans. However, in a Georgia case (*Larios v. Cox*) from the previous round of redistricting the courts struck down plans because they were drawn for partisan purposes, even though the districts fell within the 10 percent population variance. The 2010 census revealed that Kentucky congressional districts 2, 4, and 6 are overpopulated and that districts 1, 3, and 5 are underpopulated, based on the ideal district size of 723,228.

The federal Voting Rights Act and the 14th Amendment to the U. S. Constitution make it clear that no plan can have the intent or effect of discriminating against minority voters. General guidelines for compliance with the Voting Rights Act are: (1) Do

2

minorities represent most of the voters in a concentrated area? (2) Do other voters tend to vote for different candidates than minorities? (3) Is the minority population otherwise protected, given the totality of the circumstances? and (4) Race cannot be the predominant factor and should be balanced with traditional principles. (Mr. Storey referenced a 1980 North Carolina case, *Thornburg v. Gingles*.) Traditional redistricting principles include contiguity—all parts of the district are adjacent to each other; consideration of political boundaries; compactness—appearance of the district, or how close people live to each other; preservation of communities of interest—social, cultural, racial/ethnic, economic/trade, geographic, media, urban, rural, occupation, lifestyle, partisanship, and competition. Oregon adopted statutory guidelines that no district could intentionally favor or disfavor a candidate or party. Florida voters adopted a similar constitutional amendment, which is being litigated. Arizona had a provision requiring districts to be "competitive" that was litigated for more than five years.

Practical tips to consider in the redistricting process include: (1) expect the unexpected; (2) talk to legislators because they know their districts; (3) consider future development; (4) consult legal counsel often and think about what is discoverable; and (5) simplify shapes if at all possible.

In 2010, five states are adjusting census data prior to redistricting. Hawaii adjusts military people out of the count; Kansas adjusts students and military out of the count; and Delaware, Maryland, and New York have passed statutes to adjust prisoners out of their incarcerated location into their home of record. The New York law is in litigation, Delaware is reconsidering, and Maryland has made the adjustment in its database.

Mr. Storey concluded his presentation by stating that there is skepticism whether the new California commission system—a completely new way to accomplish redistricting—will be successful, with the state's redistricting deadline approaching in a few weeks. He said that there has been a dramatic shift toward public participation in the redistricting process. He also discussed the American Community Survey [an ongoing survey that provides data every year to help determine how more than $400 billion in federal and state funds are distributed each year].

Responding to inquiries from Representative Stacy, Mr. Storey said that the use of political boundaries in redistricting is permissible. If a state can show that it has consistently and historically followed certain rules about drawing plans, the courts will be differential up to a point, as long as the population variance is not too extreme. Litigation in redistricting cases primarily involves the Voting Rights Act but also the issues of population equality and partisan gerrymandering. Mr. Storey spoke briefly about a Texas case and a notable Pennsylvania gerrymandering case, *Vieth v. Jubelirer*, that went to the U. S. Supreme Court.

3

When Representative Owens asked about the counting of prisoners in the three states referred to earlier, Mr. Storey explained that the Census counted the prisoners in Delaware, New York, and Maryland in their place of incarceration. Those states' decision to adjust the data to count prisoners at their home of record instead involves an administrative element that is not easy to accomplish, and all three states have found it to be an administrative challenge because records are incomplete. New York and Delaware have not done the adjustment yet. In fact, Maryland was only able to adjust data for state prisoners because the federal bureau of prisons would not share data with the state. The Census is a platinum standard for data. If a state wants to adjust the data, it must be willing to defend the adjustment in court to show that it is as accurate or better than the Census count. So far no decision has been rendered on litigation relative to prisoner adjustment in this redistricting cycle.

When Representative Graham asked about the status of redistricting plans drawn in Wisconsin, where recall elections are being held, Mr. Storey said he does not know the circumstances regarding the challenges to those plans.

In response to an inquiry from Senator Thayer, there was brief discussion of congressional seats in Illinois's Cook County.

Senator Thayer pointed out that the meeting folders include copies of Peter Wattson's publication, "How to Draw Redistricting Plans That Will Stand Up in Court." He said also that copies of Mr. Storey's PowerPoint presentation will be provided to the Committee, and a PDF link to the fourth edition of NCSL's publication, "Redistricting Law," will also be available. He thanked Mr. Storey for an excellent presentation and noted that his appearance before the Committee was at no expense to LRC because of the agency's membership in NCSL.

### Administrative Regulation Review

The Committee reviewed Personnel Board administrative regulation 101 KAR 1:325 (Probationary Periods), which was referred to the Committee July 6, 2011. Mark Sipek, Executive Director of the Personnel Board, explained the regulation. Mr. Sipek said that the normal probationary period for merit system classifications is six months. Per state agency requests, the amended regulation specifies a 12-month probationary period for the classifications Audiologist I, Fire Protection Systems Inspector, Probation and Parole Officer I, and Criminal Intelligence Analyst I and II. The regulation also eliminates classifications that are no longer used, changes the names of certain other classifications, deletes language in Section 1(4) that is no longer applicable, and adds clarifying language in Section 2(4). When asked by Representative Cherry, Mr. Sipek confirmed that the regulation does not affect HB 149, enacted in 2010, with respect to the probationary period for employees who move from unclassified into classified positions. Senator Thayer noted that the Committee has completed its review of the regulation and thanked Mr. Sipek for his testimony.

4

**Information Transmittals from Personnel Cabinet**

For the information of committee members, two transmittals were included in the meeting folders: House Bill 387/Personnel Cabinet Quarterly Report, dated April 2, 2011; and KRS 18A.030(6) Report, dated May 15, 2011. Present from the Cabinet were Dinah Bevington, General Counsel, and Mary Elizabeth Harrod, Director, Division of Employment Management.

Senator Thayer noted that the reports contain data only through March 23 and March 15, respectively, and he asked why data through the end of June has not yet been reported. Ms. Harrod said that second quarter data should be available within the next week, after cabinet employees complete posting to close out the fiscal year. Senator Thayer asked that the updated information be provided to the Committee in time for its August 24 meeting.

When Representative Henley asked why the Department for Natural Resources has 116 nonmerit employees, as reflected in the House Bill 387 report, Ms. Bevington said that those numbers came from the Department and that she would be happy to relay that question to the agency. Senator Thayer asked Ms. Bevington to also provide that information for the Committee's August meeting.

Senator Thayer thanked the speakers. Business concluded, and the meeting was adjourned at 2:20 p.m.