# DEFENDANT LRC'S EXHIBIT 12

# Supreme Court of Kentucky
## CASE NO. 2012-SC-091-TG
### 2012-SC-092-TG

**LEGISLATIVE RESEARCH COMMISSION**                    **APPELLANT**

v.

**JOSEPH M. FISCHER, et al.,**                              **APPELLEES**

---

## BRIEF FOR APPELLANT
## LEGISLATIVE RESEARCH COMMISSION

---

Sheryl G. Snyder
Frost Brown Todd LLC
400 W. Market St., 32nd Fl.
Louisville, KY 40202
Telephone: 502-568-0247
ssnyder@fbtlaw.com

Laura H. Hendrix
General Counsel
Legislative Research Commission
State Capitol Annex, Room 104
Frankfort, KY 40601
Telephone: 502-564-8100
laura.hendrix@lrc.ky.gov

*Counsel for Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this Brief for Appellant by electronic mail and U.S. Mail this 22nd day of February, 2012, upon the following: Victor B. Maddox, John David Dyche, Jennifer Metzger Stinnett, Jason M. Nemes, 2700 PNC Tower, 101 S. Fifth St., Louisville, KY 40202; David Tachau, Dustin Meek, Tachau Meek PLC, 3600 PNC Tower, 101 S. Fifth St., Louisville KY 40202; Scott White, Sarah Mattingly, Morgan & Pottinger, 133 W. Short St., Lexington, KY 40507; Anita Britton, Britton Osborn Johnson, 200 W. Vine St., Ste. 800, Lexington KY 40507; Jack Conway, Sean Riley, Office of the Attorney General, 700 Capitol Ave., Ste. 118, Frankfort, KY 40601; and Phillip Shepherd, Chief Circuit Judge, Franklin Circuit Court, 669 Chamberlin Ave., Frankfort, KY 40601.

_____
*Counsel for Appellant*

# INTRODUCTION

While questioning the soundness of this Court's decision in *Fischer II* that "county integrity" must be protected with "mathematical precision," the Franklin Circuit Court felt bound by that decision to declare that the 2012 apportionment plan contravenes § 33 KY. CONST. And despite recognizing that the 2002 legislative districts deviate from one-person, one-vote to a far greater extent than the 2012 districts, the Court enjoined use of the 2012 districts to preserve the right of voters in presently odd-numbered Senate districts to vote for a Senate candidate in 2012 rather than 2014.

# TABLE OF CONTENTS

STATEMENT OF THE CASE.................................................................................. 1

    The filing deadline need not be delayed again........................................... 2

STATEMENT OF FACTS ..................................................................................... 4

ARGUMENT ....................................................................................................... 6

    I.    *Fischer II* was modified by *Jensen*, and should be further modified or overruled ......................................................................................... 6

        A.    The holding in *Fischer II* that the General Assembly must divide only the fewest number of counties mathematically possible – while also achieving the plus-or-minus 5% standard for population equality – should be replaced with a requirement that the General Assembly must endeavor in good faith to protect county boundaries to the extent practicable while also attaining the requisite population equality................................................................................... 6

        B.    The Court should also clarify that population equality is satisfied by attaining an overall range of 10% between the least populous district and the most populous district, not the "plus-or-minus 5%" deviation from the ideal per-district population erroneously adopted by *Fischer II*................. 14

        C.    Overruling *Fischer II* will not require Kentucky to justify every deviation from pure population equality............................. 17

    II.    The Temporary Injunction should be dissolved because it is predicated upon an erroneous conclusion of law, changes the *status quo* and treads unnecessarily on the separation of powers ...................... 25

        A.    *Anggelis v. Land* is controlling precedent. The Temporary Injunction therefore rests upon an erroneous conclusion of law........................................................................................ 27

        B.    The Circuit Court issued the injunction to preserve Senator Stein's claims as to odd-numbered districts, not upon Rep. Hoover's claims under *Fischer II*. In doing so, the Court changed – rather than preserved – the *status quo* ......................... 30

        C.    The Temporary Injunction treads needlessly upon the Constitutional doctrine of separation of powers ........................... 36

    CONCLUSION.................................................................................................. 39

## STATEMENT OF POINTS AND AUTHORITIES

**First Point**    *Fischer II* was modified by *Jensen*, and should be further modified or overruled ...........................................................................6

**A.**    The holding in *Fischer II* that the General Assembly must divide only the fewest number of counties mathematically possible – while also achieving the plus-or-minus 5% standard for population equality – should be replaced with a requirement that the General Assembly must endeavor in good faith to protect county boundaries to the extent practicable while also attaining the requisite population equality ............................ 6

*Fischer v. State Bd. of Elections*, 879 S.W.2d 475 (Ky. 1994).......... *passim*

§ 33 Ky. Const.......................................................................... 6-8, 11

*Baker v. Carr*, 369 U.S. 186 (1962)............................................... 6

*Jensen v. Kentucky State Bd. of Elections*, 959 S.W.2d 771 (Ky. 1997) ............................................................................ 6, 8, 9, 11

*Wells v. White*, 623 S.W.2d 187 (Ark. 1981)................................. 6

*Connor v. Finch*, 431 U.S. 407 (1977) ......................................... 7

*Reynolds v. Sims*, 377 U.S. 533 (1964) ........................................ 7

Caneyville Volunteer Fire Dep't v. Green's Motorcycle Salvage, Inc., 286 S.W.3d 790 (Ky. 2009)................................................... 8

*Commonwealth ex rel. Cowan v. Wilkinson*, 828 S.W.2d 610 (Ky. 1992) ...................................................................................... 8

CR 54.02 .................................................................................... 11

*Matheney v. Commonwealth*, 191 S.W.3d 599 (Ky. 2006) ...................... 11

*Harmelin v. Michigan*, 501 U.S. 957 (1991) ............................... 11

*Agostini v. Felton*, 521 U.S. 203 (1997) ..................................... 11

*Bright v. Am. Greetings Corp.*, 62 S.W.3d 381 (Ky. 2001)...................... 11

*Mitchell v. W.T. Grant Co.*, 416 U.S. 600 (1974)............................. 11

*Fletcher v. Commonwealth ex rel. Stumbo*, 163 S.W.3d 852 (Ky. 2005) ................................................................................. 11, 13

*Martin v. Commonwealth*, 96 S.W.3d 38 (Ky. 2003) ................................. 11

*Reynolds v. Sims*, 377 U.S. 533 (1964) ........................................... 12

*State ex rel. Lockert v. Crowell*, 656 S.W.2d 836 (Tenn. 1983) .............. 12

*State ex rel. Lockert v. Crowell*, 631 S.W.2d 702 (Tenn. 1982) .............. 12

*Logan v. O'Neill*, 448 A.2d 1306 (Conn. 1982) ......................................... 12

*In re Reapportionment Plan*, 442 A.2d 661 (Pa. 1981) ............................ 13

*Stiglitz v. Schardien*, 239 Ky. 799, 40 S.W.2d 315 (1931) ...................... 13

*Ragland v. Anderson*, 125 Ky. 141, 100 S.W. 865 (1907) ....................... 13

**B.    The Court should also clarify that population equality is satisfied by attaining an overall range of 10% between the least populous district and the most populous district, not the "plus-or-minus 5%" deviation from the ideal per-district population erroneously adopted by *Fischer II*** ...................................... 14

*Fischer v. State Bd. of Elections*, 879 S.W.2d 475 (Ky. 1994)............ 14-16

*Connor v. Finch*, 431 U.S. 407 (1977) ............................................. 14

*Gaffney v. Cummings*, 412 U.S. 735 (1973) ...................................... 14, 16

*Daly v. Hunt*, 93 F.3d 1212 (4th Cir. 1996)........................................ 14-16

*Jensen v. Kentucky State Bd. of Elections*, 959 S.W.2d 771 (Ky. 1997) ................................................................................................. 15

*Brown v. Thomson*, 462 U.S. 835 (1983)........................................... 16

National Conference of State Legislators, Redistricting Law 2010 (2009)......................................................................................... 16

§ 33 KY. CONST.................................................................................. 17

**C.    Overruling *Fischer II* will not require Kentucky to justify every deviation from pure population equality** ..................................... 17

*Fischer v. State Bd. of Elections*, 879 S.W.2d 475 (Ky. 1994)..... 18, 20, 25

§ 33 KY. CONST.................................................................................. 18

*Brown v. Thomson*, 462 U.S. 835 (1983)........................................... *passim*

iv

*Daly v. Hunt*, 93 F.3d 1212 (4th Cir. 1996) ................................. 19, 22, 24

*Hulme v. Madison County*, 188 F.Supp. 2d 1041 (S.D. Ill. 2001) ............ 20

*Marylanders for Fair Representation, Inc. v. Schaefer*, 849 F.Supp. 1022 (D. Md. 1990) ............................................................................... 20

*Abate v. Mundt*, 403 U.S. 182 (1971) ...................................................... 20

*Karcher v. Daggett*, 462 U.S. 725 (1983) ................................................ 20

*Cox v. Larios*, 542 U.S. 947 (2004) .................................................... 20-22

*In re: Mun. Reapportionment of the Twp. of Haverford*, 873 A.2d 821 (Pa. Comm'n Ct. 2005) ........................................................ 20

*Fusari v. Steinberg*, 419 U.S. 379 (1975) ................................................ 21

*Edelman v. Jordan*, 415 U.S. 651 (1974) ................................................ 21

*Mandel v. Bradley*, 432 U.S. 173 (1977) ................................................. 21

*Connor v. Finch*, 431 U.S. 403 (1977) .................................................... 21

*Gaffney v. Cummings*, 412 U.S. 735 (1973) ....................................... 21, 24

*League of United Latin American Citizens v. Perry*, 548 U.S. 399 (2006) ................................................................................................ 22

*Vieth v. Jubelirer*, 541 U.S. 267 (2004) .............................................. 22, 23

Stephanie Cirkovich, Abandoning the Ten Percent Rule and Reclaiming One Person, One Vote, 31 CARDOZO L. REV. 1823, 1844 (2010) .............................................................................................. 22

DANIEL HAYS LOWENSTEIN, RICHARD L. HASEN AND DANIEL P. TOKAJI, ELECTION LAW: CASES AND MATERIALS, p. 73 (4th ed. 2008) ......................................................................................... 23

*Fund for Accurate & Informed Representation v. Weprin*, 796 F.Supp. 662 (N.D. N.Y. 1992) ............................................................ 23

*Shaw v. Reno*, 590 U.S. 630 (1993) ......................................................... 24

*Jensen v. Kentucky State Bd. of Elections*, 959 S.W.2d 771 (Ky. 1997) .............................................................................................. 24

*Fletcher v. Commonwealth ex rel. Stumbo*, 163 S.W.3d 852 (Ky. 2005) ............................................................... 24

*Ragland v. Anderson*, 125 Ky. 141, 100 S.W. 565 (1907) ...................... 24

*Abate v. Mundt*, 403 U.S. 182 (1971) ......................................... 25

**Second Point** **The Temporary Injunction should be dissolved because it is predicated upon an erroneous conclusion of law, changes the *status quo* and treads unnecessarily on the separation of powers ............................................ 25**

*Fischer v. State Bd. of Elections*, 879 S.W.2d 475 (Ky. 1994) ............... 26

*Anggelis v. Land*, 371 S.W.2d 857 (Ky. 1963) ........................................ 26

**A.** ***Anggelis v. Land* is controlling precedent. The Temporary Injunction therefore rests upon an erroneous conclusion of law ....... 27**

*Anggelis v. Land*, 371 S.W.2d 857 (Ky. 1963) ................................. 27-30

*Payne v. Davis*, 254 S.W.2d 710 (Ky. 1953) ............................................ 27

*Republican Party of Oregon v. Keisling*, 959 F.2d 144 (9th Cir. 1992) ....................................................................... 29

*Kahn v. Griffin*, 2004 WL 1635846 (D. Minn. 2004) ................................. 29

*City of Louisville v. Allen*, 385 S.W.2d 179 (Ky. 1964) ........................... 29

*Buddenberg v. Buddenberg*, 304 S.W.3d 717 (Ky. App. 2010) ............... 30

*Commonwealth ex rel. Conway v. Thompson*, 300 S.W.3d 152 (Ky. 2009) ..................................................................... 30

*Alcatel USA, Inc. v. DGI Technologies, Inc.*, 166 F.3d 772 (5th Cir. 1999) ..................................................................... 30

**B.** **The Circuit Court issued the injunction to preserve Senator Stein's claims as to odd-numbered districts, not upon Rep. Hoover's claims under *Fischer II*. In doing so, the Court changed – rather than preserved – the *status quo* ............................... 30**

*Fischer v. State Bd. of Elections*, 879 S.W.2d 475 (Ky. 1994) ..... 30, 31, 34

§ 33 KY. CONST. ...................................................................... 31

CR 65.04(1) ............................................................................. 33

*Commonwealth ex rel. Cowan v. Wilkinson*, 828 S.W.2d 610 (Ky. 1992) ................................................................. 33, 34

*Oscar Ewing, Inc., v. Melton*, 309 S.W.2d 760 (Ky. 1958) .................... 34

*Maupin v. Stansbury*, 575 S.W.2d 695 (Ky. App. 1978) ......................... 34

*Whitcomb v. Chavis*, 403 U.S. 124 (1971) .......................................... 34, 35

*Davis v. Mann*, 377 U.S. 678 (1964) .................................................. 34, 35

*Pileggi v. Aichele*, --- F.Supp. 2d ---, 2012 WL 398784 (E.D. Pa. 2012) ................................................................. 35, 36

*Reynolds v. Sims*, 377 U.S. 533 (1964) .................................................. 35

Pa. Const. Art. II, § 17 ....................................................................... 35

*Holt v. 2011 Legislative Reapportionment Commission*, --- A.2d ---, 2012 WL 360584 (Pa. February 3, 2012) ............................................. 35

C.  **The Temporary Injunction treads needlessly upon the Constitutional doctrine of separation of powers** ................................... 36

*Legislative Research Comm'n ex rel. Prather v. Brown*, 664 S.W.2d 907 (Ky. 1984) ................................................................. 36, 38

*Arnett v. Meredith*, 121 S.W.2d 36 (Ky. 1938) ................................... 36

*Jensen v. Kentucky State Bd. of Elections*, 959 S.W.2d 771 (Ky. 1997) ................................................................. 37, 38

§§ 27-29 Ky. Const. ........................................................................... 37

§ 33 Ky. Const. ................................................................................. 37, 38

*Fischer v. State Bd. of Elections*, 879 S.W.2d 475 (Ky. 1994) ............... 38

*Colorado General Assembly v. Lamm*, 700 P.2d 508 (Colo. 1985) .......... 38

*Sixty-Seventh Minnesota State Senate v. Beens*, 406 U.S. 187 (1972) ..... 38

*Anggelis v. Land*, 371 S.W.2d 857 (Ky. 1963) ................................... 39

# STATEMENT OF THE CASE

The Franklin Circuit Court enjoined the Secretary of State and Board of Elections from conducting elections under the 2012 apportionment plan and required the 2012 legislative elections to occur under the prior (2002) apportionment plan which it replaced.

In contrast, this Court's most recent decision postponed the effectiveness of its decision declaring the new apportionment plan unconstitutional, and allowed elections to go forward under the new apportionment plan that had been concurrently declared unconstitutional. *Fischer v. State Bd. of Elections*, 879 S.W.2d 475, 480 (Ky. 1994) (*Fischer II*). In *Fischer II*, this Court allowed the General Assembly ample time to reapportion the districts consistently with the Court's newly rendered opinion. *See Fischer II*, 879 S.W.2d at 480. That decision is consistent with standard practice in federal one-person, one-vote cases. *See* pp. 33-34, *infra*.

In contrast to this Court's Solomonic decision, the Circuit Court's injunction requires the General Assembly to either forgo its constitutional right of appeal and enact new reapportionment legislation consistent with the Circuit Judge's views – including his opinion concerning changing odd and even-numbered Senate districts – or permit elections to proceed under the 2002 districts.

But it is undisputed that the 2002 districts deviate egregiously from one-person, one-vote. With the passage of a decade that saw significant population shifts throughout Kentucky, the 2002 districts are significantly malapportioned. For example, House district 60 now has a +42.7% deviation from the ideal per-district population and Senate district 11 now has a +22.2 deviation. In contrast, all the 2012 districts except two

comply with the "plus-or-minus 5%" rule of *Fischer II*. Moreover, it is undisputed that the 2012 Senate districts comply with the federal rule, which requires an overall range of less than 10% between the least populous district and the most populous district, and the 2012 House districts exceed the overall range of 10% by a statistically insignificant difference.

Clearly, the 2012 apportionment plan comes far closer to achieving population equality than the 2002 districts. Consequently, the Temporary Injunction effectuates far more voter dilution than does House Bill 1. Appellees nevertheless argue that dissolution of the Temporary Injunction "would effectively deny the constitutional right of the Plaintiffs and all citizens of the Commonwealth to have elections using districts that comply with the clear mandate of this Court and the Kentucky Constitution."[1] But it is indisputable that the 2002 legislative districts violate the "plus-or-minus 5%" test of *Fischer II* to a far greater extent than House Bill 1 (2012).

The Court should therefore dissolve the Temporary Injunction – even if it affirms the declaration that House Bill 1 violates the *Fischer II* standards – and allow the 2012 election to proceed under the 2012 districts while the legislature enacts a new apportionment plan (if necessary) for the next election cycle.

**The filing deadline need not be delayed again.**

Contrary to the Secretary of State, dissolution of the Temporary Injunction, allowing legislative elections to proceed under the 2012 districts, does not require the filing deadline to be reopened, at all. The statutory deadline for filing to run in a 2012 district was January 31 (and was extended by one week under the Restraining Order).

---

[1] Respondents'/Plaintiffs' Response to LRC Motion for Interlocutory Relief Pursuant to CR 65.07, p. 1 (hereinafter "Response").

Accordingly, any person who desired to be a candidate for the House or Senate in a 2012 district had ample time to file her candidacy papers.

The districts in which some candidates reside are numbered differently in the 2002 plan than in the 2012 plan. When the Franklin Circuit Court issued the Temporary Injunction, the Secretary of State unilaterally required such candidates to withdraw their filings to run in the 2012 districts as a precondition to filing to run in a 2002 district. Apparently, the Secretary of State believed that the prohibition against filing as a candidate for more than one office would preclude a candidate who had filed for a 2012 district from filing in a differently numbered 2002 district. But requiring candidates to withdraw their filings was both unnecessary and unwise. Clearly, when the dust settles on this litigation, there will be only one set of legislative districts for the 2012 elections – either the 2002 districts or the 2012 districts. A candidate whose residence is in two differently numbered districts (depending on whether the 2002 or 2012 boundaries are used) is not filing for two offices because he will obviously withdraw from one when the other is finalized as the operative district.

Accordingly, it was absolutely unnecessary to require the candidates to withdraw their filing papers. And the remedy is simple: the withdrawn candidacy filings can be deemed valid despite the involuntary withdrawal improvidently required by the Secretary of State. Thus, every candidate who filed otherwise valid papers to run for the House or the Senate in a 2012 district pursuant to House Bill 1 prior to the expiration of the January 31 deadline (as extended one week by the Restraining Order) can simply be deemed to have timely filed their candidacy papers. Dissolving the Temporary Injunction will not further delay the 2012 legislative elections.

## STATEMENT OF FACTS

The Kentucky General Assembly acted promptly to redistrict the Commonwealth's legislative and judicial districts by enacting 2012 Regular Session House Bill 1, which was signed by the Governor and became law on January 20, 2012. HB 1 contained an emergency clause pursuant to Kentucky Constitution Section 55, thus it became law upon the Governor's signature. The filing deadline of January 31, 2012, at 4:00 p.m., was established by KRS 118.165.

On January 26, 2012, two business days prior to the filing deadline, the Plaintiffs (Appellees) Joseph M. Fischer, Jeff Hoover, Kim King, Frey Todd and Anthony Gaydos (hereinafter collectively "Rep. Hoover") filed a Verified Complaint and Motion for Temporary Injunction, and noticed it to be heard on Monday, January 30, 2012, at 10:30 a.m. The Plaintiffs sought a Temporary Injunction enjoining the Secretary of State and the State Board of Elections from certifying any candidates' names as nominees, from certifying the names of candidates to county clerks, from certifying the order of the ballot, "conducting or preparing to conduct elections for the existing legislative districts, created by statute for the General Assembly of Kentucky under the provisions of HB 1", and from enforcing the statutory filing deadline.

The Appellees David B. Stevens, M.D., David O'Neill, Jack Stephenson, Marcus McGraw, and Kathy Stein (hereinafter collectively "Senator Stein") intervened as Plaintiffs to contest the Senate districts in HB 1.

On January 31, 2012, the Franklin Circuit Court entered a nonappealable Restraining Order enjoining enforcement of the filing deadline until February 7, 2012 at 4:30 p.m. The Court then set a hearing date for February 6, 2012 to hear the Motion for

Temporary Injunction. The Court also permitted the Legislative Research Commission (hereinafter "LRC") to intervene under KRS 5.005.

On February 7, 2012, Franklin Circuit Court issued a Temporary Injunction enjoining election officials from conducting elections for the Kentucky Senate and House of Representatives pursuant to the districts in House Bill 1 and required the 2012 elections to proceed under the districts in the preexisting apportionment plan that had been enacted in 2002. The Franklin Circuit Court held that the apportionment plan for both the House and Senate violated § 33 KY. CONST., as construed by this Court in *Fischer II*, because (1) each includes one district whose population exceeds the ideal per-district population by more than 5%, and (2) each divides more than the fewest number of counties mathematically possible while staying within the plus-or-minus 5% standard announced in *Fischer II*.

The Court also held that Senator Stein had raised a significant Constitutional issue by her challenge to the portion of House Bill 1 that moved the Senate district numbered 4 to the territory in which she resides, which had previously been within the Senate district numbered 13. But the Court stated that it needed more evidence to decide whether that change unconstitutionally deprived those voters of the right to vote for a Senator for two more years than if their residence had remained within an odd-numbered district.

The Circuit Court recited that there was no just reason to delay an appeal from its declaratory judgment invalidating House Bill 1 as being in contravention of § 33 KY. CONST. as construed by this Court in *Fischer II*.

LRC filed a Notice of Appeal from the Circuit Court's February 7, 2012 judgment on February 10, 2012. The Court granted LRC's motion to transfer this appeal and, upon

the recommendation of the Court of Appeals, also transferred LRC's Motion pursuant to CR 65.07 to dissolve the Temporary Injunction.

## ARGUMENT

I.    *Fischer II* was modified by *Jensen*, and should be further modified or overruled.

    A.    **The holding in *Fischer II* that the General Assembly must divide only the fewest number of counties mathematically possible – while also achieving the plus-or-minus 5% standard for population equality – should be replaced with a requirement that the General Assembly must endeavor in good faith to protect county boundaries to the extent practicable while also attaining the requisite population equality.**

In *Fischer II*, a 5-2 majority of this Court adopted a standard for protecting "county integrity" that is found nowhere in the Constitution of Kentucky. Simply stated, § 33 KY. CONST. requires that no county can be split in an apportionment act, at all. But *Fischer II* correctly declared that provision unconstitutional under the federal Equal Protection Clause line of cases.[2] In a state such as Kentucky which has more counties that it has House districts, with several of those counties being above the statistical ideal per-district population, an absolute prohibition against splitting counties is void and unenforceable as a violation of the Equal Protection Clause of the U.S. Constitution. *Accord Wells v. White*, 623 S.W.2d 187, 200 (Ark. 1981) (provision in Arkansas

---

[2] While the 1891 Constitutional Convention decided that "the command with respect to the division of any county is absolute," "any such view is now untenable . . . ." 879 S.W.2d at 477, 479. The author of *Fischer II* recognized that the unenforceability of the anti-county-splitting provision in § 33 resulted from application of *Baker v. Carr*, 369 U.S. 186 (1962) and its progeny. *Jensen v. Kentucky State Bd. of Elections*, 959 S.W.2d 771, 777 (Ky. 1997) (Lambert, J., dissenting).

Constitution prohibiting splitting county boundaries "is likewise unconstitutional in that it violates the principle of one-man, one-vote.").[3]

Instead of simply declaring unconstitutional and unenforceable the anti-county-splitting clause in § 33, however, *Fischer II* substituted a different constitutional test:

> The mandate of Section 33 is to make full use of the maximum constitutional population variation as set forth herein and divide the fewest possible number of counties.

879 S.W.2d at 479. But § 33 does not require the General Assembly to "divide the fewest possible number of counties." It requires the General Assembly to not split any county, at all; a mandate which is indisputably unconstitutional. Accordingly, the majority in *Fischer II* created a new test for protecting county boundaries that is found nowhere in the Constitution. The requirement that an apportionment act must divide the fewest number of counties mathematically possible is a judge-made standard that is not required by the Constitution.

The majority opinion's ode to the importance of counties in the lives of Kentuckians is nothing less than a pronouncement that public policy should protect county integrity as vigorously as possible, subject to the constitutional command of equality. But it is well settled that it is for the General Assembly, not the judiciary, to establish public policy:

> Shaping public policy is the exclusive domain of the General Assembly. We have held that "[t]he establishment of public policy is granted to the legislature alone. It is beyond the power of a court to vitiate an act of the legislature on the grounds that the public policy promulgated therein is contrary to what the court considers to be in the public interest."

---

[3] *See, e.g., Connor v. Finch*, 431 U.S. 407, 418-19 (1977) ("[T]he policy against breaking county boundary lines is virtually impossible of accomplishment in a State where population is unevenly distributed . . . ."); *see also Reynolds v. Sims*, 377 U.S. 533, 581 (1964).

*Caneyville Volunteer Fire Dep't v. Green's Motorcycle Salvage, Inc.*, 286 S.W.3d 790, 807 (Ky. 2009) (citing *Commonwealth ex rel. Cowan v. Wilkinson*, 828 S.W.2d 610, 614 (Ky. 1992)).

In *Jensen*,[4] this Court retreated from protecting county integrity with "mathematical precision" at the expense of equality of representation. Indeed, the author of *Fischer II* said in his dissent in *Jensen* that the majority was rejecting the "central holding" in *Fischer II*. 959 S.W.2d at 777 (Lambert, J., dissenting).

In *Jensen*, the plaintiff argued that the principle of protecting "county integrity" with "mathematical precision" required the General Assembly to allocate a full House district to any county with sufficient population to contain a full House district. This Court recognized that the drafters of the compromise embodied in § 33 probably intended the result sought by the plaintiff. But because that result was not mandated by the express language of § 33, this Court refused to impose that requirement upon the General Assembly when apportioning House districts:

> The delegates [at the 1891 Convention] probably did not foresee that a county with sufficient population to contain a whole district within its borders might not be given such a district. However, regardless of what the delegates may or may not have foreseen, **that requirement was not included in the language of Section 33**.

959 S.W.2d at 775 (emphasis added).

Of course, the same is true of the *Fischer II* standard requiring splitting the fewest number of counties mathematically possible: "that requirement was not included in the language of Section 33."

---

[4] *Jensen v. Ky. State Bd. of Elections*, 959 S.W.2d 771, 776 (Ky. 1997).

Thus, *Jensen* rejected an effort to extend the "county integrity" principle, squarely holding:

> We have long held that when the goals of population equality and county integrity inevitably collide, the requirement of approximate equality of population must control.

959 S.W.2d at 774.

In the course of holding that *Fischer II* did not literally require the result sought by the appellant in *Jensen*, this Court quoted its holding in *Fischer II*. Rep. Hoover and Senator Stein argue that was a reaffirmation that dividing "the fewest number of counties" requires adhering to a mathematical formulation of that test. LRC respectfully suggests that *Jensen* represents a relaxation of county integrity protection, as the dissent in *Jensen* concluded, and that splitting 28 (rather than 24) small counties in pursuant of population equality should not render House Bill 1 *per se* unconstitutional.

Moreover, the mathematical precision demanded by Rep. Hoover would result in "county integrity" being denigrated, rather than protected. As the number of less populous counties that cannot be split is increased, the number of more populous counties that must be split increases commensurately. Thus, in the name of protecting "county integrity," *Fischer II* requires larger counties to be balkanized more than would otherwise be necessary to satisfy the "plus-or-minus 5% rule." In short, *Fischer II* protects smaller counties at the expense of larger counties, leaving "county integrity" in the eye of the beholder.

The other flaw in the "mathematical precision" interpretation of *Fischer II* is that it requires every Kentucky reapportionment plan to begin the decade at the maximum population deviation permitted by federal constitutional law. The inevitable result is that

Kentucky's legislative districts quickly violate one-person, one-vote and, by the end of the decade, are egregiously malapportioned. This consequence flows from "[t]he mandate" of *Fischer II* "to make full use of the maximum constitutional population variation" allowed by law "and divide the fewest possible number of counties." 879 S.W.2d at 479. Thus, interpreting *Fischer II* as requiring splitting "with mathematical precision the fewest number of counties that must be divided" (Response, p. 4.) at the outer limits of one-person, one-vote means that the inevitable collision with population equality occurs immediately, and the equally inevitable result is that population shifts leave Kentucky's legislative districts seriously malapportioned at the end of the ensuing decade. That is clearly true of the 2002 districts that would prevail in the 2012 elections if the Temporary Injunction is not dissolved.

In this case, the Franklin Circuit Court candidly critiqued this fallacy in *Fischer II*'s reasoning, and invited this Court to overrule it:

> It is apparent that the Supreme Court's ruling in <u>Fischer II</u> has had unintended consequences. . . . It is a concern of this Court that the <u>Fischer II</u> mandate *requires* the legislature to "make maximum use" of the 10% population variance it approved in that case. As a result, each new redistricting plan post-<u>Fischer II</u> must begin the decennial period with a 10% deviation in the population of districts, and this variation is virtually certain to increase with each passing year as a result of normal demographic trends and the movement of people from rural to urban areas. Accordingly, <u>Fischer II</u> seems to guarantee districts that over time will violate the 10% variation standard even more quickly, because it *starts* with a 10% variation.
>
> Likewise, <u>Fischer II</u> is based on the Supreme Court's belief that county integrity and population equality can always be reconciled, but it is apparent from the proceedings in this case that the constitutional value of population equality is significantly impaired by the requirement to preserve county integrity. . . . All of these considerations militate in favor of giving greater weight to population equality than county integrity when those values clash, as they inevitably do. Those considerations, however, must be addressed to the Kentucky Supreme Court, not to a trial court that

is required to apply the binding precedent of <u>Fischer II</u>.

(Opinion at 3-4) (footnote omitted) (italics in original).

Holding that it is bound by *Fischer II*, the Franklin Circuit Court held that, under *Fischer II*, the 2012 reapportionment plan for both the Senate and House of Representatives contravenes § 33 KY. CONST. because: (1) each includes one district that exceeds the so-called ideal per-district population by more than 5%; and (2) each divides more than the minimum number of counties mathematically possible while also achieving the "plus or minus 5%" standard announced in *Fischer II*. The Franklin Circuit Court entered a final judgment declaring House Bill 1 unconstitutional for those violations of the 5% rule and made that judgment appealable under CR 54.02.

But the standard erected by *Fischer II* is not required by the Constitution. The policy question of preserving certain county boundaries is therefore remitted by the doctrine of separation of governmental powers to the General Assembly. Again, *Jensen* is on point:

> Apportionment is primarily a political and legislative process. . . . Our only role in this process is to ascertain whether a particular redistricting plan passes constitutional muster, not whether a better plan could be crafted.

959 S.W.2d at 776 (citation omitted).

To the extent *Jensen* has not already done so, *Fischer II* should be modified or overruled.[5] The Court should replace the requirement that the reapportionment plan split

---

[5] "'We have long recognized, of course, that the doctrine of *stare decisis* is less rigid in its application to constitutional precedents' . . . 'because our interpretation can be altered only by constitutional amendment or by overruling our prior decisions.'" *Matheney v. Commonwealth*, 191 S.W.3d 599, 621 (Ky. 2006) (Cooper, J., dissenting) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 965 (1991); *Agostini v. Felton*, 521 U.S. 203, 235 (1997)). "'It is thus not only our prerogative but also our duty to re-examine a precedent where its reasoning or understanding of the Constitution is fairly called into question. And if the precedent or its rationale is of doubtful validity, then it should not stand.'" *Bright v. Am. Greetings Corp.*, 62 S.W.3d 381, 387 (Ky. 2001) (quoting *Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 627-628 (1974)). In recent years,

the fewest number of counties mathematically possible with a test that echoes the federal test for population equality, namely, to "make an honest and good faith effort to construct districts [splitting the least number of county lines] . . . as is practicable" while maximizing population equality. *Reynolds v. Sims*, 377 U.S. 533, 577 (1964).

An illustrative precedent is *State ex rel. Lockert v. Crowell*, 656 S.W.2d 836 (Tenn. 1983), the sequel to the Tennessee decision relied upon by the majority in *Fischer II*.[6]   Having previously declared unconstitutional the provision in the Tennessee Constitution prohibiting splitting county lines, the Tennessee Supreme Court decided that "the Legislature must enact a House Plan reasonably close to dividing only 25 counties" (the minimum number mathematically necessary to split). 656 S.W.2d at 842. "If the legislature proceeds in good faith," it can divide more than the mathematical minimum.

Another illustrative precedent is *Logan v. O'Neill*, 448 A.2d 1306 (Conn. 1982). In that case, the Connecticut constitution provided that "no town shall be divided" when drawing legislative districts. It was conceded that the apportionment plan "divides more towns than necessary to meet the federal [one-person, one-vote] requirements." *Id.* at 1309. The challengers presented expert testimony that apportionment plans could be drawn "which resulted in fewer town segments than the adopted plan." *Id.* at 1311. The Court rejected "[t]he plaintiffs' contention . . . that the town integrity principle requires the General Assembly to adopt [the plan] . . . which most effectively minimizes the cutting of town lines." *Id.* at 1312. The Court squarely held that political decision is entrusted to the "judgment" of the legislature. *Id.*

---

this Court has overruled settled precedent without discussing *stare decisis*. *See Fletcher v. Commonwealth ex rel. Stumbo*, 163 S.W.3d 852, 869 (Ky. 2005); *Martin v. Commonwealth*, 96 S.W.3d 38, 56 (Ky. 2003).

[6] 897 S.W.2d at 479 (citing *State ex rel. Lockert v. Crowell*, 631 S.W.2d 702 (Tenn. 1982)).

And another illustrative precedent is *In re Reapportionment Plan for Pennsylvania General Assembly*, 442 A.2d 661 (Pa. 1981). In that case, the Pennsylvania constitution provided that, "[u]nless absolutely necessary no county . . . shall be divided in forming" legislative districts. *Id.* at 666 (quoting Pa. Const. art. II, § 16). The court rejected the challengers' argument that splitting county boundaries was permitted by the state constitution "only if these deviations are absolutely necessary to survive federal equal protection analysis." *Id.* The court squarely held that "adherence to political subdivision lines must yield to this 'overriding objective'" of population equality. *Id.* The court therefore held that the decision as to how many county lines to split is remitted to the "constitutionally permissible judgment" of the legislature. *Id.* at 668.

By allowing the General Assembly to split a handful of counties in addition to the mathematical minimum, the Court would allow the General Assembly to keep larger portions of more populous counties intact. And by eliminating the requirement that an apportionment plan must start the decade at the outer limits of one-person, one vote, this Court would restore its prior precedent's holding that population equality is the paramount concern of the Kentucky Constitution. *Stiglitz v. Schardien*, 239 Ky. 799, 40 S.W.2d 315, 320 (1931); *Ragland v. Anderson*, 125 Ky. 141, 100 S.W. 865 (1907). These modifications would promote both population equality and county integrity while recognizing that implementing those goals by drawing the district boundary lines is, in the final analysis, a political question.[7]

Moreover, overruling or modifying *Fischer II* does not "declare the preservation of county integrity irrelevant for redistricting purposes . . . ." (Response at 32.) Quite

---

[7] Kentucky adheres to the political question doctrine of nonjusticiability. *Fletcher v. Commonwealth ex rel. Stumbo*, 163 S.W.3d 852, 860 (Ky. 2005).

the contrary, modifying *Fischer II* would allow the General Assembly to exercise the lawmaking power in a manner which preserves the integrity of the more populous counties, not just the least populous counties. And it would not deprive the General Assembly of the discretion to protect the integrity of small counties, as well, to the extent that can be done while accommodating the paramount principle of population equality.

This Court should dissolve the Temporary Injunction and permit the 2012 election cycle to proceed using the districts enacted in House Bill 1. *See Fischer II* at 480. The Court could then determine the constitutionality of House Bill 1 according to its customary schedule, while giving the General Assembly ample time thereafter to enact further legislation – if any – necessitated by this Court's decision.

    **B.**    **The Court should also clarify that population equality is satisfied by attaining an overall range of 10% between the least populous district and the most populous district, not the "plus-or-minus 5%" deviation from the ideal per-district population erroneously adopted by *Fischer II.***

In *Fischer II*, this Court held that the apportionment plan challenged in that case satisfied federal one-person, one-vote standards. 879 S.W.2d at 478. This Court first correctly recognized that federal Constitutional law for state legislative apportionment is less stringent than the requirements for Congressional redistricting:

> It is important to note, however, that while controlling federal decisions require virtual perfection in the apportionment of Congressional districts, no such rule prevails with respect to the apportionment of state legislative districts.

*Id.* (citing *Connor v. Finch*, 431 U.S. 407 (1977); *Gaffney v. Cummings*, 412 U.S. 735 (1973)).[8]

---

[8] The cases relied upon by Rep. Hoover support this conclusion. For example, in *Daly v. Hunt*, 93 F.3d 1212, 1220 (4th Cir. 1996), the court expressly stated that "the equal population requirements for congressional districts, which are imposed by Art. I, § 2 of the Constitution, are more stringent than those

Noting that the apportionment plan at issue contained "a population deviation range of -4.97% to +4.94% from the ideal district population . . .", *id.* at 476, the majority articulated the federal standard as a deviation from the ideal, per-district population that "does not exceed -5% to +5% . . . ." *Id.* at 478. In *Jensen*, this Court interpreted the federal standard adopted in *Fischer II* as "a maximum variation of plus-or-minus 5% from the ideal population of a legislative district." 959 S.W.2d at 772.

But the federal standard is an overall range of 10% between the least populous district and the most populous district, not a deviation of plus or minus 5% from the ideal, per-district population. While deviation from the ideal district is used in Congressional redistricting under the Apportionment Clause, state legislative redistricting is governed by the Equal Protection Clause. The dispositive question for equal protection is the relative voting strength of the most populous district compared to the least populous district and the 10% overall range evolved as a rebuttable presumption of equality of voting strength.[9]

The precedents relied upon by Rep. Hoover squarely support LRC's analysis. For example, in *Daly v. Hunt*, 93 F.3d 1212 (4th Cir. 1996) the Fourth Circuit squarely held that the "[m]aximum deviation is the sum of the absolute value of the deviation of the

---

for state or local legislative districts, which are governed by the Equal Protection Clause of the Fourteenth Amendment." Rep. Hoover nevertheless argues: "Ordinarily, legislative districts must be nearly identical in population, as is the case in congressional redistricting." (Response, p. 30.)

[9] LRC concedes that the federal 10% rule refers to an overall range between the least populous district and the most populous district of "less than 10%," as distinguished from "10% or less. " While a percentage stated as 9.9 to infinity is not statistically significantly different from a percentage stated as 10.0 to infinity, LRC concedes that the correct collocation of words is "less than 10%." However, Rep. Hoover's argument that LRC contends that the federal law allows deviations from the ideal per-district population "of as much as 10%" misstates LRC's argument. (Response at 27.) The federal 10% rule refers to the overall range between the least populous district and the most populous district.

district with the smallest population and that of the district with the largest population." 93 F.3d at 1216, n. 2.[10]

Thus, under the federal 10% rule, a district may exceed a 5% deviation from the ideal, per-district population, so long as the overall range is less than 10%. Of course, arithmetically, the most and least populous districts could not deviate much from plus-or-minus 5% without causing the apportionment plan to miss the 10% overall range. Nevertheless, one or two districts may exceed +5%, as occurs in House Bill 1, if the overall range to the least populous district is less than 10%.

The Franklin Circuit Court declared House Bill 1 unconstitutional under *Fischer II's* "plus-or-minus 5%" rule solely because House District 24 varies by +5.38%, while Senate District 8 varies by +5.52%. (Opinion, p. 5, Findings of Fact ¶ 2; *id* p. 8, Conclusion of Law ¶ 3.) ("House Bill 1 fails to comply with the 'maximum constitutional population variation' as set forth in *Fischer* by virtue of the fact that at least **one** House District and **one** Senate District have a population variance greater than 5%.") (emphasis added).

---

[10] Because the equal protection inquiry is the relative voting strength between districts, federal law looks to the "overall range" of the population deviation between the least populous county and the most populous county is 10% or less. *Brown v. Thomson*, 462 U.S. 835 (1983). It is therefore important to understand that the "maximum population deviation" is **not** the "plus or minus 5%" invented in *Fischer II*. Stating a statistic as plus or minus relative to the so-called "ideal population of a district" is a "relative deviation." NATIONAL CONFERENCE OF STATE LEGISLATURES, REDISTRICTING LAW 2010, at 23 (2009). The federal 10% rule is not a "relative deviation" from the ideal of plus-or-minus 5%, but is the "overall range." "The 'overall range' is the difference in population between the largest and smallest districts . . . . Although the courts normally measure a plan using the statistician's 'overall range,' they almost always call it something else, such as 'maximum deviation.'" *Id.*, pp. 23-24, n. 71 (collecting cases). The courts often add the relative deviation of the least populous district to the relative deviation of the most populous district and refer to the sum as the "maximum deviation between any two districts . . . ." *Gaffney*, 412 U.S. at 303. Accordingly, unlike *Fischer II*, federal one-person, one-vote standards permit a relative deviation more than plus 5% for the most populous district if the relative deviation from the ideal of the least populous district leaves the overall range between the least populous and most populous at 10% or less.

Yet it is undisputed that the Senate reapportionment plan complies with the federal 10% rule. And, while Appellees contend that the House districts do not comply with the federal 10% rule, the 10.0013287% overall range results from the legislature's decision not to split LaRue County, leaving House District 24 with 166 people more than necessary for the range to be less than 10%, a result concededly permissible under federal law as protecting county integrity. These facts graphically illustrate the manner in which Kentucky's unique, plus-or-minus 5% rule differs fundamentally from the federal 10% rule.

In fact, the Franklin Circuit Court found that House Bill 1 complies with the federal 10% rule: "House Bill 1 provides an overall range of deviation for House Districts of 10%, and an overall range of deviation for Senate Districts of 9.84%. . . . It is undisputed that House Bill 1 sets those variances at, or near, the constitutionally permissible limits for both House and Senate." (Opinion at 5-6, Findings of Fact ¶ 5.)

This Court should hold that the federal 10% rule governs under § 33 KY. CONST. as well as under the federal Equal Protection Clause. Adopting the 10% overall range, instead of the plus-or-minus 5% deviation, would permit the General Assembly even more flexibility for protecting the integrity of county boundaries, while retaining approximate population as the paramount goal of apportionment. And by so holding, this Court would also conclude that House Bill 1 does not violate the Kentucky Constitution under the 10% rule.

## C.     Overruling *Fischer II* will not require Kentucky to justify every deviation from pure population equality.

Federal constitutional precedents hold that if a state legislative apportionment plan achieves the overall range of less than 10%, it is presumed constitutional and the

challengers carry the burden of proving that the plan is unconstitutional for reasons other than population inequality. Only if the plan has an overall range of 10% or more is the state required to justify the population disparity with a rational state policy, such as county integrity.

Rep. Hoover nevertheless makes the absurd argument that "[o]verruling *Fischer II* and abandoning the county integrity clause of Section 33 would remove any justification for even the slightest population deviation between districts . . . ." (Response at 31.) Rep. Hoover continues: "If Kentucky were to abandon the clear, easy to apply, dual mandate of *Fischer II* . . . federal constitutional law would bar *any* population deviation, and would instead require near perfect equality, just as it does now for congressional redistricting." (*Id.* at 32.) (italics in original). Likewise, he asserts: "The moment Kentucky abandons the rational state policy of preserving county integrity . . . any deviation from strict population equality in redistricting is unconstitutional under federal law." (*Id.* at 33.)

Rep. Hoover's contention is predicated upon his clearly erroneous conclusion that every deviation from pure equality must be justified by the state:

> *Every* deviation from population equality must advance a rational state interest . . . . [W]here population deviations are not supported by such legitimate interests but, rather, are tainted by arbitrariness or discrimination, they cannot withstand constitutional scrutiny.
>
> . . .
>
> While the Supreme Court recognized in *Brown* that "as a general matter" an apportionment plan with a maximum population deviation *less than 10%* falls into the category of minor deviations, the Court went on to affirm that "the ultimate inquiry . . . is whether the legislature's plan 'may be said to advance [a] rational state policy.'" *Brown*, therefore, requires . . . [the state] **to prove that** *any* **population deviations are justified by the faithful adherence to a rational state policy if challenged.**

. . .

Second, *Brown* and subsequent cases make clear that unless there is a rational state policy involved – such as an (sic) consistent, nondiscriminatory policy to preserve county integrity – then there is no permissible population deviation under federal equal protection law.

. . .

The "ultimate inquiry" in judging any deviation from equality – *of any magnitude* – is whether the legislature's plan "may reasonably be said to advance [a] rational state policy," such as a consistently applied policy of preserving a county integrity.

*Id.* at 28, 28-29, 31 (italics in original) (boldface added) (quoting *Brown v. Thomson*, 462 U.S. at 835, 848 (1983)).

But federal law does not require an apportionment plan that achieves the overall range of less than 10% to be justified, at all, much less on some state policy other than having attained sufficient population equality by attaining an overall range of less than 10%.

Rep. Hoover's own authorities so hold. In *Daly v. Hunt*, 93 F.3d 1212 (4th Cir. 1996), the Fourth Circuit squarely held that the State has the burden to justify the population deviations only if the overall range exceeds 10%:

If the maximum deviation is less than 10%, the population differential will be considered *de minimus* and will not, by itself, support a claim of vote dilution. If the maximum deviation is greater than 10%, it is *prima facie* evidence of a one person, one vote violation, and the state must justify the population disparity by showing a rational and legitimate state policy for the districting plan.

93 F.3d at 1217-18. Indeed, contradicting his own brief, Rep. Hoover concedes the burden of proof is on the challenger if the plan's overall range is less than 10%:

Thus, the practical implication of *Brown* for redistricting litigation involved the burden of proof. Redistricting plans that keep their overall

> population deviations *under* 10% enjoy a presumption of validity.   The burden of proving the plan unconstitutional falls on the challengers. . . .
>
> Supreme Court decisions have treated overall population deviations of less than 10% as requiring no proof that a rational state policy supports them, while placing the burden of proving a rational state policy on states whose plans exhibit overall deviations of 10% or more . . . .

(Response at 30, 33.) (italics in original).[11]

Clearly, Rep. Hoover's argument that the state must justify even the most minor deviation from pure population equality fundamentally misunderstands federal constitutional law.   Consequently, modifying or overruling *Fischer II* would not deprive Kentucky of the presumption of constitutionality under federal law for apportionment plans that achieve an overall range of less than 10%.[12]

The only case Rep. Hoover cites is *Cox v. Larios*.[13]   But there is no opinion of the Court at that citation, at all, for the obvious reason that the decision is merely a summary affirmance of a decision by a three-judge District Court.

It is well settled that "[a] summary affirmance such as *Cox* represents no more than a decision of the United State Supreme Court not to hear an appeal . . . ."[14]   "When

---

[11] Other cases relied upon by Rep. Hoover contain precisely the same holding.   *Hulme v. Madison County*, 188 F.Supp. 2d 1041, 1047 (S.D. Ill. 2001) ("It is also clear that a total population deviation of less than 10% enjoys a presumption of validity and will not, by itself, support a claim of invidious discrimination."); *Marylanders for Fair Representation, Inc. v. Schaefer*, 849 F.Supp. 1022, 1031 (D. Md. 1990) ("Thus, a redistricting plan with a maximum deviation below ten percent is *prima facie* constitutional and there is no burden on the State to justify that deviation.").

[12] Rep. Hoover's repeated reference to "a consistently applied, even-handed rational state policy" (Response at 36) also misstates federal law.   A state is not required to justify district boundaries if the overall range is less than 10%.   Even if the overall range exceeds 10%, there is no requirement that the justification take the form of a mandate in the state constitution. *Abate v. Mundt*, 403 U.S. 182, 186 (1971). The strict scrutiny test is inapplicable to state legislative reapportionment, in recognition of the political nature of the decisionmaking involved in apportionment; so the state need only present a rational basis for the boundaries even when the overall range exceeds 10%.   *Karcher v. Daggett*, 462 U.S. 725, 741 (1983).

[13] 542 U.S. 947 (2004).

[14] *In re Mun. Reapportionment of Twp. of Haverford*, 873 A.2d 821, 835 (Pa. Commw. Ct. 2005).

we summarily affirm, without opinion, the judgment of a three-judge District Court we affirm the judgment but not necessarily the reasoning by which it was reached."[15] It is therefore well settled that "[s]ummary actions . . . should not be understood as breaking new ground but as applying principles established by prior decisions to the particular facts involved." *Mandel v. Bradley*, 432 U.S. 173, 176 (1977).

Rep. Hoover nevertheless contends that *Cox v. Larios* is a ground-breaking precedent. Despite U.S. Supreme Court cases expressly holding that apportionment plans which satisfy a 10% overall range do not violate the federal Equal Protection Clause,[16] Rep. Hoover proclaims that "the United States Supreme Court has made this plain in *Cox v. Larios*, 124 S.Ct. 2806, 2807-08 (1984) . . . ." (Response at 33.) But nothing is made "plain" in *Cox*, at all, because there is no opinion of the Court in *Cox*, much less an opinion of the Court with the holding attributed to it by Rep. Hoover.

Every quotation that Plaintiffs' Response attributed to *Cox* is either a quotation from the separate opinion of Justice Stevens concurring in the summary affirmance, or a quotation from the District Court opinion below. Neither has any precedential value for this Court.

Rep. Hoover nevertheless make the ludicrous statement that "[i]n his concurring opinion, . . . Justice Stevens explained the Supreme Court's rationale." (Response at 34.) But a concurring opinion never explains the majority's rationale; it always explains why

---

[15] *Fusari v. Steinberg*, 419 U.S. 379, 391-92 (1975) (Burger, C.J., concurring) (footnote omitted) (citing *Edelman v. Jordan*, 415 U.S. 651, 671 (1974)).

[16] *Brown v. Thomson*, 462 U.S. 835 (1983); *Connor v. Finch*, 431 U.S. 407 (1977); *Gaffney v. Cummings*, 412 U.S. 735 (1973).

the concurring judge disagrees with the majority's rationale. And here, there is no majority opinion, at all.

Rep. Hoover is obviously relying upon an opinion that has zero precedential value. Mr. Justice Stevens was consistently in the minority in the cases attacking redistricting plans as partisan in motive and result. *See, e.g., League of United Latin American Citizens v. Perry*, 548 U.S. 399, 447 (2006) (Stevens, J., concurring in part and dissenting in part); *Vieth v. Jubelirer*, 541 U.S. 267, 318 (2004) (Stevens, J., dissenting). His concurrence in the summary affirmance in *Cox* adds nothing to his minority view.

And the District Court opinion quoted by Plaintiffs is the only reported decision subsequent to *Brown v. Thomson* that inquired into a state apportionment plan that fell within the 10% federal rule. That District Court opinion is therefore referred to in the academic literature as an "aberrantly" decided "outlier" case.[17]

All of the cases (except *Larios*) relied upon by Rep. Hoover actually stand squarely for the proposition that an overall range less than 10% is not only presumed to be constitutionally valid, but cannot be attacked on the basis of population deviations at all. As a matter of federal constitutional law, an overall range less than 10% is "*de minimus* and will not, by itself, support a claim of vote dilution." *Daly*, 93 F.3d at 1217-18. Consequently, the burden is upon the challengers to demonstrate that an apportionment plan with an overall range less than 10% is unconstitutional for some reason other than population deviations between the districts. But the U.S. Supreme

---

[17] "Vigo, Hulme, and Larios are outliers in the canon of reapportionment jurisprudence, not only because the three redistricting plans at issue were aberrantly struck down as unconstitutional post-*Brown v. Thomson*, but also because the defendants in all three cases were uncharacteristically frank about what motivated them to malapportion districts." Stephanie Cirkovich, Abandoning the Ten Percent Rule and Reclaiming One Person, One Vote, 31 CARDOZO L. REV. 1823, 1844 (2010).

Court has been unable to fashion any jurisprudential standard by which a reapportionment plan can be attacked for reasons other than population inequality.

When apportionment plans that satisfy the federal 10% rule are challenged for drawing lines to achieve partisan advantage, the Supreme Court routinely dismisses the challenge for lack of a workable standard of review.[18] From the 5-4 decision in *Davis v. Bandemer*[19] through a series of fractured decisions, culminating the 4-1-4 decision in *Vieth*,[20] the Supreme Court has dismissed every such "partisan linedrawing" case it has considered for failure to state a claim. Thus, while the Supreme Court has held such a challenge is technically justiciable, the culmination of this line of cases is the plurality opinion written by Justice Scalia in *Vieth* in which he said that the total absence of any "judicially discernible and manageable standards for adjudicating political gerrymandering claims . . . ." renders it a legal fiction to say that political linedrawing cases are justiciable. *Vieth*, 541 U.S. at 281 (plurality).[21]

---

[18] Attacks upon apportionment plans for reasons other than population inequality are referred to in the caselaw as "political gerrymandering." To be clear, however, those courts do not use the term "political gerrymandering" with reference to the irregularity of district boundaries. Rather, "political gerrymandering" is shorthand for cases in which the attack upon the apportionment plan alleged that the boundaries of districts were drawn with partisan motives for partisan effects. For clarity, LRC therefore denominates the "political linedrawing" cases.

[19] 478 U.S. 109 (1986).

[20] *Vieth v. Jubelirer*, 541 U.S. 267 (2004).

[21] Because that rebuttable presumption is so difficult to overcome with a "political linedrawing" challenge, courts and commentators often say the 10% federal rule is *de facto* a "safe harbor." The standard textbook recognizes the 10% overall range as a safe harbor. *See* DANIEL HAYS LOWENSTEIN, RICHARD L. HASEN AND DANIEL P. TOKAJI, ELECTION LAW: CASES AND MATERIALS, p. 73 (4th ed. 2008) ("small deviations (up to 10%) at the state level require no justification at all."); *see also Fund for Accurate & Informed Representation v. Weprin*, 796 F.Supp. 662, 668 (N.D. N.Y. 1992) ("This concession [that the redistricting plan had a 9.43% overall range] is fatal to the one person, one vote claim because, absent credible evidence that the maximum deviation exceeds 10 percent, plaintiffs fail to establish a *prima facie* case of discrimination . . . sufficient to warrant further analysis by this Court."), aff'd, 506 U.S. 1017 (1992).

The case on which Rep. Hoover relies so heavily, *Daly v. Hunt*, agrees that any challenge to an apportionment plan that meets the federal 10% rule would have to be maintained on a basis other than population inequality:

> The 10% *de minimus* threshold recognized in *Brown* does not completely insulate a state's districting plan from attack **of any type**. . . . [I]f the maximum deviation is less than 10%, the population disparity is considered *de minimus* and the plaintiff cannot rely on it alone to prove invidious discrimination or arbitrariness.
>
> . . .
>
> Presumably, an apportionment plan that satisfies the 10% *de minimus* threshold could nevertheless be challenged under another theory, such as a violation of the Voting Rights Act or as an unconstitutional racial gerrymander under *Shaw v. Reno* . . . .

93 F.3d at 1220-21 (citing *Shaw v. Reno*, 590 U.S. 630 (1993)).  Thus, as Justice Cooper wrote for this Court in *Jensen*:

> Nevertheless, the mere fact that a particular apportionment scheme makes it more difficult for a particular group in a particular district to elect the representatives of its choice does not render that scheme constitutionally infirm.

Judicial review of the political process by which the various lines are (literally) drawn during redistricting would contravene Kentucky's "strictly construed" doctrine of separation of powers and would involve a political question.[22]  As the Court said in *Gaffney*:

> It would be idle, we think, to contend that any political consideration taken into account in fashioning a reapportionment plan is sufficient to invalidate it. . . . Politics and political considerations are inseparable from districting and apportionment. . . . The reality is that districting inevitably has and is intended to have substantial political consequences.

---

[22] Kentucky continues to adhere to the political question doctrine.  *Fletcher v. Commonwealth ex rel. Stumbo*, 163 S.W.3d 852, 860 (Ky. 2005).  To be sure, vindication of the principle of equal representation is justiciable.  *Ragland v. Anderson*, 125 Ky. 141, 100 S.W. 865, 866-67 (1907).  But review for political purpose and effect is not justiciable.

412 U.S. at 752-53.

In this case, the Senate districts concededly fall within the 10% overall range provided by settled U.S. Supreme Court precedent. And to a statistician, the House districts' deviation rounds out to 10%. Moreover, it is indisputable from the statistics available in the attested documents that were introduced into evidence that the deviation of 10.0013287 among the House districts is a mathematical function of 166 people in LaRue county retained in that particular district in order not to divide that county. Thus the microscopic statistical deviation from 10% results from the principle of "county integrity" upon which Plaintiffs have built their entire case under Section 33 of the Kentucky Constitution. And preserving the integrity of counties justifies such an insignificant population deviation under federal law, as well. *Brown*, 462 U.S. at 843 (quoting *Abate v. Mundt*, 403 U.S. 182, 185 (1971).

In sum, Rep. Hoover's federal Equal Protection Clause argument misstates the governing precedents. Accordingly, modifying the "mathematical precision" requirement of *Fischer II* will not result in Kentucky being required to justify every minor deviation from pure population equality. The 10% federal rule would continue to apply and, so long as the General Assembly achieves the 10% overall range, any Kentucky apportionment plan would satisfy the federal precedents.

**II. The Temporary Injunction should be dissolved because it is predicated upon an erroneous conclusion of law, changes the *status quo* and treads unnecessarily on the separation of powers.**

LRC agrees that the balance of the equities requires the 2012 legislative elections to proceed according to the statutory schedule. But Senators and Representatives should

be elected in 2012 from the districts enacted in 2012, which comply with the 10% overall range required by federal one-person, one-vote caselaw.

It is undisputed that, with the passage of time, the districts enacted in 2002 do not satisfy that standard. Indeed, the overall range of the 2002 House districts is now 60.71%, and the overall range of the Senate districts is 37.71%,[23] compared to the federal 10% rule. Accordingly, the rights of the voters on a statewide basis are better served by conducting the 2012 elections under the plan that more closely complies with federal one-person, one-vote standards.

Indeed, the Circuit Court did not base its preference for the 2002 districts upon either standard set forth in *Fischer II*. Quite the contrary, he predicated the injunction upon the claim of certain voters residing in Fayette County that their voting rights are abridged by the reassignment of some of the territory of formerly numbered Senate district 13 to a new district numbered as 4. But the Circuit Court did not enter a final and appealable declaratory judgment on those voters' claim. Rather, he determined that their claim "raised a substantial issue of law" (Opinion p. 9), but said that he "has not found . . . any controlling legal authority that addresses the question" posed by that claim (*id.* p. 10). That conclusion of law ignores the square holding in *Anggelis v. Land*, 371 S.W.2d 857 (Ky. 1963). That erroneous conclusion of law constitutes an abuse of discretion requiring dissolution of the Temporary Injunction.

---

[23] These statistics are from public LRC documents of which this Court may take judicial notice. With shifts in population, House district 60 under the 2002 plan has a +42.7% deviation from the ideal per-district population while House district 43 has a -18.01% deviation. Senate district 11 has a +22.2% deviation and Senate district 29 has a -17.51% deviation.

A.     *Anggelis v. Land* is controlling precedent.  The Temporary Injunction
therefore rests upon an erroneous conclusion of law.

The Circuit Court gave an unduly narrow reading of *Anggelis v. Land*, which is, indeed, the controlling precedent.  In that case, the 13th Senate district, which had encompassed all of Fayette County, was reduced to encompass only the territory inside the Lexington city limits.  The 12th district was moved from Meade, Hardin and LaRue Counties to encompass Fayette County outside the city limits.[24]

The Senator elected from the former 12th district had two more years to serve on his term, but obviously was not a resident of Fayette County.  The plaintiff contended that the incumbent Senator's lack of residence in Fayette County created a vacancy to be filled by a special election.  This Court recognized that the 12th district would continue to be represented for the next two years by a non-resident:

> Admittedly the redistricting has caused an unusual situation in which the Senator representing the Twelfth District neither lives within the boundaries of that District as presently constituted nor was he elected by the people who do live within them.

371 S.W.2d at 859.  But this Court said the non-residence of the incumbent Senator did not divest him of his office, nor create a vacancy in the 12th district:

> The Act does not abolish the office, nor shorten the term of the Senator presently representing the Twelfth District and it is doubtful whether the Legislature could validly have done so.  . . . Contrary to appellant's contention, it is our opinion that the Act did not create a new Twelfth Senatorial District but merely changed the geographic boundaries of that District.  Therefore, there is no vacancy in the office of Senator from the Twelfth District.

*Id.* at 858-59 (citing *Payne v. Davis*, 254 S.W.2d 710 (Ky. 1953)).

---

[24] *See* Intervening Defendant LRC's Trial Exhibit 3.

In *Anggelis*, as in this case, the incumbent senator had two more years to serve on his term. Thus, the voters in the new 12th district would not be voting for a senator for six years – precisely the contention advanced by Senator Stein (and accepted by the Franklin Circuit Court) in this case – namely, that if the non-resident represented Fayette County for another two years, "the people of the [12th] District will not be represented in the 1964 Senate." 371 S.W.2d at 858. This Court rejected that argument.

This Court recognized that every reapportionment in Kentucky is impacted by the fact that our Senate has staggered four-year terms. Consequently, in every reapportionment in which new boundaries are drawn to adhere to one-person, one-vote, there will be voters who formerly resided in odd-numbered districts who are moved to even-numbered districts and vice versa.[25] That fact, standing alone, does not deprive those voters of any right:

> Although a Senator is required by Section 32 of the Kentucky Constitution to be a resident of the district from which he is elected, once he is elected he represents generally all the people of the state and specifically all the people of his district as it exists during his tenure in office. Certainly no one would suggest that a Senator represents only those persons who voted for him. **The fact that the persons who are represented by the Senator from the Twelfth District are no longer the ones who elected him indicates there is a hiatus following a redistricting** of the state. . . .

> Section 33 of the Kentucky Constitution provides *inter alia* that the Legislature shall redistrict the state every ten years. **The framers of the Constitution must have realized that for two years after each redistricting there would be some persons in the state who would not be represented in the Senate by a Senator of their own choosing.** Apparently the men who framed our Constitution thought that this circumstance was offset by the desirability of maintaining a Senate, in which at least one-half of the members are always experienced men.

---

[25] For example, in *Anggelis*, parts of Hardin and Meade counties that had been in the 12th district were moved to the new 5th district. s *See* Intervening Defendant's Trial Ex. 3.

371 S.W.2d at 859 (emphasis added); *accord, Republican Party of Oregon v. Keisling*, 959 F.2d 144 (9th Cir. 1992).[26]

*Anggelis* is, in fact, directly on point. In repeatedly stating that "[t]here is no controlling case law on this issue" (Opinion at 9), the Circuit Court simply misstated the facts in *Anggelis*. The Circuit Court seemed to think that it was the voters in the new 12th district that voted in the 1963 election and that it was the voters in the 13th district who waited two years to vote. The Franklin Circuit Court said:

> It appears that the Senator elected by the voters in all of Fayette County for the 13th District continued to serve until the next election for an odd numbered district, and the voters who were re-assigned to an even numbered district were able to elect a new senator at the first election after the 1963 redistricting. Thus no citizen was assigned to be represented by a senator who had never been elected by the voters of that geographic area, nor was the right of any citizen to vote for a senator delayed.

(Opinion at 9.) But, of course, the true facts are precisely contrary to the Circuit Court's rendition. The voters who were reassigned to the even-numbered 12th district were not able to elect a new senator at the first election after the 1963 redistricting. They were assigned to be represented by a senator who had never been elected by the voters of that geographic area, and who would serve two more years. This Court squarely held that result did not implicate the constitutional rights of those voters. The Circuit Court has simply ignored the holding in *Anggelis* by misreading its facts, in order to reach that Court's desired result as to Senator Stein's candidacy for reelection from district 13.

It is well settled that a misapplication of the controlling law is inherently an abuse of discretion. *City of Louisville v. Allen*, 385 S.W.2d 179, 184 (Ky. 1964) ("An abuse of

---

[26] This Court's holding that the effect of four year staggered terms in reapportionment is not a deprivation of voting rights is supported by a legion of cases. *See Kahn v. Griffin*, 2004 WL 1635846, n. 9 (D. Minn. July 20, 2004) (collecting cases).

discretion may be said to be an error of law"); *Buddenberg v. Buddenberg*, 304 S.W.3d 717, 722 (Ky. App. 2010) ("A trial court abuses its discretion when its decision rests on an error of law . . . ."). These principles apply with equal force to appellate review of a temporary injunction. *Commonwealth ex rel. Conway v. Thompson*, 300 S.W.3d 152, 162 (Ky. 2009) ("The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."); *see also Alcatel USA, Inc. v. DGI Technologies, Inc.*, 166 F.3d 772, 790 (5th Cir. 1999) ("A district court abuses its discretion if it . . . relies on erroneous conclusions of law . . . .").

The Circuit Court's decision to ignore this Court's true holding in *Anggelis* is an abuse of discretion. The Temporary Injunction should be dissolved.

**B.      The Circuit Court issued the injunction to preserve Senator Stein's claims as to odd-numbered districts, not upon Rep. Hoover's claims under *Fischer II*.  In doing so, the Court changed – rather than preserved – the *status quo*.**

There is nothing in the Circuit Court's opinion that indicates in any way that the Circuit Court preferred the seriously malapportioned 2002 districts to the 2012 districts solely because House Bill 1 did not divide the fewest number of counties mathematically possible (or that one House and one Senate district slightly exceeded +5%). After all, the 2002 apportionment plan splits 27 counties, compared to the 2012 plan splitting 28, whereas 24 is the fewest that it is mathematically possible to split in either year.

It is clear from the Circuit Court's opinion that the Temporary Injunction was issued to preserve the *status quo* as to the even-numbered and odd-numbered Senate districts *pendente lite* while the Circuit Court considered the as yet undecided state constitutional question raised by Senator Stein. The Circuit Court discussed the number of voters being moved from odd-numbered to even-numbered Senate districts (and vice

versa) as the focal point of his remedial analysis. (Opinion at 13-14.) Indeed, the Circuit Court focused particularly upon Senate district 13 in Fayette County. (*Id.* at 14.) Focusing exclusively on this issue, the Circuit Court concluded:

> The Court therefore concludes that the redistricting cure of House Bill 1 is worse than the malapportionment disease that it is legally required to remedy, at least for the next two years.

(*Id.* at 13.) Clearly, the Temporary Injunction was issued to preserve the *status quo* until the Court could adjudicate Senator Stein's claims as to the odd-numbered Senate districts.

Rep. Hoover nevertheless recites the Circuit Court's declaratory judgment as to § 33 and claims:

> The Franklin Circuit Court **then stated** that **because** of this Section 33 violation "the public interest demands that the Court grant injunctive relief to maintain the *status quo* pending a full adjudication of the merits." (*Id.* at 13, ¶ 15.) HB 1's excessive number of county splits was definitely among the factors upon which the Circuit Court based its injunction.[27]

But the Circuit Court said no such thing. Rep. Hoover has taken one snippet of the Opinion out of context, and conflated it into his conclusory argument, creating a cut-and-paste version of ¶ 15 that totally changes what the Circuit Court actually said.

In ¶ 15, the Franklin Circuit Court first states that "the Court is mindful that the current districts are out of balance and must be redrawn to comply with the 'one person, one vote' mandate of federal and state law." But the Court indicated that the malapportionment of the 2002 districts is ameliorated by the fact that House Bill 1 does not completely attain the plus-or-minus 5% test of *Fischer II*. The Court then proceeds to

---

[27] Rep. Hoover's Response to Motion to Stay Pending Appeal, pp. 6-7 (emphasis added).

say that this balance is tipped by the impact of HB 1 on the voting rights of voters in odd-numbered Senate districts:

> The Court further finds as yet undisputed evidence that as many as 351,394 persons will be legislatively re-assigned under House Bill 1 from districts that are required to elect a senator this year to districts that will not hold an election until 2014. Those citizens, for two full annual sessions of the General Assembly (2013 and 2014) would be assigned to senators who do not reside in the districts they represent and who have no meaningful ties to those communities. The Court therefore concludes that the redistricting cure of House Bill 1 is worse than the malapportionment disease that it is legally required to remedy, at least for the next two years. In these circumstances, the public interest demands that the Court grant injunctive relief to maintain the *status quo* pending a full adjudication on the merits.

(*Id.* at p. 13 ¶ 15.) Of course, the claim that had not yet received "a full adjudication on the merits" is Senator Stein's claim, not Rep. Hoover's claim under Section 33, which has been fully adjudicated.

Moreover, the Franklin Circuit Court used the balance of its Findings of Fact, ¶¶ 16-17, to further explain that it was the constitutional concerns over the odd-numbered Senate districts that prompted it to preserve the *status quo* by requiring the elections to be run in the 2002 districts. Specifically, the Franklin Circuit Court held:

> The re-assignment of geographic territory of the former SD 13 to an even numbered district. . . . appears to be an arbitrary decision without a rational basis. . . . Here, the public's right to elect a senator has been delayed for 2 years, and . . . the Court can see no countervailing rational basis or valid reason to re-assign the former SD 13 to an even numbered district, thereby delaying the right of those citizens to vote on the election of their senator.

(Opinion p. 14 ¶ 17.) Clearly, the injunction was issued to protect Senator Stein's interests.

The Circuit Court also said, "it is necessary to maintain the *status quo* pending a final adjudication because in the absence of injunctive relief 'the acts of the adverse party

will tend to render such final judgment ineffectual.'" (*Id.* at 13.) (quoting CR 65.04(1)). The Circuit Court seems unconcerned that the converse is equally true; by mandating that the elections proceed under the 2002 districts, Senator Stein obtained complete relief on the merits despite the fact that the Circuit Court readily concedes that her claim has not yet been adjudicated. That is an unprecedented use of the power of an injunction to resolve a political question.

Rep. Hoover cites cases for the proposition that a stay pending appeal would amount to a decision on the merits. But conducting the 2012 legislative elections in the 2012 districts would not be a decision on the merits. This Court could still determine the constitutionality of House Bill 1 and, if deemed unconstitutional, require the General Assembly to reapportion for the next election cycle. But conducting the 2012 elections under the 2002 districts does amount to a decision on the merits, because it gives Senator Stein all the relief she has requested despite the fact that her claim remains to be adjudicated. If the elections are conducted under the 2002 districts, Senator Stein will be eligible to be elected to a 4-year term and there will be nothing that this or any other court can do about that for the next four years. Thus it is the mandate of the Temporary Injunction to conduct the elections using the 2012 districts that amounts to a decision on the merits. That injunction should be dissolved, and the partial declaratory judgment should be stayed pending this appeal.

Moreover, requiring elections to be held under the old malapportioned districts rather than the new districts changes the *status quo*. It is well settled that "a temporary injunction is an extraordinary remedy . . . ." *Commonwealth ex rel. Cowan v. Wilkinson*, 828 S.W.2d 610, 612 (Ky. 1992). "It is apparent that the issuance of such an injunction

constitutes a prejudgment of the controversy before the defendant has had his day in court, and doubtful cases should await final judgment. **This is particularly true when mandatory relief is asked**, as in the present case, which **will change the status quo**." *Oscar Ewing, Inc., v. Melton*, 309 S.W.2d 760, 762 (Ky. 1958) (emphasis added) (internal citation omitted).

The Temporary Injunction issued in this case does not "merely . . . maintain the status quo." *Maupin v. Stansbury*, 575 S.W.2d 695, 698 (Ky. App. 1978). "Actually it would appear that the temporary injunction would change the status quo . . . ." *Cowan*, 828 S.W.2d at 613. Plainly, the *status quo* for the 2012 elections consists of the districts enacted by the 2012 General Assembly for those elections. Enjoining the use of those districts *pendente lite*, and mandating that the election officials instead use the 2002 districts, does not preserve the *status quo*, it changes it.

In order to preserve the *status quo*, this Court decided in *Fischer II* that the 1994 elections should proceed under the apportionment plan it declared unconstitutional. 879 S.W.2d at 480-81. That is consistent with the standard practice of federal courts, which routinely stay pending appeal a declaratory judgment invalidating an apportionment plan. *See, e.g., Whitcomb v. Chavis*, 403 U.S. 124, 140 (1971) (The judgment of the 3-judge District Court had been stayed pending appeal, 396 U.S. 1055 (1970), "thus permitting the 1970 elections to be held under the existing apportionment statutes declared unconstitutional by the District Court."); *Davis v. Mann*, 377 U.S. 678, 684 (1964) ("On application by appellants, THE CHIEF JUSTICE . . . granted a stay of the District Court's injunction pending final disposition of the case by this Court. Because of this stay, the November 1963 election of members of the Virginia Legislature was conducted

under the existing statutory provision" which had been held unconstitutional by the District Court).[28]

The only case that Rep. Hoover cites actually supports LRC's analysis. *Pileggi v. Aichele*, --- F.Supp. 2d ---, 2012 WL 398784 (E.D. Pa. Feb. 8, 2012) squarely holds that elections may proceed under an unconstitutional apportionment plan. "'[W]here an impending election is imminent and a State's election machinery is already in progress,' in which a court may withhold the granting of relief, even if an existing apportionment scheme is found to be invalid." *Id.* at *6 (quoting *Reynolds v. Sims*, 377 U.S. 533, 585 (1964).

The reason that Pennsylvania's 2012 legislative elections are to be run in the 2001 districts is a function of a unique provision in the Pennsylvania Constitution. Specifically, Pa. Const. Art. II, § 17 creates a Legislative Reapportionment Commission whose apportionment plan is appealable directly to the Pennsylvania Supreme Court. Under § 17(e), the reapportionment plan does not "have the force of law" until approved by that court.[29] Thus, when the Pennsylvania Supreme Court rejected the Commission's 2011 apportionment plan, that plan did not yet have the force of law.[30] That left the 2001

---

[28] Rep. Hoover seems to contend both *Whitcomb* and *Davis* support the Temporary Injunction issued in this case, but Rep. Hoover has misread both opinions. Unlike the present case, those cases did not involve an injunction against conducting election under the newly enacted district and requiring the elections to be conducted under the previous apportionment plan. Rather, in both cases, the 3-judge District Court had declared unconstitutional the existing legislatively-enacted plan and promulgated a judicially-created plan. In both cases, the U.S. Supreme Court issued a stay of the declaratory judgment declaring the most recently enacted plan unconstitutional, thereby permitting the elections to proceed under the most recently enacted plan despite the declaration that the plan was unconstitutional. Thus, both cases squarely support LRC's position, not Rep. Hoover's position, as to the Temporary Injunction issued by the Franklin Circuit Court.

[29] *Pileggi*, at *1. ("A reapportionment plan has the force of law only when the Supreme Court has 'finally decided' an appeal . . . .) (citing Pa. Const. Art. II, § 17(e)).

[30] *See Holt v. 2011 Legislative Reapportionment Comm'n*, --- A.2d ---, 2012 WL 360584 (Pa. Jan. 25, 2012).

plan as the only plan with the force of law. *Pileggi*, at *10 ("Under these unique circumstances, . . . the election should proceed under the **only-existing** plan, the 2001 Plan.") (emphasis added).

Of course, House Bill 1 was enacted by the General Assembly and signed into law by the Governor. It has the force of law, and it should not have been enjoined in favor of the significantly malapportioned 2000 plan.

The changes in the odd-numbered and even-numbered Senate districts are presumed to be constitutional, and the Circuit Court has not adjudged otherwise.

Moreover, House Bill 1 complies with the federal 10% rule and, as the Circuit Court conceded, the 2002 districts do not. Thus, the Circuit Court's injunction reflects his policy preference that incumbents in odd-numbered districts be allowed to run for reelection from their old districts (and procure a new four-year term before this Court can effectively decide this appeal) over the policy of equality of representation statewide.

LRC respectfully suggests that the Temporary Injunction changes the *status quo* and effectuates a profound imbalance of the equities while ignoring controlling precedent. That constitutes an abuse of discretion. The Temporary Injunction should be dissolved so that legislative elections in 2012 may proceed under the boundaries enacted by the General Assembly in 2012.

### C.   The Temporary Injunction treads needlessly upon the Constitutional doctrine of separation of powers.

The Circuit Court's decision plainly treads needlessly upon Kentucky's "strictly construed" doctrine of separation of powers.[31]  While adherence to one-person, one-vote

---

[31] *Legislative Research Comm'n ex rel. Prather v. Brown*, 664 S.W.2d 907, 912 (Ky. 1984) (quoting *Arnett v. Meredith*, 275 Ky. 223, 121 S.W.2d 36, 38 (1938).

presents a justiciable controversy, the actual drawing of the lines in an apportionment plan is a quintessential political question. Indeed, this Court expressly held in *Jensen* that an apportionment map drawn by the judiciary would be unconstitutional, "for the issuance of such an injunction would clearly violate the requirement of separation of powers. Ky. Const., Sections 27, 28, 29. Section 33 assigns to the legislature the duty to reapportion itself." 959 S.W.2d at 773.

Thus, when the Franklin Circuit Court said "the Court can see no countervailing rational basis or valid reason to re-assign the former SD 13 to an even numbered district," (Opinion at 14), it was deciding a political question that is not for the courts to decide. "Apportionment is primarily a political and legislative process. Our only role in the process is to ascertain whether a particular redistricting plan passes constitutional muster, not whether a better plan could be crafted." 959 S.W.2d at 776 (citation omitted).

Rep. Hoover nevertheless characterizes as "completely meritless" any argument that it would violate the separation of powers for the Kentucky judiciary to draft a reapportionment plan. (Response at 20.) In support of that contention, Rep. Hoover relies exclusively upon decisions applying the federal one-person, one-vote doctrine, not cases decided under the Constitution of Kentucky. Obviously, cases decided under the Equal Protection Clause of the Constitution of the United States do not involve a question of separation of powers under a state constitution because the Supremacy Clause trumps state law. At this procedural stage of this case, however, the Franklin Circuit Court has expressly reserved decision upon the Rep. Hoover's federal constitutional claims. The partial Declaratory Judgment relates solely to those Plaintiffs' state constitutional claims

under *Fischer II* and, under the square holding in *Jensen*, this Court could not remedy those alleged violations of § 33 KY. CONST. by drafting its own reapportionment plan.

Both Rep. Hoover and Senator Stein contend that LRC does not have "standing" to seek dissolution of the injunction because, they say, "LRC is not adversely affected" by the injunction. Rep. Hoover contends that "[t]he Circuit Court did not issue an injunction that adversely affects the LRC or the legislative branch in any way." (Response at 9.) That sweepingly conclusory statement ignores the interests of the General Assembly as a coordinate branch of government. It is well settled that a state legislative body has standing to litigate a violation of the doctrine of separation of powers. *Colorado General Assembly v. Lamm*, 700 P.2d 508 (Colo. 1985) (collecting cases). Specifically, a state legislature has standing in reapportionment litigation. *Sixty-Seventh Minnesota State Senate v. Beens*, 406 U.S. 187, 194 (1972). A classic example in Kentucky is *Legislative Research Commission ex rel. Prather v. Brown*, 664 S.W.2d 907 (Ky. 1984).

Appellees' argument also ignores the fact that the core issue created by the injunction is whether members of the General Assembly will stand for reelection in the 2002 districts or the 2012 districts, despite the fact that the General Assembly exercised the lawmaking power – vested by the Constitution exclusively in the General Assembly – and decided that the 2012 elections should be conducted in the districts established in 2012 by House Bill 1.

To say that the General Assembly is not "adversely affected" by a declaration that its enactment is unconstitutional – and an injunction ordering the Executive Branch to

ignore an enactment of the Legislative Branch for conducting elections for members of the Legislative Branch – exalts procedural form over constitutional substance.

In sum, by valuing the rights of the voters in the odd-numbered 13th district higher than the principle of population equality state-wide, the Circuit Court's "balancing of the equities" is an abuse of discretion.  By ignoring the binding precedent of *Anggelis*, changing the *status quo* and deciding a political question, the decision is an abuse of discretion.  The Temporary Injunction should therefore be dissolved.

## CONCLUSION

For the foregoing reasons, the Temporary Injunction should be dissolved.  This Court should modify *Fischer II* by adopting the federal 10% rule and eliminating the requirement of "mathematical precision" when protecting county integrity, and hold that House Bill 1 does not contravene § 33 KY. CONST.  In the alternative, the partial Declaratory Judgment should be stayed pending appeal, so that the 2012 legislative elections are conducted using the districts enacted in House Bill 1 (2012) rather than the 2002 districts.

Respectfully submitted,

Sheryl G. Snyder
Frost Brown Todd LLC
400 W. Market St., 32nd Fl.
Louisville, KY  40202
Telephone:  (502) 568-0247
ssnyder@fbtlaw.com

Laura H. Hendrix
General Counsel
Legislative Research Commission
State Capitol Annex, Room 104
Frankfort, KY  40601
Telephone:  (502) 564-8100
*Counsel for Appellant*

## INDEX TO APPENDIX

**Description of Item**                                        **Appendix  No.**

Feb. 7, 2012 Temporary Injunction Under CR 65.04 and                A
Partial Declaration of Rights ("Opinion")

# APPENDIX A



COMMONWEALTH OF KENTUCKY
FRANKLIN CIRCUIT COURT
DIVISION I
CIVIL ACTION NO. 12-CI-109

| | |
|---|---|
| JOSEPH M. FISCHER, et al. | **PLAINTIFFS** |
| and | |
| DAVID B. STEVENS, M.D., et al. | **INTERVENING PLAINTIFFS** |

V.                          **TEMPORARY INJUNCTION**
        **UNDER CR 65.04 AND PARTIAL DECLARATION OF RIGHTS**

| | |
|---|---|
| ALISON LUNDERGAN GRIMES, | |
| in her official capacity as | |
| Secretary of State for the Commonwealth | |
| of Kentucky, et seq.  and | **DEFENDANTS** |
| LEGISLATIVE RESEARCH COMMISSION | **INTERVENING DEFENDANT** |

This action is before the Court on the motions of the Plaintiffs and Intervening Plaintiffs for a Temporary Injunction under CR 65.04.  The Plaintiffs filed this action to challenge the constitutionality of the House re-districting plan adopted by the Kentucky General Assembly in House Bill 1, which was signed into law by the Governor on January 20, 2011.  The Court held a hearing on January 30, 2012 at which all original parties were represented by counsel.   The Court granted the motion of David Stevens, Jack Stephenson, Marcus McGraw and Senator Kathy Stein to intervene under CR 24.01.  The Intervening Defendants raise a similar challenge the provisions of House Bill 1 for re-districting of the Kentucky Senate.

The Court then granted a restraining order under CR 65.03 to preserve the *status quo* pending its decision on the motion for temporary injunction. The Court's restraining order prohibits the Secretary of State for implementing the filing deadline for legislative offices Tuesday, February 7, 2012. After the Court granted the Intervening Plaintiffs the right to participate, the Legislative Research Commission filed a motion to intervene pursuant to KRS

1

5.005, which the Court also granted.  The Court further set this action for an evidentiary hearing and further argument on Monday, February 6, 2012.

The Court heard evidence and argument at the hearing on February 6, 2012, and being sufficiently advised, IT IS ORDERED  the motions of the plaintiffs and intervening plaintiffs for a temporary injunction under CR 65.04 is GRANTED for the reasons set forth below.

## DISCUSSION

This action presents a challenge to the new districts that the General Assembly adopted for House and Senate districts in House Bill 1 of the 2012 General Assembly.  The Kentucky Supreme Court has established an authoritative interpretation of the requirements of Section 33 of the Kentucky Constitution for redistricting of legislative districts in Fischer v. State Board of Elections, 879 S.W.2d 475 (Ky. 1994)[1].  The Fischer case was subsequently revisited in Jensen v. State Board of Elections,  959 S.W.2d 771 (Ky. 1997), which dealt with the application of Section 33 to the multiple divisions of a single county.  Jensen recognized that any plan that maintains county integrity and population equality, as interpreted by the Supreme Court,  is bound to result in multiple divisions of some counties.   Nevertheless, the central ruling of Fischer II has remained in force, and must be applied by this Court.  As the Court held in Jensen,  the constitutional mandate of Section 33 requires a redistricting plan "to make full use of the maximum constitutional population variation as set forth herein [plus or minus 5%] and divide the fewest possible number of counties."  959 S.W.2d at 776.

The uncontested evidence before this Court demonstrates that the House and Senate Districts adopted in House Bill 1 fail on both counts.  At least one House District and one Senate District exceed the "maximum constitutional population variation" set forth in Fischer II.  Both

---

[1] This case or Fischer II, was preceded by Fischer  v. State Board of Elections, 847 S.W.2d 718 (Ky. 1992), which dealt with venue questions (Fischer I).  See also  State Board of Elections v. Fischer, 910 S.W.2d 245 (Ky. 1996) dealing with application of the redistricting rulings to special elections during this time frame (Fischer III).

2

the House and the Senate plans adopted in House Bill 1 divide more counties than "the fewest possible number of counties."   Accordingly, this Court is required to apply this binding precedent and hold that the legislative redistricting provisions of House Bill 1 violate Section 33 of the Kentucky Constitution, as construed by the Kentucky Supreme Court.

The Legislative Research Commission has advanced strong arguments that Section 33 of the Kentucky Constitution should be construed in a more flexible manner, to give the legislature greater discretion in the difficult task of balancing the competing, and sometimes inconsistent, constitutional values of population equality and county integrity.  Whatever merit those arguments may have, they must be addressed to the Kentucky Supreme Court.  This Court remains bound by that Court's decision in Fischer II.

It is apparent that the Supreme Court's ruling in Fischer II has had unintended consequences.  In Fischer II, the Supreme Court stated that "We recognize that the division of some counties is probable and have interpreted Section 33 to permit such division to achieve population requirements.  However, we can scarcely conceive of a circumstance in which a county or part thereof which lacks sufficient population to constitute a district would be subjected to multiple divisions."  *Id.*, 879 S.W.2d 479, fn 5.  A short time later, after the legislature struggled to draw a plan that complied with Fischer II, the Court in Jensen was forced to observe that "In fact, what we thought was scarcely conceiveable has been proven to be unavoidable."  959 S.W.2d at 776.

This demonstrates the real tension between the competing values of county integrity and population equality that continues today.  It is a concern of this Court that the Fischer II mandate *requires* the legislature to "make maximum use" of the 10% population variance it approved in that case.  As a result, each new redistricting plan post-Fischer II must begin the decennial

3

period with a 10% deviation in the population of districts, and this variation is virtually certain to increase with each passing year as a result of normal demographic trends and the movement of people from rural to urban areas. Accordingly, Fischer II seems to guarantee districts that over time will violate the 10% variation standard even more quickly, because it *starts* with a 10% variation.

Likewise, Fischer II is based on the Supreme Court's belief that county integrity and population equality can always be reconciled, but it is apparent from the proceedings in this case that the constitutional value of population equality is significantly impaired by the requirement to preserve county integrity. The Supreme Court's view of the importance of county integrity in Fischer II appears rooted in the history of the county unit, and fails to recognize that at the time of the adoption of the 1891 constitution, the county was the central unit of government for basic government services such as roads, education, mental health, and social welfare. *See e.g.,* Ireland, *The County in Kentucky History* (University Press of Kentucky, 1976), *Little Kingdoms* (University Press of Kentucky, 1977). In today's world of government, all of those functions now reside primarily with state government, rather than county government. All of these considerations militate in favor of giving greater weight to population equality than county integrity when those values clash, as they inevitably do[2]. Those considerations, however, must be addressed to the Kentucky Supreme Court, not to a trial court that is required to apply the binding precedent of Fischer II.

The duty of this Court is to apply the binding precedents that control the application of Section 33. Under the controlling precedents, the provisions of House Bill 1 simply fail to pass constitutional muster.

---

[2] It appears that the text of Section 33 itself requires that greater weight be given to population equality, in that it qualifies the provision on maintaining county integrity with the expressed command that "Provided, in doing so the principle requiring every district to be as nearly equal in population as may be shall not be violated."

4

## FINDINGS OF FACT

1.  Under the population data from the 2010 U.S. Census relied upon by the General Assembly in redrawing its district lines in House Bill 1, the ideal district for the House of Representatives would include 43, 394 people, and the ideal district for the Senate would include 114,194 people. The ideal district is composed of the total population of Kentucky reflected in the 2010 census, divided by 100 for the House of Representatives and divided by 38 for the Senate.

2.  The Districts for the House and Senate established in House Bill 1 contain variations from the ideal population for House and Senate Districts. House District (HD) 24 contains a population of 45,730, a 5.38% variance from the ideal.   One Senate District (SD 8) contains a population of 120,498, a variance of 5.52% from the ideal.    In the House of Representatives, 15 districts (HD 47, 52, 58, 60, 62, 63, 64, 66, 68,69, 78, 80, 83, 88, and 100) include a variance of 5%, the maximum variance allowed under Fischer v. State Board of Elections,, 879 S.W.2d 475 (Ky. 1994). (*See* Exhibit 3 to the Complaint, LRC Population Summary Report, January 10, 2012).

3.  House Bill 1 divides 28 counties in districts for the House of Representatives, and 5 counties for Senate districts.

4.  House Floor Amendment 1 to House Bill 1 provides for a redistricting that divides only 24 counties.   Senate Floor Amendment 1 to House Bill 1 provides for a redistricting that divides only 4 counties.

5.  House Bill 1 provides an overall range of deviation for House Districts of 10%, and an overall range of deviation for Senate Districts of 9.84%. *See* LRC Population Summary Report, *Id.*   Plaintiffs have argued that this level of variance between the least populous

5

district and the most populous district exceeds the constitutional requirements for House Districts. It is undisputed that House Bill 1 sets those variances at, or near, the constitutionally permissible limits for both House and Senate.

6. The Plaintiffs have identified at least one House District, HD 80, that has been designed in such a manner as to raise a substantial question as to whether that district complies with the requirement of Section 33 that "the counties forming a district shall be contiguous." House District 80 contains a one mile wide strip that runs from the Casey County border, through the northwestern corner of Pulaski County, to the Rockcastle County border. This strip of Pulaski County contains only 1882 residents. (*See* LRC's Answers to the Court's Questions, filed 2/6/12).

7. Former Senate District 13, in which Intervening Plaintiffs Stevens, Stephenson, McGaw vote and reside, and which is represented by Intervening Plaintiff Senator Kathy Stein, was located entirely within Fayette County prior to the enactment of House Bill 1, which re-located Senate District 13 to the northeastern Kentucky counties of Bath, Fleming, Harrison, Lewis, Mason, Montgomery, Nicholas and Robertson Counties. The vast majority of the geographic territory that constituted the former SD 13, and almost all the voters who resided there, have been re-assigned by House Bill 1 to SD 4, which formerly was located in Western Kentucky and is represented by Sen. Dorsey Ridley of Henderson.

8. The Fayette county voters of the former SD 13 elected a senator in the election of 2008, and absent the enactment of House Bill 1, would elect a senator in 2012. All odd numbered Senate Districts are on the ballot in 2012, and all even numbered Senate Districts are on the ballot in 2014.

6

9. By virtue of the enactment of House Bill 1, and the reassignment of the voters in the geographic territory that formerly constituted SD 13 to SD 4, the voters who reside in that territory will be denied the right to vote for and elect a Senator for 2 additional years, from 2012 (when the election would have been held prior to House Bill 1, to 2014 when it would be held if House Bill 1 is allowed to take effect).

10. In Fayette County alone, 113,724 citizens who resided in the former territory of SD 13, were reassigned to SD 4 by House Bill 1. (LRC Exhibit 1, Hearing 2/6/12).

11. House Bill 1 further provides that a statewide total of 351,394 citizens and residents were transferred from odd numbered districts (for which senators were elected in 2008, and for which elections will be held this November) to even numbered districts (for which senators were elected in 2010 and elections will be held in November, 2014). (LRC Exhbit 1, Hearing 2/6/12).

12. In addition to the wholesale reassignment of the voters of former SD 13 to SD 4, House Bill 1 also reassigns the voters of 9 other counties[3] *in their entirety* from odd numbered Senate Districts to even numbered Senate Districts.

13. By virtue of this reassignment, virtually all of the residents and voters of the former SD 13 in Fayette County, and in the other 9 counties that were transferred *en masse*, will be denied the right to vote for and elect a senator to represent them for two additional years, and will be represented for two entire legislative sessions in the Senate by a person not elected by the voters of the district, but assigned to them by legislative fiat.

---

[3] Boyd, Breathitt, Casey, Estill, Gallatin, Johnson, Magoffin, Powell, Pulaski and Russell Counties are all reassigned from odd numbered districts to even number districts. *See LRC Exhibit 1, id.*

7

## CONCLUSIONS OF LAW

1. The decision of the Kentucky Supreme Court in <u>Fischer v. State Board of Elections,</u> 879 S.W.2d 799 (Ky. 1984) provides that under Section 33 of the Kentucky Constitution, the General Assembly may enact a redistricting plan in which the population variation "does not exceed -5% to +5% from an ideal legislative district." *Id.* at 479.

2. <u>Fischer</u> further provides that the General Assembly is obligated to "formulate a plan which reduces to the minimum the number of counties which must be divided between legislative districts. ... The mandate of Section 33 is to make full use of the maximum constitutional population variation as set forth herein and divide the fewest possible number of counties." *Id.*

3. House Bill 1 fails to comply with the "maximum constitutional population variation" as set forth in <u>Fischer</u> by virtue of the fact that at least one House District and one Senate District have a population variance greater than 5%. The right of the plaintiffs and intervening plaintiffs to proportional representation under Section 33 of the Kentucky Constitution, as construed by the Kentucky Supreme Court in <u>Fisher, *id.*,</u> has been violated by the provisions of House Bill 1.

4. House Bill 1 fails to comply with the mandate of <u>Fischer</u> to "divide the fewest possible number of counties" because the record in this case demonstrates that it is possible to divide as few as 24 counties in the House, and as few as 4 counties in the Senate.

5. The Plaintiffs have raised a substantial issue of law regarding the issue of whether HD 80, and perhaps HD 89, comply with the requirement of Section 33 that "counties

8

forming a district shall be contiguous." There is no controlling case law on this issue, and the issue requires further proof and briefing on the merits before the Court can render a final decision.

6. The Intervening Plaintiffs have raised a substantial issue of law regarding whether their transfer from SD 13 to SD 4 has unconstitutionally impaired their right to vote for and elect a senator. The Court is not aware of, and the parties have not cited, any controlling legal authority on this issue. In Anggelis v. Land, 371 S.W.2d 857 (Ky. 1963), the former Court of Appeals rejected a claim that the Redistricting Act of 1963, dividing the 13th Senate District into two districts (12 and 13), created a vacancy in the office of Senator from the 12th district. No claim was raised that the Act denied or abridged the right of any citizens to vote on the election of their senator. Rather, Anggelis rejected an attempt by the sitting Senator in the 13th district to obtain by mandamus a certificate of nomination "as Democratic nominee, for the office of State Senator from the Twelfth Senatorial District of Kentucky." Id. at 858. Having been moved out of his district, he sought to be re-elected by judicial action rather than standing for election in the newly established district. Anggelis did not challenge the re-districting at all. It appears that the Senator elected by the voters in all of Fayette County for the 13th District continued to serve until the next election for an odd numbered district, and the voters who were re-assigned to an even numbered district were able to elect a new senator at the first election after the 1963 redistricting. Thus no citizen was assigned to be represented by a senator who had never been elected by the voters of that geographic area, nor was the right of any citizen to vote for a senator delayed.

9

7.   Senator Stein seeks no such relief here, but rather, she and her constituents maintain that by transferring the geographic territory of former SD 13 (an odd numbered district that will be subject to election this year) to SD 4 (an even numbered district that will not be subject to election until 2014), that House Bill 1 denies and abridges their right to elect a senator, and, as a practical matter extends the term of the Senator representing them from 4 years to 6 years because the last election for senator in that geographic territory was in 2008, and the next election will be held until 2014.

8.   The Court has not found, nor have the parties cited, any controlling legal authority that addresses the question of whether an entire senatorial district can be transferred from an odd numbered district to an even numbered district, when such a transfer results in a delay of 2 years in the right of those citizens to elect a senator.  The Court concludes that this alleged abridgement of the voting rights of the Intervening Plaintiffs is a substantial question of law that merits a full adjudication on the merits.

9.   In deciding whether to grant injunctive relief, this Court is required to weigh the competing equities, including the public interest.  Maupin v. Stansbury, 575 S.W.2d 695 (Ky. App. 1978). This balancing of competing interests is also required in connection with cases that allege the impairment of the right to vote. See, e.g. Burdick v. Takushi, 504 U.S. 428 (1992).  Here, the Court finds that the "character and the magnitude" of the asserted impairment of the right to vote is substantial, and the public interest requires preservation of the *status quo* pending a final judgment.

10.   Having found a violation of the rights of the Plaintiffs and Intervening Plaintiffs, the Court must address the question of remedies. Here, the Court recognizes that there are substantial competing interests. The last redistricting completed by the General

Assembly was enacted into law in 2002 (*see* 2002 Ky. Acts., c. 1).   Accordingly, we are in the 10th year of that plan, and a new census was completed last year, showing that the districts are substantially out of balance.   Thus, there is no question that the legislature is under an obligation to complete re-districting as soon as possible.   The question before the Court then, is whether the November 2012 elections should be conducted under the district boundaries that preceded the enactment of House Bill 1, or whether the Court should redraw legislative district line, or require the legislature to redraw those lines (and extend all necessary deadlines to do so).

11.   The Court finds and concludes that there is no constitutional or statutory deadline that requires that legislative district lines be redrawn prior to the November 2012 election.   In fact, the case law on redistricting is replete with cases that demonstrate that the decennial redistricting required by Section 33 has been only loosely observed. *See* Combs v. Matthews, 364 S.W.2d 647 (Ky. 1963), Stiglitz v. Schardien, 239 Ky. 799, 40 S.W.2d 315 (Ky. 1931), Ragland v. Anderson, 125 Ky. 141, 100 S.W. 865 (Ky. 1907).

12.   If the Court allows the district lines established in House Bill 1 to take effect immediately, it is uncontested that virtually all of the citizens and voters of the former SD 13 (at least 113,000 citizens) will be represented in not one, but two full annual sessions of the General Assembly (the 2013 and 2014 sessions) by a senator who does not live in the district, and has no political, social, economic or other connection to the community he has been assigned to represent.   Those citizens and voters will be represented in the Senate by a Senator from another area of the state who has been politically assigned to this task.   Those citizens and voters will be denied the right to

11

select their own senator for another two years, although they otherwise would be able to vote for a senator this November.

13.   Likewise it appears that there are hundreds of thousands of citizens and voters who are similarly situated to the Intervening Plaintiffs. LRC Exhibit 1 documents that there are 350,394 persons who have been moved from odd numbered districts to even numbered districts, and thereby will be delayed by 2 years in their right to vote for a senator. It is true that LRC Exhibit 1 indicates that 400,667 persons were moved from an even numbered to an odd numbered district, and thereby will be able to vote for a senator 2 years sooner than they would have if they remained in an even numbered district. But the Court can find no basis for holding that the law allows the General Assembly the right to delay one citizen's right to vote for a senator by advancing the right of other citizens' vote for a senator.

14.   The Court can find no basis in law or precedent for the wholesale transfer of virtually an entire Senate District from an odd-numbered district to an even numbered district, in a manner that delays the right of the voters of the district to elect a senator by two years. No such law or precedent has been cited to the Court. The Court recognizes that Senate Districts have been re-assigned to new geographic territory, and that to some degree such re-assignments are necessary to address shifts in population. Such transfers of districts to new territory have been upheld by Opinions of the Attorney General. *See OAG 82-18 and OAG 82-55.*  But there are no reported cases in which this issue has been decided, and no prior redistricting legislation in which a challenge has been brought by voters who claim their right to vote for a senator has been impaired. Again, this Court concludes that these issues warrant a full

12

adjudication on the merits, and it is necessary to maintain the *status quo* pending a final adjudication because in the absence of injunctive relief "the acts of the adverse party will tend to render such final judgment ineffectual." CR 65.04(1). Maupin v. Stansbury, *supra.*

15. In balancing the equities, the Court is mindful that the current districts are out of balance and must be redrawn to comply with the "one person, one vote" mandate of federal and state law. But the question before the Court is one of timing. The Court notes that the uncontested evidence in this case demonstrates that House Bill 1 itself violates with the mandate of Section 33 for proportional representation because it includes districts in both House and Senate that exceed the maximum 5% variation. The Court further finds as yet undisputed evidence that as many as 351,394 persons will be legislatively re-assigned under House Bill 1 from districts that are required to elect a senator this year to districts that will not hold an election until 2014. Those citizens, for two full annual sessions of the General Assembly (2013 and 2014) would be assigned to senators who do not reside in the districts they represent and who have no meaningful ties to those communities. The Court therefore concludes that the redistricting cure of House Bill 1 is worse than the malapportionment disease that it is legally required to remedy, at least for the next two years. In these circumstances, the public interest demands that the Court grant injunctive relief to maintain the *status quo* pending a full adjudication on the merits.

16. The Court finds and concludes that there is no Kentucky case on point deciding whether the impairment of the Intervening Plaintiffs' voting rights reflected in House Bill 1 constitutes a violation of the guarantee of due process and equal protection of

13

the law under Sections 2 and 3 of the Kentucky Constitution. However, the Court

notes that other jurisdictions have found equal protection violations in similar

circumstances. As explained by a three judge federal District Court in Wisconsin,

> "every new reapportionment plan creates a situation that results in 'holdover'
> Senators and the temporary disenfranchisement of some residents for a two-year
> period. .. The temporary disenfranchisement of citizens is constitutionally tolerated
> under either of two related theories.  Due to the complexities of the reapportionment
> process, a temporary loss of voting rights (the cases speak of a 'delay' in the right to
> vote) is tolerated when it is an 'absolute necessity' or when it is 'unavoidable.'"
> Republican Party of Wisconsin v. Election Board, 585 F.Supp. 603 (E.D. Wis. 1984),
> *vacated and remanded* Wisconsin Elections Board v. Republican Party of Wisconsin,
> 469 U.S. 1081 (1984).[4]

17. The re-assignment of geographic territory of the former SD 13 to an even numbered

district is neither "an absolute necessity" nor "unavoidable."  On the record before

this Court, it appears to be an arbitrary decision without a rational basis.  To the

extent that political considerations concerning the political impact of this re-

assignment on the majority party are involved, the Court notes that this is a political

process and it is appropriate to take political concerns into consideration so long as

they do not impair the nonpartisan voting rights of the public. Here, the public's right

to elect a senator  has been delayed for 2 years, and in conducting the balancing test

required under Burdick *supra*,  the Court can see no countervailing rational basis or

valid reason to re-assign the former SD 13 to an even numbered district, thereby

delaying the right of those citizens to vote on the election of their senator.   No such

rational basis has been advanced thus far in the litigation.

---

[4] The U.S. Supreme Court granted an order staying the lower court's ruling, apparently because of time constraints
that would make the mechanics of running the 1984 election difficult or impossible.  469 U.S. 812.  After the
November election was held under the legislatively adopted plan, rather than the judicially imposed plan, the action
became moot, and the Supreme Court vacated the lower court's decision and directed dismissal of the complaint.

# CONCLUSION

For the reasons stated above, IT IS ORDERED AND ADJUDGED as follows:

1.  The defendant Allison Lundergan Grimes, in her capacity as Secretary of State of the Commonwealth of Kentucky, and the Kentucky State Board of Elections, and all agents, employees and others acting in concert with them, are hereby ENJOINED under the provisions of CR 65.04 from implementing the districts for the Kentucky House of Representatives and Kentucky Senate that are set forth in House Bill 1, enacted by the 2012 General Assembly;

2.  Until the General Assembly passes redistricting legislation that complies with all applicable constitutional requirements to revise the districts in effect under KRS 5.005 (2011), as enacted by 2002 Ky. Acts, c. 1,  the elections for the House and Senate shall be conducted with the legislative district boundaries in effect immediately prior to the enactment of House Bill 1 for both the House of Representatives and  the Senate.

3.  The filing deadline set forth in KRS 118.165 shall be extended through 4:00 p.m. on Friday, February 10, 2012 to allow all candidates and potential candidates the opportunity to make the required candidacy filings under the temporary injunction issued by this Court, with the legislative districts required by this Court's ruling;

4.  The motion of the Legislative Research Commission to intervene as a matter of right is GRANTED under CR 24.01 and KRS 5.005(1).

5.  This is a final and appealable judgment on the claim set forth in Count 1 of the Complaint filed by Plaintiffs Fischer, Hoover, King, Todd and Gaydos for violation

15

of their rights under Section 33 of the Kentucky Constitution regarding the population variance of greater than 5%, and the failure to divide "the fewest possible number of counties." It is also a final and appealable judgment on the claim set forth in Count 1 of the Intervening Complaint filed by Intervening  Plaintiffs Stevens, Stephenson, McGraw and Stein for violation of their rights under Section 33 of the Kentucky Constitution regarding the population variance of greater than 5% and the failure to divide "the fewest possible number of counties."   Those claims of the plaintiffs and intervening plaintiffs under Fischer v. State Board of Elections, 879 S.W.2d 475 (Ky. 1994) constitute a facial challenge to the constitutionality of House Bill 1 under Section 33 of the Kentucky Constitution, and there is no just cause for delay in the entry of this judgment on the facial challenge to the constitutionality of House Bill 1. *See* CR 54.02

6.   The Court RESERVES ruling on all other claims and defenses, pending the filing of Answers, completion of discovery, and briefing on the merits.   Accordingly, this Order is an interlocutory order on all other claims of the Plaintiffs[5] and the Intervening Plaintiffs[6].

7.   The bond previously set for the issuance of the restraining order under CR 65.03 ($200), which was posted by the Plaintiffs, shall remain in effect and serve as the bond for the temporary injunction.

---

[5] Lack of contiguity under Section 33, State and Federal Equal Protection, State and Federal Freedom of Association, 42 U.S.C. Sec. 1983, and Declaratory and Injunctive Relief under KRS 418.040)
[6] Equal Protection, Freedom of Association, Violation of Term of Office, 42 U.S.C. Sec. 1983, and Declaratory and Injunctive Relief.

16

IT IS SO ORDERED this 7th day of February, 2012, at 3:00 p.m. EST.

PHILLIP J. SHEPHERD, JUDGE
Franklin Circuit Court, Division 1

DISTRIBUTION:

Fultz Maddox Hovious & Dickens
Victor B. Maddox
John David Dyche
Jennifer Metzger Stinnett
Jason M. Nemes
101 S. Fifth Street, 27th Floor
Louisville, KY 40202

Britton Osborn Johnson
Anita Britton
200 West Vine Street, Suite 800
Lexington, KY 40507

Tachau Meek PLC
David Tachau
Dustin Meek
3600 National City Tower
101 S. Fifth Street
Louisville, KY 40202-3120

Pierce Whites
702 Capital Avenue
Annex Room 309
Frankfort, KY 40601

Scott Jones
702 Capital Avenue
Capitol Annex Building, Suite 304
Frankfort, KY 40601

J. Patrick Abell
702 Capitol Ave
Annex Room 304A
Frankfort KY 40601

Hon. Jack Conway

17

Attorney General
The Capitol Building
700 Capitol Avenue, Suite 118
Frankfort, KY 40601


Sheryl Snyder
400 West Market Street
Suite 3200
Louisville, KY 40202

Laura Hendrix, General Counsel
Legislative Research Commission
Room 300, State Capitol
725 Capital Avenue
Frankfort, KY 40601

Scott White
Sarah Mattingly
Morgan & Pottinger
133 W. Short Street
Lexington, KY 40507

18