## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## NORTHERN DIVISION AT COVINGTON

| | |
|---|---|
| KENNY BROWN, individually and in his official capacity as the Boone County Clerk, *et al.*, | |
| Plaintiffs, | Case No. 2:13cv00068 |
| v. | **Electronically filed** |
| COMMONWEALTH OF KY, *et al.*, | |
| Defendants. | |
| MARTIN HERBERT, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 3:13cv00025 |
| KENTUCKY STATE BOARD OF ELECTIONS, *et al.*, | |
| Defendants. | |

## REPLY IN SUPPORT OF PLAINTIFFS'
## JOINT MOTION FOR SUMMARY JUDGMENT

Plaintiffs in these consolidated actions ("*Brown* Plaintiffs" and "*Herbert* Plaintiffs," respectively) submit this reply memorandum in support of their joint motion for summary judgment. [RE #67; RE #67-1.]

### INTRODUCTION

In these consolidated actions, the *Brown* Plaintiffs and the *Herbert* Plaintiffs (collectively "Plaintiffs") have jointly moved for summary judgment on the central issue in both cases — whether Kentucky's current legislative districts (which were adopted in 2002) are

constitutionally valid in light of the substantial population deviations evinced by the 2010 Census. [RE #67; RE #67-1.] The Plaintiffs raise this issue in claims against the various official capacity defendants seeking: 1) a declaration that that the 2002 districts now violate the Fourteenth Amendment's Equal Protection clause, and; 2) prospective injunctive relief barring those official capacity defendants from using the mal-apportioned districts in future Kentucky elections. [*Herbert* Verified Compl., ¶¶ 37-39; *Brown* Compl., 18, ¶¶ C-D.]

Notably, Plaintiffs' summary judgment motion does *not* include the *Brown* Plaintiffs' damages claims relating to the 2012 elections *or* their state constitutional claim because those claims have been abandoned. [RE #64; RE #64-1; RE #69.] Moreover, the *Brown* Plaintiffs and the *Herbert* Plaintiffs seek to pursue their claims (and thus enjoin) only Executive branch officials sued in their official capacities — *i.e.*, the Governor, the Secretary of State, and the members (and executive director) of the Kentucky State Board of Elections ("KSBE") — because the *Brown* Plaintiffs have dismissed, or moved to dismiss, the remaining defendants in their suit. [RE #30 (agreed motion to dismiss Attorney General); RE #65 (agreed motion to dismiss Commonwealth of Kentucky); RE #64 (motion to dismiss Senate President Stivers and Speaker Stumbo); RE #69 (motion to dismiss Legislative Research Commission ("LRC")).] Similarly, the *Herbert* Plaintiffs have agreed to dismiss the organizational defendant the KSBE [RE #72], and the *Brown* Plaintiffs have sought to replace KSBE with that organization's board members and its executive director as official capacity defendants — a proposition with which those official capacity defendants have agreed. [RE #77: Joint Motion to Substitute Defendants.]

In their joint motion for summary judgment, Plaintiffs argued that undisputed material evidence establishes that Kentucky's current House and Senate districts are governed by maps that were enacted in 2002 and, as a result, are now grossly mal-apportioned in light of

Kentucky's 2010 Census data. [RE #67-1: Memorandum in Support of Plaintiffs' Joint Motion for Summary Judgment.]  They pointed to their status as residents (and registered voters) of overpopulated House and Senate districts, including the *most* overpopulated House and Senate districts, to establish irreparable harm in the form of vote dilution caused by the continued use of the mal-apportioned maps. [*Id*. at 6-7.] They established that the districts' population deviations exceed that which is permitted under the Fourteenth Amendment. [*Id*. at 7-11.] And they further established that the mal-apportioned maps (and their resulting population deviations) are not the result of any rational state policy, but rather the product of the General Assembly's failure to timely enact constitutionally permissible legislative districts between 2011 (when state official received the Census data) and 2013 (when these cases were filed). [*Id*. at 11-12; *Brown* Compl. (filed Apr. 26, 2013); *Herbert* Verified Compl. (filed May 10, 2013).] Thus, Plaintiffs maintain that summary judgment is appropriate because there is no genuine issue of material fact regarding the substantial population imbalances caused by Kentucky's 2002 maps and that they are entitled to judgment as a matter of law.

      In opposing the motion, the various defendants filed four separate responses. [RE #75-1: LRC's Memorandum in Opposition to Plaintiffs' Joint Motion for Summary Judgment ("LRC Response"); RE #81: Defendants' Response to Plaintiffs' Joint Motion for Summary Judgment ("KSBE Response")(filed on behalf of KSBE and its official capacity board members and executive director, as well as the Secretary of State); RE #84: Speaker Stumbo's Response to *Brown* Plaintiffs' Motion for Summary Judgment ("Stumbo Response"); and RE #86: Response of Senate President Robert Stivers to the Plaintiffs' Joint Motion for Summary Judgment ("Stivers Response").] In doing so, three of the briefs advanced several arguments against granting summary judgment or the awarding of declaratory and/or injunctive relief, including:

Plaintiffs lack standing; the claims are moot or are unripe; the claims are barred by *res judicata,* the *Rooker-Feldman* doctrine, and/or the statute of limitations; Plaintiffs are not entitled to declaratory and/or injunctive relief; and that the 2002 maps do not violate the Fourteenth Amendment. [RE #75-1: LRC Response at 5-6 (standing); *id*. at 7-8 (declaratory/injunctive relief inappropriate); *id*. at 9-10 (no Equal Protection violation); *id*. at 33-35 (*res judicata*); *id*. at 35-37 (mootness); *id*. at 37-38 (*Rooker-Feldman*); *id*. at 38-39 (statute of limitations); RE #84: Stumbo Response at 3-5 (standing); *id*. at 5-6 (declaratory relief inappropriate); *id*. at 6-7 (no Equal Protection violation); *id*. at 8-9 (*res judicata*); and RE #86: Stivers Response at 3-5 (no Equal Protection violation); *id*. at 5-6 (standing); *id*. at 7-8 (declaratory/injunctive relief inappropriate); *id*. at 9-10 (*res judicata*); *id*. at 10-11 (*Rooker-Feldman*); *id*. at 11-12 (statute of limitations).] The fourth response brief — filed on behalf of the Secretary of State and the official capacity defendants comprising the KSBE's board and its executive director — did not contest the merits of Plaintiffs' claims, but instead opposed only the entry of Plaintiffs' requested permanent injunction. [RE #81: KSBE Response at 2 ("Defendants take no position as to whether Kentucky's current Senate and House districts are mal-apportioned"), *id*. at 3-5 (opposing entry of permanent injunction).]

Because of the substantial overlap in Defendants' arguments opposing summary judgment, Plaintiffs now submit this single, joint reply addressing each in turn.[1]

---

[1]   Because the *Brown* and *Herbert* Plaintiffs seek to file a single, joint reply, the parties have agreed, subject to the Court's approval, to extend the page limit for this reply brief from fifteen (15) pages to twenty-five (25) pages. [*See* RE #87: Stipulation/Agreed Order Regarding Page Limitations; RE #87-1.]

## I.     PLAINTIFFS' CLAIMS ARE JUSTICIABLE

Defendants' arguments opposing summary judgment largely focus on the asserted non-justiciability of Plaintiffs' claims, either because jurisdiction is lacking (standing, ripeness, mootness, *Rooker-Feldman*), or because the central issue cannot be reached (*res judicata*, statute of limitations). These arguments, however, are without merit and do not warrant denying Plaintiffs' motion for summary judgment or withholding the requested declaratory and injunctive relief.

### A.     Plaintiffs Possess Standing to Pursue Their Claims

Defendants mistakenly assert that Plaintiffs lack standing to pursue their Equal Protection claims because they have not suffered a cognizable injury-in-fact. [RE #75-1: LRC Response, 5-7; RE #84-1: Stumbo Response, 3-5; RE #86: Stivers Response, 5-6.] But this argument ignores the undisputed material evidence establishing Plaintiffs' status as residents and registered voters in grossly overpopulated House and Senate districts, and it misconstrues the relevant Article III standing inquiry in redistricting cases where vote dilution (as is the case here) constitutes a cognizable injury.

Specifically, there is *no* genuine dispute that several Plaintiffs are residents and registered voters in House and Senate districts that are currently overpopulated. For example, the uncontested facts establish that several Plaintiffs are residents and registered voters in House Districts 29, 58, and 60 — districts that are overpopulated by 34.46%, +28.29%, and 42.70%, respectively. [*Hebert* Verified Compl. ¶¶ 6-10; *Brown* Compl. ¶¶ 2, 4-7, 13; RE #67-29: Plaintiffs' Exh. 9 — House District Deviation Table; *see also attached* Plaintiffs' Exh. 1: Declaration of Kenny Brown ("Brown Decl.").] Likewise, several Plaintiffs also live and vote in overpopulated Senate Districts, including Senate Districts 10, 11, 20, and 36 which are

overpopulated by 5.55%, 20.20%, 16.87%, and 10.26%, respectively. [*Id.*; RE #67-33: Plaintiffs' Exh. 14 — Senate District Deviation Table.] These voter-plaintiffs include individuals who reside in (and are registered voters of) House District 60 and Senate District 11 — the *most* overpopulated districts under the 2002 maps. [*Brown* Compl., ¶¶ 2-13; *Herbert* Verified Compl., ¶¶ 6-10.][2]

But in contesting Plaintiffs' standing, Defendants have not pointed to any genuine dispute with respect to these material facts (nor could they) because no defendant sought to depose any plaintiff regarding her residency or voter status, nor has any defendant tendered written discovery requests into these matters. Thus, the *Herbert* Plaintiffs' Verified Complaint establishes the material facts regarding their residency and voter status in overpopulated districts, and these facts are unchallenged by any Defendant. [*Herbert* Verified Compl., ¶¶ 6-10.] Similarly, the *Brown* Plaintiffs' residency and voter status is detailed both in their Complaint and in the attached declaration, and these, too, are un-refuted by any Defendant. [*Brown* Compl., ¶¶ 2-13; Plaintiffs' Exh. 1: Brown Decl.]

It is well-settled that an individual residing in an overpopulated district suffers a dilution in voting power, a form of injury-in-fact sufficient to confer standing in redistricting cases. *See Baker v. Carr*, 369 U.S. 186, 205–06 (1962)("voters who allege facts showing disadvantage to themselves as individuals have standing to sue"); *Reynolds v. Sims*, 377 U.S. 533, 568

---

[2]    In addition to the voter-plaintiffs whose vote dilution constitutes a cognizable injury, the official capacity plaintiffs and candidate-plaintiffs also have standing to represent the rights of third-party voters whose votes are diluted under the 2002 maps. *Penn. Psych. Society v. Green Spring Health Servs., Inc*, 280 F.3d 278, 288 n.10 (3d Cir. 2002)(stating that "candidates for public office may be able to assert the rights of voters"); *Walgren v. Board of Selectmen of Amherst,* 519 F.2d 1364, 1365 n.1 (1st Cir. 1979)(observing that "we have in the past indicated that a candidate has standing to raise the constitutional rights of voters"); *Mancuso v. Taft*, 476 F.2d 187, 190 (1st Cir. 1973)(same). Of course, so long as one plaintiff has standing, there is no need for the Court to separately consider the other plaintiffs' standing. *See Bowsher v. Synar*, 478 U.S. 714, 721 (1986).

(1964)("[A]n individual's right to vote ... is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living [i]n other parts ...."). Accordingly, Plaintiffs, as residents and registered voters in substantially overpopulated House and Senate districts, suffer an immediate and ongoing injury in the dilution of their voting power which is a cognizable injury under Article III.[3]

Moreover, although the Defendants cite *Miyazawa v. City of Cincinnati*, 825 F. Supp. 816 (S.D. Ohio 1993) for the accepted proposition that a cognizable injury is one that is "real and immediate, and not 'conjectural' or 'hypothetical,'" their further reliance upon that decision to undermine Plaintiffs' standing here is misplaced. [RE 86: Stivers Response, 5 (quoting *Miyazawa*, 825 F.Supp. at 818); RE #75-1: LRC Response, 6 (same); RE #84: Stumbo Response, 4 (same).] *Miyazawa* involved a challenge to term limits brought by plaintiffs alleging that they had been deprived of the ability to vote for particular candidates. *Miyazawa*, 825 F.Supp. at 818. In rejecting plaintiffs' contention that the asserted "injury" conferred standing, the court stated that "[a]t best Plaintiff shares a political harm with every other voter" affected by the term limits. *Id.* Here, however, Plaintiffs' asserted mal-apportionment claims are based upon a specific injury that is neither a mere "political harm" nor one shared by every other Kentuckian — the dilution of their voting power by virtue of living in grossly overpopulated districts. Because Plaintiffs' injuries are thus concrete and particularized, and because there is no genuine dispute as to Plaintiffs' status as residents and voters in the overpopulated districts, they have standing to bring these mal-apportionment claims.  *Baker*, 369 U.S. at 186.

---

[3]    The LRC's speculation that "a new law *may* be passed that *may* alleviate any such concerns" regarding Kentucky's overpopulated districts is inadequate to defeat Plaintiffs' standing to challenge the current, mal-apportioned districts. [RE #75-1: LRC Response at 6 (emphasis added).]

**B.     Plaintiffs' Claims Are Ripe**

Related to its standing argument, the LRC also asserts that the claims at issue are unripe because Plaintiffs' asserted injury is not "impending." [RE #75-1: LRC Response, 3.] This, of course, is incorrect because the dilution of Plaintiffs' voting power is a current and ongoing injury resulting from the continued use of the current legislative districts, and the resolution of the 2002 maps' constitutional validity is presently fit for judicial review.

"Ripeness is peculiarly a question of timing. Its basic rationale is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985). The Supreme Court has instructed that "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration must inform any analysis of ripeness." *Id*. at 581. Whether a case is ripe depends on the state of affairs at the time the court is called upon to render a decision. *Buckley v. Valeo,* 424 U.S. 1, 113-14 (1976)(considering events intervening between date of Court of Appeals' decision and time of Supreme Court's review).

An action challenging a statute becomes ripe when parties need to start preparing to comply with it. *See New York v. United States*, 505 U.S. 144, 175 (1992). In redistricting cases, ripeness occurs when citizens begin to prepare for the primary election cycle. *Arrington v. Elections Bd.*, 173 F.Supp.2d 856 (E.D.Wis. 2001); *Montanto v. Suffolk County Legislature*, 263 F.Supp.2d 644 (E.D. N.Y. 2004)(same). When it comes to preparation for an election, a key consideration is campaign planning and fundraising. Campaign planning decisions must be made months in advance of the election to be effective. *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1500-01 (10th Cir. 1995); *Miller v. Brown*, 462 F.3d 312 (4th Cir. 2006).

Furthermore, case law is clear that for a court to provide relief, a redistricting case must be filed well in advance of the start of the qualifying period (in this case November 6, 2013). *Maryland Citizens for a Representative Gen. Assembly v. Governor of Maryland*, 429 F.2d 606 (4th Cir. 1970)(no injunctive relief available where plaintiffs filed suit 13 weeks before candidate filing deadline); *Simkins v. Gressette*, 631 F.2d 287 (4th Cir. 1980)(suit filed two days prior to commencement of candidate filing period resulted in no injunctive relief).

In *Favors v. Cuomo*, 881 F.Supp.2d 356 (E.D. N.Y. 2012), the Court was clear that ripeness must be measured in light of the time it takes the court to have a redistricting plan in place prior to the start of the qualification period.

> [A] court should have as its goal the imposition of a plan no later than one month before candidates may begin qualifying for the primary ballot, which means that the court should begin drawing its plan about three months before the beginning of ballot qualification in order to build in time for possible hearings and adjustments to the plan.

*Id.* at 364 (internal quotations and citation omitted). *See also Smith v. Clark*, 189 F.Supp.2d 503, 511 n.5 (S.D. Miss. 2002)("We are simply unwilling to wait until a point in time that would not provide ample time for our thorough consideration of the reapportionment issues presented in this case."), *aff'd sub. nom.*, *Branch v. Smith*, 538 U.S. 254 (2003).

As is the case here, the Defendants in *Favors* argued that the Court should stay its hand to allow the legislature to possibly do its constitutional duty. The Court rejected that argument, noting that doing so could result in no constitutional plan being implemented and stating "[t]he court must not wait to intervene until after such a disastrous scenario comes to pass." *Favors*, 866 F.Supp.2d at 183-184; *Flateau v. Anderson*, 537 F.Supp. 257, 262 (S.D. N.Y. 1982)(the court cannot stay its hand and allow an election to be conducted under an unconstitutional plan).

Moreover, the court noted that regardless of "the likely future actions of various … state officials … the incontrovertible fact is that no plan had been adopted…" *Favors*, 866 F.Supp.2d at 185.

Here, the start of the period for nomination petitions is 13 weeks away — a time period that the Court in *Maryland Citizens* found to foreclose injunctive relief for plaintiffs just then initiating a suit. Here, of course, Plaintiffs filed suit in April and May in order to afford the Court sufficient time to reach and decide the merits of Plaintiffs' claim *and* be able to adopt legislative maps, if necessary, one month prior to the start of the petitioning period. *See Favors*, 866 F.Supp.2d 176; *see also* NATHANIEL PERSILY, *When Judges Carve Democracies: A Primer on Court-Drawn Redistricting Plans*, 73 Geo. Wash. L. Rev. 1131, 1147 92005). Because the legal issue here is fit for judicial resolution, and because withholding adjudication of it would result in continued irreparable harm to Plaintiffs, the question of whether (or not) Kentucky's 2002 legislative districts are unconstitutionally mal-apportioned is ripe for adjudication.

### C.    Plaintiffs' Claims Are Not Moot

In addition to asserting that Plaintiffs' claims are not ripe, the LRC also argues that the claims are moot. [RE #75-1: LRC Response, 35-37.] The argument focuses, in part, upon the Plaintiffs' damages claims regarding the 2012 elections. [*Id.*] But the *Herbert* Plaintiffs did not assert any such claims, and the *Brown* Plaintiffs have withdrawn their damages claims regarding the 2012 elections, a fact that this Court has already recognized. [RE #48: Mem. Op. & Order, 3 n.1.] Thus, the LRC's mootness argument about claims relating to the 2012 elections is simply unnecessary because there are no such claims. The LRC's other apparent argument — that Plaintiffs' claims regarding the 2002 maps are also moot — reflects a fundamental misapprehension of that doctrine's applicability here.

It is undisputed that the Kentucky Supreme Court invalidated the General Assembly's attempt to enact new legislative districts in 2012. *LRC v Fischer* ("*Fischer IV*"), 366 S.W.3d 905 (Ky. 2012). And as a result, Kentucky used its existing legislative districts (which were enacted in 2002) to conduct the then-impending 2012 presidential primaries, and then again for the 2012 general elections. The Kentucky Supreme Court noted in *Fischer IV* that the 2002 maps were "the only legislative districts capable of implementation" at that time, and the state's "interest [in] an efficient election process" necessitated leaving the 2002 maps in place. *Id*. at 917, 918. Thus, to the extent the LRC argues that any claims objecting to the continued use of the 2002 maps must have been brought, if at all, prior to the 2012 elections is simply without merit. *See White v. Weiser*, 412 U.S. 783 (1973)(judicial relief in redistricting foreclosed until adequate opportunity given to legislature to do so).

Moreover, the lack of scheduled elections for 2013 rendered it unnecessary for Plaintiffs to press their claims *prior* to the General Assembly's 2013 Regular Session, particularly given that the 2013 Regular Session could have (but did not) result in constitutionally adequate redistricting. Only *after* the General Assembly failed to enact any legislative districts during its 2013 Regular Session did Plaintiffs then file suit seeking to enjoin the further use of the currently operative (and mal-apportioned) 2002 maps. Plaintiffs' claims thus seek a declaratory judgment regarding the 2002 maps' continued validity and *prospective* injunctive relief barring their use in future Kentucky elections.

A case becomes moot "'when the issues presented are no longer 'live' or parties lack a legally cognizable interest in the outcome.'" *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)(*quoting Powell v. McCormack*, 395 U.S. 486, 496 (1969)). In other words, a case becomes moot only when subsequent events make it absolutely clear that the allegedly wrongful

behavior cannot reasonably be expected to recur and "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Id.* The heavy burden of demonstrating mootness rests on the party claiming mootness. *Id.* Here, the LRC has not carried that heavy burden, nor can it, because the 2002 maps remain in place. In fact, Kentucky conducted a special election this year during the pendency of this matter using those same maps. And, if constitutional redistricting does not occur, those same maps will, without court intervention, be used again.

Because there has been no material change in circumstances since Plaintiffs filed these actions to conclude that their claims are no longer "live" or that they no longer have a cognizable interest in the outcome, or that it is absolutely clear that the continued use of the 2002 maps cannot reasonably be expected to recur, Plaintiffs' claims are not moot.

> ### D.    The *Rooker-Feldman* Doctrine Does Not Bar Plaintiffs' Claims Seeking Prospective Injunctive Relief

Defendants also err in asserting that the *Rooker-Feldman* doctrine bars this Court from deciding Plaintiffs' claims because they are merely an "appeal" from a final state court decision. [RE #75-1: LRC Response, 37-38; RE #84: Stumbo Response, 9; RE #86: Stivers Response, 10-11.] But whether (or not) a claim is barred by the *Rooker-Feldman* doctrine is determined by reference to the "source-of-the-injury," and the source of the claimed injury is determined by reference to the complaint. *McCormick v. Braverman*, 451 F.3d 382, 393 (6th Cir. 2006). Only those claims whose purported injury is *caused by* an earlier state court judgment are barred by *Rooker-Feldman*.

Here, Plaintiffs do not seek "appellate" review of the Kentucky Supreme Court's decision in *Fischer IV*, but rather assert claims seeking declaratory and *prospective* injunctive relief to bar Defendants' use of the 2002 legislative maps in *future* elections. [*Herbert* Verified Compl., ¶¶

38-39.] Even assuming that any legal conclusions actually decided in *Fischer IV* are implicated by Plaintiffs' claims here (an assumption with which Plaintiffs disagree), they are insufficient to divest this Court of jurisdiction under the *Rooker-Feldman* doctrine. "If a federal plaintiff present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party ..., then there is jurisdiction ..." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291 (2005). *See also Berry v. Schmitt*, 688 F.3d 290, 300 (6th Cir. 2012)(holding *Rooker-Feldman* inapplicable to pre-enforcement claim seeking prospective injunctive relief even though its resolution would implicate an earlier state-court judgment); *Fieger v. Ferry*, 471 F.3d 637, 646 (6th Cir. 2006)(holding that where the source of the alleged injury "is not the past state court judgments [but rather] the purported unconstitutionality of Michigan's recusal rule *as applied in future cases ... [s]uch a claim is independent of the past state court judgments*.")(emphasis added). Thus, the *Rooker-Feldman* doctrine is simply inapplicable to Plaintiffs' claims here which seek prospective injunctive relief, *even if* the resolution of those claims would implicate (or "deny") an earlier state court judgment.

### E.   Plaintiffs' Claims Are Not Barred By *Res Judicata* or Collateral Estoppel

Defendants also raise *res judicata* and collateral estoppel as reasons why Plaintiffs' claims are barred. [RE #75-1: LRC Response, 33-35; RE #84: Stumbo Response, 8-9; RE #86: Stivers Response, 9-10.] According to Defendants, the Kentucky Supreme Court conclusively determined the continued validity of Kentucky's 2002 House and Senate maps in *Fischer IV*, and thus the issue cannot be re-litigated here. [*See e.g.*, RE #86: Stivers Response, 9 (stating that "whether the use of the 2002 legislative districts is unconstitutional has been addressed by the Kentucky Supreme Court ... [and is] not properly subject to re-litigation.").] But neither doctrine applies here principally because the Kentucky Supreme Court in *Fischer IV* did not reach (or

decide) the validity of the 2002 maps in light of the 2010 Census — the issue squarely presented in these cases.

"The doctrine of *res judicata* provides that a final judgment on the merits of an action precludes the parties or their privies from re-litigating issues that were or could have been raised in a prior action. *In re Alfes*, 709 F.3d 631, 638 (6th Cir. 2013)(internal quotations and citation omitted). In Kentucky, the application of *res judicata* depends upon three factors:

> First, there must be identity of the parties. Second, there must be identity of the two causes of action. Third, the action must be decided on its merits. In short, the rule of *res judicata* does not act as a bar if there are different issues or the questions of law presented are different.

*Smith v. Bob Smith Chevrolet, Inc.*, 275 F. Supp. 2d 808, 813 (W.D. Ky. 2003)(citing *City of Louisville v. Louisville Prof'l Firefighters Ass'n*, 813 S.W.2d 804, 806 (Ky.1991)). Here, there is no identity of parties; *Fischer IV* involved legislator-Plaintiffs but none of the Plaintiffs in this action were parties in that case. *Groupwell Int'l (HK) Ltd. v. Gourmet Express, LLC*, 277 F.R.D. 348, 2011 U.S. Dist. LEXIS 129621 (WD KY. 2011)(parties not identical forecloses application). There is likewise no identity of the causes of action because *Fischer IV* did not conclusively resolve the claims at issue here. *Stemler v. City of Florence*, 350 F.3d 578 (6th Cir. 2003)(the causes must be identical).

Specifically, *Fischer IV* involved a successful challenge to Kentucky's 2012 legislative maps under the state constitution. 366 S.W.3d at 908-09. The trial judge declared the 2012 maps invalid and enjoined their use in the then-impending 2012 elections. *Id*. at 908. The Kentucky Supreme Court affirmed the ruling as to the 2012 maps, and in doing so observed that "ensuring the orderly process of the 2012 elections" required the use of the 2002 maps despite the "resulting temporary imbalanced representation" that would result. *Id*. at 919. Thus, contrary to Defendants' assertions, the Kentucky Supreme Court did not conclusively determine the 2002

14

maps' continued constitutional validity.[4]

Similarly, collateral estoppel likewise does not bar Plaintiffs' claims because the validity of Kentucky's 2002 maps was not at issue in *Fischer IV*, nor was the validity of the 2002 maps necessary to the outcome of that case. *See N.L.R.B. v. Kentucky May Coal Co., Inc.*, 89 F.3d 1235, 1239 (6th Cir. 1996)(identifying four factors necessary to apply collateral estoppel in Kentucky, which include that the "precise issue ... must have been raised and actually litigated in the prior proceeding" and that "determination of the issue must have been necessary to the outcome of the prior proceeding")(internal quotation and citation omitted). Because the factors necessary for the application of *res judicata* and collateral estoppel are lacking, neither doctrine applies here.[5]

## II.    PLAINTIFFS ARE ENTITLED TO DECLARATORY AND INJUNCTIVE RELIEF

In addition to the arguments noted above, Defendants also assert that Plaintiffs are not entitled to declaratory or injunctive relief relating to the 2002 maps. As to the former, Defendants argue that declaratory relief is improper because it would not "settle the controversy between the parties" but would, if granted, intrude upon the General Assembly's prerogative to conduct redistricting. [RE #84: Stumbo Response, 5-6; RE #75-1: LRC Response, 7; RE #86: Stivers Response, 7.] And as to the latter, they argue that the public interest in conducting

---

[4]    To the extent *res judicata* applies here, it would operate *in Plaintiffs' favor* because the trial court arguably found the 2002 maps constitutionally infirm. [RE #75-5: LRC Exh. 3 — *Fischer, et al. v. Grimes, et al.*, Civil Action No. 12-CI-109, 13 (Franklin Cir. Ct. Feb. 7, 2012)(finding that the 2002 maps "are out of balance and must be redrawn to comply with the 'one person, one vote' mandate of federal and state law." ).]

[5]    Another reason why *res judicata* does not bar Plaintiffs' claims is that the doctrine is not absolute and should not be applied where (as here) doing so would "defeat the ends of justice or so as to work an injustice." *Groupwell Int'l (HK) Ltd. v. Gourmet Express, LLC*, 277 F.R.D. 348, 357 (W.D. Ky. 2011)(internal quotations and citation omitted).

orderly elections warrants denying the injunction because it *might* result in some as-yet realized harm. [RE #81: KSBE Response, 3-4.][6] Both arguments are without merit.

With respect to Plaintiffs' request for a declaratory judgment, the relevant factors weigh *in favor of* granting that relief. *Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 453 (6th Cir. 2003)(citing five factors to consider). First, granting declaratory relief as to Kentucky's 2002 maps would "settle the controversy" between the parties as to the validity of those maps in future Kentucky elections. *Id*. Only if the General Assembly thereafter fails to timely redistrict, or if it enacts constitutionally inadequate maps, will this Court then be asked to further exercise its authority to resolve those as-yet unknown issues. But the possibility of continued judicial proceedings that may (or may not) become necessary does not undermine the fact that declaratory relief regarding the 2002 maps would completely settle Plaintiffs' claims. Likewise, granting the declaratory relief would also "serve a useful purpose in clarifying the legal relations at issue," in that it would vindicate Plaintiffs' rights under the Equal Protection Clause and, if granted, ensure that the 2002 maps are not again used in Kentucky elections. *Id*.

The remaining factors — whether the declaratory remedy is being used for "procedural fencing," whether it would increase the friction between federal and state courts and "improperly encroach on state jurisdiction," and whether there is "an alternative remedy that is better or more effective" — do not undermine the conclusion that declaratory relief here is appropriate. *Id*. at 968. There is no credible argument that Plaintiffs' claims are improper or otherwise constitute "procedural fencing" because those claims, which Plaintiffs brought only *after* the General

---

[6]    President Stivers and the Legislative Research Commission also assert legislative immunity to bar Plaintiffs' requested injunctive relief. [RE #86: Stivers Response, 8; RE #75-1: LRC Response, 8.] But that argument, even if accepted in lieu of granting the *Brown* Plaintiffs' pending motions to dismiss those defendants [RE #64; RE #69], does not undermine the appropriateness of granting prospective injunctive relief as to the remaining official capacity defendants. *See Ex Parte Young*, 209 U.S. 123 (1908).

Assembly failed to enact lawful maps in 2012 *and* failed to enact any maps in 2013, are the central issue of this litigation. And, for the reasons stated above, granting the requested declaratory relief does not undermine or otherwise conflict with the Kentucky Supreme Court's holding in *Fischer IV*. Thus, the declaratory relief, if granted, would apply only to the continued validity of Kentucky's 2002 maps and would not improperly encroach upon the state's jurisdiction or otherwise usurp the state's prerogative to timely conduct redistricting.

Entry of a permanent injunction is also appropriate because the undisputed material facts establish that: 1) Plaintiffs have suffered (and continue to suffer) irreparable injury in the form of vote dilution due to the mal-apportioned 2002 maps; 2) there is no adequate remedy at law; 3) a balance of equities weighs in favor of granting the requested injunctive relief because Defendants can point to only speculative and hypothetical inconvenience (as opposed to concrete, particularized harm) that would result from issuance of the injunction; and 4) the public interest favors issuance of the injunction because preventing constitutional violations is always in the public interest. *See Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1490 (6th Cir. 1995)(public "as a whole" has interest in protecting constitutional liberties). *See also Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006)(identifying four factors for issuance of permanent injunction)(citation omitted).[7]

---

[7]    The KSBE Defendants argue that granting injunctive relief barring the use of the 2002 maps "*could hinder* Defendants' ability to administer future elections, including *potential* special legislative elections and the 2014 Primary Election." [RE #81: KSBE Response, 3 (emphasis added).] Not so. If, after entry of an injunction but prior to any legislative or judicial adoption of new maps, Defendants believe that their ability to conduct elections is hampered by the injunction, they would be free to bring that issue before the Court. But, at present, Plaintiffs are aware of no such circumstances and Defendants have identified none.

### III.    THE CLAIMS ARE NOT TIME-BARRED

As with the mootness arguments, Defendants also raise a statute of limitations defense to claims not at issue in the case. Specifically, Defendants argue that Kentucky's one-year statute of limitations bars Plaintiffs' claims regarding passage of House Bill 1 in 2012 and the validity of subsequently using the 2002 legislative maps in the 2012 elections. [RE #75-1: LRC Response, 38-39; RE #86: Stivers Response, 11-12.] But Plaintiffs do not assert claims challenging the passage of the 2012 redistricting act or even its implementation. That statute has already been challenged (and found unconstitutional) in *Fischer IV*. Nor are Plaintiffs challenging the validity of the 2012 elections or asserting any other claims regarding the use of the 2002 maps to conduct those elections.[8]

Rather, Plaintiffs' claims seek a declaration that the 2002 maps are now unconstitutionally mal-apportioned. And that Equal Protection claim is based upon the continued use of the mal-apportioned districts — a violation that renews itself each time an election is held. *See Blackmoon v. Charles Mix County*, 386 F. Supp. 2d 1108 (D. SD 2005). To accept the Defendants' contention, no one would be able to challenge Kentucky's continued use of its 2002 maps (despite the fact that they are mal-apportioned) if they did not do so within one year of the *Fischer IV* decision. This result is simply inconsistent with the generally recognized principle that statute of limitations that are ordinarily applicable to a legal right do not apply to an equitable remedy — in this case injunctive and declaratory relief. *Environmental Defense Fund,*

---

[8]    As noted in Section I.C. above, the *Brown* Plaintiffs have abandoned their damages claims which were the only claims in this litigation relating to the 2012 elections.

*Inc. v. Alexander*, 614 F.2d 474, 478 (5th Cir. 1980); *Equal Employment Opportunity Commission v. Dresser Industries, Inc.*, 668 F.2d 1199, 1201 (11th Cir. 1982).[9]

## IV.    THERE ARE NO GENUINE ISSUES OF MATERIAL FACT AND PLAINTIFFS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THEIR EQUAL PROTECTION CLAIMS

Finally, Defendants' attempts to justify the 2002 maps on the merits are unavailing.[10] Contrary to the LRC's assertions, those severely mal-apportioned redistricting plans are not the product of a rational state policy. [RE #75-1: LRC Response, 9-11.] Rather, the Kentucky Supreme Court ordered the use of the 2002 redistricting plans because they were "the only legislative districts capable of implementation" prior to the then-impending 2012 elections. *Fischer IV*, 366 S.W.3d at 917; *see also id.* at 319 ("ensuring the orderly process of the *2012 elections* requires the 2002 redistricting plan to remain in effect.")(emphasis added). Now, more than a year after that decision and *after* a Regular Session in which the General Assembly failed to enact any new legislative maps, there are no exigencies to justify the continued use of the mal-apportioned maps.

Defendants incorrectly assert that there is no violation in their failure to redistrict today. The U.S. Supreme Court, in *Reynolds v. Sims*, 377 U.S. 533 (1964), announced the constitutional standard for state redistricting, stating:

---

[9]    Even assuming *arguendo* that a one year statute of limitations applied to Plaintiffs' claims seeking declaratory relief, those claims accrued when the Plaintiffs could "file suit and obtain relief." *Wallace v. Kato*, 549 U.S. 384 (2007). In this case, that occurred when Plaintiffs first suffered vote dilution as a result of the mal-apportioned maps, *i.e.* the May 22, 2012 primaries. The *Brown* Plaintiffs filed suit on April 26, 2013, and the *Herbert* Plaintiffs filed suit on May 10, 2013, both within the one year statute of limitations.

[10]    Notably, several official capacity defendants — the Secretary of State and KSBE's members and executive director — do not contest Plaintiffs' argument that the 2002 maps are now constitutionally infirm. [*See* RE #81: Defendants' Response to Plaintiffs' Joint Motion for Summary Judgment, 2 ("Defendants take no position as to whether Kentucky's current Senate and House districts are mal-apportioned.").]

In substance, we do not regard the Equal Protection Clause as requiring daily, monthly, annual or biennial reapportionment, so long as a State has a reasonably conceived plan for periodic readjustment of legislative representation. While we do not intend to indicate that decennial reapportionment is a constitutional requisite, compliance with such an approach would clearly meet the minimal requirements for maintaining a reasonably current scheme of legislative representation. And we do not mean to intimate that more frequent reapportionment would not be constitutionally permissible or practicably desirable. But if reapportionment were accomplished with less frequency, it would assuredly be constitutionally suspect.

In a host of cases, courts have been clear that using decade old population data is unconstitutional following the release of census data and a short period following receipt of that data. *Honsey v. Donovan*, 236 F. Supp. 8, 15-16 (D. Minn. 1964) (three-judge court) (holding in 1964 that an apportionment plan enacted in 1959 and based on updated 1950 census figures was unconstitutional); *Flateau v. Anderson*, 537 F. Supp. 257 (S.D.N.Y. 1982), *appeal dismissed*, 458 U.S. 1123 (1983)(invalidating in 1982 an apportionment scheme enacted in 1974 based on 1970 census data).[11]  Under these standards, the current maps are unconstitutional.

Nor is the continuing retention of those plans justifiable as necessary to satisfy the Kentucky State Constitution's county integrity requirements.  As an initial matter, even if the population deviations in the 2002 plans were necessary to preserve county lines (which they are not), they are too severe to pass constitutional muster.

The policy of maintaining the inviolability of county lines . . . must inevitably collide with the basic equal protection standard of one person, one vote. . . . Recognition that a State may properly seek to protect the integrity of political subdivisions or historical boundary lines permits no more than "minor deviations" from the basic requirement that legislative districts must be "as nearly of equal population as is practicable.

---

[11]     In *Flateau*, New York state officials argued that it was constitutionally permissible to delay reapportionment of state districts for six years after the release of census data. 537 F. Supp. at 262-63. But the defendants offered no compelling justifications for the delay, except to say that it was based on New York State "tradition." *Id.* at 265. The court concluded that it need not defer to the state's tradition, because the defendant failed to show that the delayed reapportionment was an "expression of significant state interests or concerns." *Id.*

*Connor v. Finch*, 431 U.S. 407, 419 (1977)(quoting *Roman v. Sincock*, 377 U.S. 695, 710 (1964)). Here, the severe population deviations of 60.71% in the House and 37.71% in the Senate cannot be described as "minor deviations." *See id.* at 418 ("maximum population deviations of 16.5% in the Senate districts and 19.3% in the House districts can hardly be characterized as *de minimis*"); *Mahan v. Howell*, 410 U.S. 315, 329 (1973)(noting that a deviation of 16% "may well approach tolerable limits"); *Gorin v. Karpan*, 775 F. Supp. 1430, 1440 (D. Wyo. 1991)(deviation of 58% "facially unconstitutional simply because the population inequality . . . exceeds tolerable equal protection limits").

Moreover, even if county integrity *were* a valid basis for such extreme deviations, the LRC has not, in response to Plaintiffs' *prima facie* case of mal-apportionment, even attempted to satisfy its burden of demonstrating that these severe deviations constitute "the minimum deviation above and below the norm, [necessary to] keep[] intact political boundaries." *Connor*, 431 U.S. at 420 (quoting *Mahan*, 410 U.S. at 326). *Cf. Travis v. King*, 552 F. Supp. 554, 561 (D. Haw. 1982)(finding redistricting plans unconstitutional where the state presented "no evidence" that substantial deviations in the plan were necessary to preserve existing political subdivisions).[12]  Instead, the LRC argues that the legislature *did* comply with federal constitutional requirements when it passed its 2012 maps, and that this Court should declare those maps permissible under the Fourteenth Amendment. [RE #75-1: LRC Response, 39-40 ("If the court disregards the other considerations ... the court[] should hold that [the 2012 legislative district enactment] is constitutional under Equal Protection.").] Of course, this assertion is

---

[12]     In any event, the 2002 redistricting plans themselves fail to minimize county splits. The 2002 House plan itself splits twenty-seven counties, seven of which could be kept whole, while the 2002 Senate plan splits three counties. [RE #67-3: Pls.' Exh. 2: Cooper Expert Report ¶¶ 31-32].

specious given that the Kentucky Supreme Court declared the 2012 maps a nullity for failing to comply with state constitutional requirements. *Fischer IV*, 366 F.3d at 917 ("House Bill 1 is null and void.  The Bill no longer exists and cannot be implemented … [it is] wholly void and ineffective for any purpose … from the time of its enactment.").

Ultimately, the mal-apportionment caused by Kentucky's continued use of the 2002 plans beyond 2012 is the result of Kentucky's increased population (and shifts in its distribution) during the last decade, and cannot be said to be the product of any rational state policy.  [RE #67-3: Plaintiffs' Exh. 2, Cooper Expert Report ¶¶ 14-30].  The only reason these plans currently remain in effect is that the 2012 redistricting plans were struck down by the Kentucky Supreme Court, and the Kentucky General Assembly failed to discharge its duty of passing new redistricting plans during the 2013 legislative session.  The LRC's assurance that the General Assembly *may* finally adopt new plans at some later date is purely speculative, and in any event is irrelevant in light of LRC's own concession that, upon receipt of the requisite Census data necessary for redistricting, "it is incumbent upon the General Assembly to reapportion the districts *at the first opportunity*." [RE #67-22: Plaintiffs' Exh. 21: LRC's Answers to the Court's Questions, ¶4.]

### Conclusion

For the foregoing reasons, in addition to those contained in their opening memorandum, the *Herbert* Plaintiffs and the *Brown* Plaintiffs respectfully request that the Court grant their joint motion for summary judgment, enter a declaratory judgment finding that the 2002 House and Senate maps violate the Fourteenth Amendment's Equal Protection clause, and grant the requested permanent injunction barring the official capacity Defendants from using the 2002 maps in future Kentucky elections.

Respectfully submitted,

s/ Christopher D. Wiest (by wes w/ permission      s/ William E. Sharp
Christopher D. Wiest (KBA 90725)                   William E. Sharp
Chris Wiest, Atty at Law PLLC                      ACLU OF KENTUCKY
25 Town Center Blvd, Suite 104                     315 Guthrie Street, Suite 300
Crestview Hills, KY 41017                          Louisville, KY 40202
513-257-1895 (v)                                   (502) 581-9746
chriswiestlaw@yahoo.com                            sharp@aclu-ky.org

Rick Brueggemann (90619)                           Laughlin McDonald
E. Jason Atkins (88044)                            ACLU Voting Rights Project
Hemmer DeFrank, PLLC                               2700 International Tower
250 Grandview Dr.                                  229 Peachtree Street, NE
Fort Mitchell, KY 41017                            Atlanta, GA 30303
859/578-3855 (v)                                   (404) 500-1235
rbrueggemann@hemmerlaw.com                         lmcdonald@aclu.org

*Counsel for Brown Plaintiffs*                     Dale Ho*
                                                   ACLU Voting Rights Project
                                                   125 Broad Street
                                                   New York, NY 10004
                                                   (212) 549-2693
                                                   dale.ho@aclu.org

                                                   * Motion for *Pro Hac Vice* admission pending

                                                   Ben Carter
                                                   BEN CARTER LAW PLLC
                                                   455 South Fourth Street, Suite 902
                                                   Louisville, KY 40202
                                                   ben@bencarterlaw.com
                                                   ACLU of KY Cooperating Attorney

                                                   *Counsel for Herbert Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on August 1, 2013, I electronically filed this Plaintiffs' Joint Motion for Summary Judgment with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Stanton L. Cave
s.cave1@insightbb.com
Jessica A. Burke
jessica@jblawoffices.net

*Counsel for Senate President Robert Stivers*

Pierce B. Whites
piercewhites@aol.com
Anna S. Whites
annawhites@aol.com

*Counsel for House Speaker Greg Stumbo*

Clay A. Barkley
clay.barkley@ag.ky.gov
Matt James
matt.james@ag.ky.gov

*Counsel for Gov. Steve Beshear, Commonwealth of Kentucky*

Laura H. Hendrix
laura.hendrix@lrc.ky.gov
Greg A. Woosley
greg.woosley@lrc.ky.gov

*Counsel for KY Legislative Research Commission*

Lynn Sowards Zellen
lynn.zellen@ky.gov
Noel E. Caldwell
ncaldwell@caldwelllawyers.com
Jonathan T. Salomon
jsalomon@tachaulaw.com

*Counsel for Kentucky State Bd. of Elections, Secretary of State Alison L. Grimes, David Cross, John W. Hampton, Stephen Huffman, Denise May, George Russell, Roy Sizemore, and Maryellen Allen*

s/ William E. Sharp
*Counsel for the Herbert Plaintiffs*