UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY

KENNY BROWN, individually and in his
official capacity as the Boone County Clerk,
et al.,

    Plaintiffs,

V.

KENTUCKY LEGISLATIVE RESEARCH
COMMISSION, et al.,[1]

    Defendants.

_____

MARTIN HERBERT, et al.,

    Plaintiffs,

V.

KENTUCKY STATE BOARD OF
ELECTIONS, et al.,

    Defendants.

_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil No. 13-cv-68
DJB-GFVT-WOB

Civil No. 13-cv-25
DJB-GFVT-WOB

**MEMORANDUM OPINION
&
ORDER**

\*\*\*  \*\*\*  \*\*\*  \*\*\*

Before:  BOGGS, *Circuit Judge*; VAN TATENHOVE, *District Judge*; and BERTELSMAN, *Senior District Judge*.

    PER CURIAM.  Plaintiff voters from various counties of the Commonwealth of Kentucky claim that malapportionment of the state's legislative electoral districts has

---

[1] The Kentucky Legislative Research Commission has been substituted as the named Defendant herein due to the Agreed Order dismissing the Commonwealth of Kentucky as a party to this action.  [R. 94].

unconstitutionally diluted their voting power.  [R. 67].  These Plaintiffs seek summary judgment declaring that the current Kentucky House and Senate districts violate the "one person, one vote" guarantee of the Fourteenth Amendment's Equal Protection Clause, and permanently enjoining state officials from using them in future elections.  The Kentucky Legislative Research Commission, the President of the Senate, the Speaker of the House of Representatives, the Secretary of State, and the Kentucky State Board of Elections, have responded in opposition on various grounds.  [R. 75; R. 84; R. 86; R. 81].  For the reasons set forth below, this three-judge district court shall GRANT Plaintiffs' Joint Motion for Summary Judgment, DECLARE that the 2002 state legislative electoral districts are presently unconstitutional, and permanently ENJOIN any future election from being conducted pursuant to these districts.  Importantly, this Order does nothing to prevent the Kentucky General Assembly from crafting redistricting legislation during the August 19, 2013 special legislative session.  What it does do is prevent the General Assembly from falling back on lines that will be over a decade old if they fail.

I

In the 2012 regular legislative session, the Kentucky General Assembly undertook the task of redistricting, and passed House Bill 1, the 2012 Reapportionment Plan.  However, shortly thereafter the plan was challenged in the Franklin Circuit Court, which pronounced the plan unconstitutional and issued a temporary injunction preventing its use.  The Legislative Research Commission, among others, appealed that decision to the Kentucky Supreme Court.  Due to the "expedited nature of these actions" the Kentucky Supreme Court issued a summary opinion on February 24, 2012, setting forth its decision, and stating that a full opinion would soon follow.

2

*Legislative Research Comm'n v. Fischer*, 2012-SC-091-TG, 2012 WL 952983 (Ky. Feb. 24,

2012).  Importantly, the Kentucky Supreme Court characterized its holding as follows:

> Before this Court is the decision of the Franklin Circuit Court, which held House Bill 1 (2012), *the reapportionment act of 2012*, *unconstitutional under Section 33 of the Kentucky Constitution* and further enjoined the implementation of the new legislative districts for the 2012 elections. Having considered the briefs filed by the parties and having heard oral argument thereon, this Court concludes that House Bill 1 (2012), the reapportionment act of 2012, is facially unconstitutional in violation of Section 33 of the Kentucky Constitution, as construed by *Fischer v. State Board of Elections,* 879 S.W.2d 475 (Ky.1994). Accordingly, we affirm the trial court.

*Id.* (emphasis added).

Subsequently, the Kentucky Supreme Court set forth its reasoning in a detailed opinion

which represents the fourth and most recent installment of the *Fischer* Reapportionment Cases,

*Legislative Research Comm'n v. Fischer*, 366 S.W.3d 905, 908 (Ky. 2012) (*Fischer IV*).  In its

analysis, the Kentucky Supreme Court reaffirmed its commitment to the state constitutional

standards of *Fischer II*, stating:

> Independent of the federal standard under the Fourteenth Amendment, Section 33 imposes a dual mandate that Kentucky's state legislative districts be substantially equal in population and preserve county integrity. A reapportionment plan satisfies these two requirements by (1) maintaining a population variation that does not exceed the ideal legislative district by −5 percent to +5 percent and (2) dividing the fewest number of counties possible.

*Id*. at 911.  Applying these rules to population figures derived from the 2012 Census, the

Kentucky Supreme Court concluded that "House Bill 1 violates Section 33 of the Kentucky

Constitution in two ways: (1) it fails to achieve sufficient population equality and (2) it fails to

preserve county integrity."  *Id*. at 908.  It is critical to note that in reaching this decision the

Kentucky Supreme Court expressly states, "Our holding that House Bill 1 is unconstitutional is based not upon federal law, but upon Section 33 of the Kentucky Constitution." *Id*. at 911.

In affirming the Franklin Circuit Court, the Kentucky Supreme Court also upheld its injunction that prohibited the upcoming elections from being conducted pursuant to the districts of the unconstitutional 2012 plan.  In its stead, the court held that "the 2012 elections will be conducted using the districts as enacted in the 2002 Ky. Acts and codified in KRS 5.200, et seq." *Id*. at 917.  In a passage that is important in light of this case, the Kentucky Supreme Court characterized and then responded to the LRC's objection to this remedy as follows:

> The LRC argues that it is inappropriate to hold the upcoming 2012 elections using the 2002 districts because they violate Section 33 of the Kentucky Constitution. According to the LRC, House District 60, under the 2002 reapportionment plan, deviates from the ideal House district by 42.7 percent; and Senate District 11 deviates from the ideal Senate district by 22.2 percent. Instead, the LRC posits that the districts established by House Bill 1 should take effect until the General Assembly passes new redistricting legislation. Although we do not doubt the LRC's population deviation numbers among the 2002 districts, these are the only legislative districts capable of implementation at this juncture.

*Id*. at 917.  Because the 2012 Reapportionment Plan was found unconstitutional and prohibited from use by an injunction, the 2012 general election was conducted under the 2002 lines as ordered by the court.

Following the initial order of the Kentucky Supreme Court that declared the 2012 reapportionment plan unconstitutional, the Governor called a special legislative session. However, the items on the agenda, as set by the Governor, did not allow for consideration of redistricting legislation.  Therefore, the 2012 Special Session came and went without action taken by the legislature to substitute the 2002 lines with a plan based on the most recent census

4

data.  In addition, the 2013 Regular Legislative Session adjourned without the passage of redistricting legislation by both houses of the General Assembly.

Having been pressed back into service by order of the Kentucky Supreme Court, the previously unchallenged 2002 reapportionment plan was contested twice by May of 2013. *Brown v. Commonwealth*, Case No. 2:13-CV-068-WOB-GFVT-DJB; *Herbert v. Kentucky State Board of Elections*, Case No. 3:13-CV-25-GFVT-WOB-DJB.  The Plaintiffs in these two actions, which were ultimately consolidated, are voters who claim that the 2010 Census revealed significant population shifts that were not accounted for in the 2002 legislative districts that had been used in the past and that were currently in force.  Plaintiffs claimed that, as a result, this legislative malapportionment had and continued to unconstitutionally dilute their voting power. Among other things, these Plaintiffs brought claims against various state actors pursuant to 42 U.S.C. § 1983 for violation of the "one person, one vote" right guaranteed by the Equal Protection Clause of the federal Constitution.

Each district court petitioned the Chief Judge of the Sixth Circuit Court of Appeals to constitute a three-judge panel as required by 28 U.S.C. § 2284.  [R. 25].  Once appointed, this three-judge district court conducted a scheduling conference with all parties present on June 21, 2013.  [R. 27].  The day of this scheduling conference, the Governor called a special legislative session for August 19, 2013 for the purpose of considering redistricting legislation.  Though the court denied a motion to stay this proceeding pending the outcome of the special session, the Scheduling Order did account for it.  [R. 49].  The court allowed an initial dispositive-motion period for filing, "All dispositive motions, including those contesting the 2002 state redistricting plan as unconstitutional."  [*Id.*]  However, the court also provided for a final dispositive-motion

5

period following the special legislative session for the parties, "to file any final statements on contentions regarding plans passed during the Extraordinary Legislative Session scheduled to commence on August 19, 2013." [*Id*.] The Scheduling Order also accounted for a pretrial conference and bench trial to be conducted if necessary. [*Id*.]

During the initial dispositive-motion period, several motions were filed, including the Plaintiffs' Joint Motion for Summary Judgment that is currently pending before this court. [R. 67]. In that motion, the Plaintiffs request very narrow and particular relief. Specifically, the Plaintiffs "seek summary judgment declaring that Kentucky's existing House and Senate legislative districts — districts that were enacted in 2002— are impermissibly mal-apportioned in violation of the Fourteenth Amendment's Equal Protection clause, and a permanent injunction barring the Defendants from utilizing the current House and Senate legislative districts in any future elections." [*Id*.] Several of the state Defendants, have responded in opposition. [R. 75; R. 84; R. 86; R. 81]. In their view, the Plaintiffs do not have standing to assert their claims, which also do not meet the requirements for a declaratory judgment or preliminary injunction and are barred by *res judicata*, collateral estoppel, mootness, the *Rooker-Feldman* doctrine, and the relevant statute of limitations. Further, some of the Defendants maintain that no violation of equal protection has taken place.

## II

## A

With nearly a half century having elapsed since a federal court in Kentucky has had occasion to consider the issue of reapportionment in the context of the Equal Protection Clause, it is now necessary to fully set forth the federal law on this matter. In *Baker v. Carr*, 369 U.S. 186,

6

82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the United States Supreme Court ushered in a new era of reapportionment litigation in federal court when it considered a constitutional challenge to the state legislative electoral districts of Tennessee.  This case arose because Tennessee had not reapportioned its legislative districts since 1901, over sixty years earlier.  The Plaintiffs brought suit in federal court pursuant to 42 U.S.C. §§ 1983 and 1988, alleging that the 1901 redistricting plan "denied the equal protection of the laws accorded them by the Fourteenth Amendment to the Constitution of the United States by virtue of the debasement of their votes." *Id*. at 188.  (internal quotation marks omitted).  However, the three-judge district court dismissed the case on the grounds that it lacked jurisdiction and that there was no claim on which relief could be granted.

In reversing this determination, the United States Supreme Court first found that the claim was without question a "case or controversy" that "arises under" the federal Constitution, such that "an unbroken line of our precedents sustains the federal courts' jurisdiction of the subject matter of federal constitutional claims of this nature."  *Id*. at 200-01.  The Court next found that the Plaintiffs, who were "qualified to vote for members of the General Assembly representing his county," had standing to bring this action.  *Id*. at 206.  Finally, the Court turned to the question of whether the case presented a justiciable issue, which is to say, whether this subject matter is appropriate for judicial consideration.  The district court had found that federal courts ought not to interfere with a state's legislative reapportionment.  However, in *Baker*, the Supreme Court "held that a claim asserted under the Equal Protection Clause challenging the constitutionality of a State's apportionment of seats in its legislature, on the ground that the right to vote of certain citizens was effectively impaired since debased and diluted, in effect presented a justiciable controversy subject to adjudication by federal courts." *Reynolds v. Sims*, 377 U.S.

7

533, 556, 84 S. Ct. 1362, 1378, 12 L. Ed. 2d 506 (1964).  Having resolved those issues, the Court remanded the case to the district court, although without providing specific guidance as to how to resolve the controversy.

Once *Baker v. Carr* was decided, a "spate of similar cases" were brought in federal court showing, "that the problem of state legislative malapportionment is one that is perceived to exist in a large number of the States."  *Id.*  *Reynolds* remains the seminal case on the reapportionment of state legislative districts.  As in *Baker v. Carr*, the Plaintiffs in this case were voters who brought claims in federal court pursuant to 42 U.S.C. §§ 1983 and 1988 that the malapportionment of their state legislative districts had deprived them of their rights under the Equal Protection Clause of the Fourteenth Amendment.  Alabama had not reapportioned its legislative electoral districts since 1901, and the more than sixty-year-old census data used in creating that plan had resulted in significant population variances in the Senate and House of Representatives.  When the district court found that the 1901 districts, as well as two plans passed during the course of the litigation, violated the Equal Protection Clause, the defendant state officials appealed.

After finding the claim justiciable under *Baker v. Carr*, the United States Supreme Court proceeded to consider the standards required of state legislative reapportionment plans under the Equal Protection Clause.  The Court first determined the principal underlying the Equal Protection Clause in this context is the democratic notion of "one person, one vote."  *Id.* at 558 (*citing Gray v. Sanders*, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963)).  Having recognized this principle, the Court held that

> as a basic constitutional standard, the Equal Protection Clause requires that the
> seats in both houses of a bicameral state legislature must be apportioned on a
> population basis. Simply stated, an individual's right to vote for state legislators is
> unconstitutionally impaired when its weight is in a substantial fashion diluted
> when compared with votes of citizens living on other parts of the State.

*Id*. at 568.  Under this standard, the Court upheld the decision of the three-judge panel that none

of the plans were constitutional.

Though the Court noted that it would be justified in proceeding no further, it continued to

essentially provide guidance for the legislature as it undertook to reapportion the electoral

districts in accordance with the mandates of the Equal Protection Clause.  Despite requiring

apportionment to be conducted under the "one person, one vote" principal and on a population

basis, the Court clarified that "mathematical exactness or precision is hardly a workable

requirement."  *Id*. at 577.  Instead, "the Equal Protection Clause requires that a State make an

honest and good faith effort to construct districts, in both houses of its legislature, as nearly of

equal population as is practicable."  *Id*. at 579.  The Court reasoned that some flexibility was

appropriate in order to allow for states to pursue other important goals of reapportionment

specific to their state's unique circumstances.  Specifically the Court stated:

> So long as the divergences from a strict population standard are based on
> legitimate considerations incident to the effectuation of a rational state policy,
> some deviations from the equal-population principle are constitutionally
> permissible with respect to the apportionment of seats in either or both of the two
> houses of a bicameral state legislature.

*Id*.  One such rational state policy that the Court approved was the "desire to maintain the

integrity of various political subdivisions." *Id*.  However, the Court reiterated that the "overriding

objective must be substantial equality of population among the various districts."  *Id*. at 580.

The Court next turned to the issue of timing.  Though the Equal Protection Clause requires apportionment on a population basis, the Court recognized that with population growth and shifts, there would necessarily be some difficultly in maintaining that standard over time. The Court stated that "we do not regard the Equal Protection Clause as requiring daily, monthly, annual or biennial reapportionment, so long as a State has a reasonably conceived plan for periodic readjustment of legislative representation." *Id*. at 583.  However, the Court recognized that the vast majority of states had plans in place for decennial reapportionment and, "if reapportionment were accomplished with less frequency, it would assuredly be constitutionally suspect." *Id*. at 584.

Finally, the Court briefly addressed the issue of the proper court remedies available under these circumstances.  Though unwilling to fully set forth the remedial devices courts could employ, the Court noted, "It is enough to say now that, once a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in *not* taking appropriate action to insure that no further elections are conducted under the invalid plan." *Id*. at 585.  (emphasis added).  The Court elaborated that this unusual case might take the form of a circumstance "where an impending election is imminent and a State's election machinery is already in progress." *Id*.  Under such conditions, "equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid." *Id*.  Therefore, though courts that find a reapportionment plan violative of the Constitution ought to engage in remediation, such action should be taken with consideration to the "proximity of the forthcoming election," "disruption to the election process," and other

10

general equitable principles.  *Id*.  To exemplify an appropriate manner of proceeding, the Court

provided the following analysis of the process applied by the federal district court in Alabama:

> We feel that the District Court in this case acted in a most proper and commendable manner. It initially acted wisely in declining to stay the impending primary election in Alabama, and properly refrained from acting further until the Alabama Legislature had been given an opportunity to remedy the admitted discrepancies in the State's legislative apportionment scheme, while initially stating some of its views to provide guidelines for legislative action. And it correctly recognized that legislative reapportionment is primarily a matter for legislative consideration and determination, and that judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so.

*Id*. at  586.

Though the holding of *Reynolds* remains the prevailing law, subsequent case law has

more clearly defined its parameters.  A state legislative reapportionment plan with a maximum

population deviation[2] of 10% or greater "creates a prima facie case of discrimination and

therefore must be justified by the state."  *Brown v. Thomson*, 462 U.S. 835, 842, 103 S. Ct. 2690,

2696, 77 L. Ed. 2d 214 (1983) (citing *Swann v. Adams,* 385 U.S. 440, 444, 87 S.Ct. 569, 572, 17

L.Ed.2d 501 (1967)).  To justify a plan with deviations exceeding the threshold 10%, the state

must first demonstrate that its plan "may reasonably be said to advance a rational state policy,"

which is applied in a manner "free from the taint of arbitrariness or discrimination."  *Id*. at 843

(citing *Mahan v. Howell,* 410 U.S. 315, 328, 93 S.Ct. 979, 987, 35 L.Ed.2d 320 (1973) and

*Roman v. Sincock,* 377 U.S. 695, 710, 84 S.Ct. 1449, 1458, 12 L.Ed.2d 620 (1964)).  However,

even if the state can identify a rational state policy and show that its plan furthers that policy, the

divergences must still be within "tolerable limits." *Mahan*, 410 U.S. at 326.  The Court has

explained that a "State's policy urged in justification of disparity in district population, however

rational, cannot constitutionally be permitted to emasculate the goal of substantial equality."

Using this analysis the Court has upheld a plan with a justified maximum deviation of 16.4%, but

noted that "this percentage may well approach tolerable limits."  *Id*.

B

Before turning to the application of the substantive federal law governing state

reapportionment claims under the Equal Protection Clause, we consider the various jurisdictional

and prudential arguments raised by the Defendants.  First, the Defendants argue that the Plaintiffs

lack standing to pursue these claims in federal court because they have suffered no cognizable

injury.  [R, 75-1 at 5, R. 84-1 at 3, R. 86 at 5].  However, the Defendants reach this conclusion by

mischaracterizing the nature of the Plaintiffs' claims.  The Plaintiffs are not asserting a right for

legislative electoral districts to be in place by a certain time or for the right to vote for a certain

candidate.  Instead, the Plaintiffs claim that the legislative electoral districts of Kentucky have

become malapportioned due to the passage of time and population shifts, and as a result, their

own voting power has been and remains improperly diluted.  [R. 88 at 5].  The United States

Supreme Court found standing to maintain a claim for such an injury in *Baker v. Carr*.  The

Supreme Court stated that "voters who allege facts showing disadvantage to themselves as

individuals have standing to sue."  *Baker*, 369 U.S. at 206 (citing *Colegrove v. Green*, 328 U.S.

549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946)).  For the same reasons, these Plaintiff voters have

---

[2] The Court has calculated the maximum deviation by combining the largest deviation above the ideal legislative district and the largest deviation below the ideal legislative district.  *See Conner v. Finch*, 431 U.S. 407, 416-17. 97

advanced a sufficiently cognizable injury to afford them standing to assert their claims in this Court.

The Defendants also argue that time is against the Plaintiffs, as their claims are either not ripe, moot, or barred by the statute of limitations.  [R. 75-1 at 3, 35, 38; R. 88 at 11].   However, because the Plaintiffs in this case are similarly situated to those in *Baker v. Carr* and *Reynolds*, their claims are no more or less ripe, moot, or time barred.  The reason for this is clear.  The injury claimed by the Plaintiffs is vote dilution caused by malapportionment of the 2002 legislative districts, which is an injury that is current and on-going.  [R. 88 at 10].  Further, as those districts are still in place, nothing has occurred to render them moot.[3]  Therefore, the court is not barred from hearing this matter on ripeness or mootness grounds.

Concerning the statute of limitations, the Plaintiffs have filed their claims pursuant to 42 U.S.C. §1983.  This was the same statutory section under which the *Baker v. Carr* and *Reynolds* plaintiffs filed their claims, and yet the sixty years that separated them from the enactment of the challenged electoral district did not render their claim time barred.  The court did not specifically articulate the reason for this, and the few courts that have subsequently considered this issue have not reached an agreement.  In *Jeffers v. Clinton*, a concurring member of the three-judge panel wrote, agreeing with the majority: "It is true…that this is a suit in equity. It is therefore not governed by any statute of limitations."  730 F. Supp. 196, 224 (E.D. Ark. 1989), *aff'd*, 498 U.S. 1019, 111 S. Ct. 662, 112 L. Ed. 2d 656 (1991).  However, that judge noted: "Still, it is important

---

S.Ct. 1828, 53 L.Ed.2d 465 (1977); *Brown*, 462 U.S. at 838-39; *Mahan*, 410 U.S. at 318-19.
[3] The Legislative Research Commission's contention that *Fischer IV*'s invalidation of the 2012 districts has mooted these claims is unavailing.  [R. 75-1 at 35].  As previously discussed, the claims at issue in this motion are based exclusively on the validity of the 2002 lines, the constitutionality of which was not directly addressed by the Kentucky Supreme Court in *Fischer IV*.

to remember that in *Owens v. Okure,* 488 U.S. 235, ——, 109 S.Ct. 573, 583, 102 L.Ed.2d 594 (1989), the Supreme Court held that a state's general or residual statute of limitations should be applied to Section 1983 claims." *Id.*

In *Blackmoon v. Charles Mix Cnty.*, another three-judge district court considered this issue in the context of the continued use of malapportioned legislative electoral districts, and found that though the statute of limitations corresponding to Section 1983 actions filed in South Dakota applied, the violation renews itself each time an election is held. 386 F. Supp. 2d 1108, 1115 (D.S.D. 2005).  The Defendants have presented no authority nor has the court uncovered any case in which a district court has dismissed a claim like this one on the grounds that it was time barred by the statute of limitations.  It is questionable as to whether the equities would favor such a rule, which would in some ways discourage voters from affording the legislature sufficient time to redistrict on its own accord out of fear that they might lose their claim due to the strict statute of limitations.   However, to the extent such a rule has been applied in this context, it would not bar these plaintiffs.  It is generally true that "Section 1983 actions in Kentucky are limited by the one-year statute of limitations found in section 413.140(1)." *Collard v. Ky Bd. of Nursing*, 896 F.2d 179, 182 (6th Cir. 1990).  Even if this somewhat stringent time bar were to govern this action, the most recent election was held in November of 2012, meaning that the Plaintiffs would have filed their claims[4] well within the one-year period.[5] Therefore, the statute of limitations is no bar to the Plaintiffs' ability to assert these claims.

---

[4] The *Brown* and *Herbert* Plaintiffs filed their claims on April 26, 2013 and May 10, 2013, respectively.

Additionally, the Defendants claim that the Kentucky Supreme Court already considered and ruled on the propriety of the 2002 electoral lines in *Fischer IV*.  As a result, the Defendants argue that this court is barred by res judicata, collateral estoppel, and the *Rooker-Feldman* doctrine from considering these claims.  [R. 75-1 at 37; R. 84 at 9; R. 86 at 10].

In making a determination of the preclusive effect of a state-court judgment "the Full Faith and Credit Act, 28 U.S.C. § 1738, requires the federal court to give the prior adjudication the same preclusive effect it would have under the law of the state whose court issued the judgment."  *Stemler v. Florence*, 350 F.3d 578, 586 (6th Cir. 2003).  As defined in Kentucky, the *res judicata* doctrine "stands for the principle that once the rights of parties have been finally determined, the litigation should end."  *Coomer v. CSX Transp., Inc.*, 319 S.W.3d 366, 371 (Ky. 2010) (citing *Slone v. R & S Mining Inc.*, 74 S.W.3d 259, 261 (Ky. 2002)).   For *res judicata* to serve as a bar under Kentucky law, three requirements must be satisfied:

> First, there must be identity of the parties. Second, there must be identity of the two causes of action. Third, the action must be decided on its merits. *In short, the rule of res judicata does not act as a bar if there are different issues or the questions of law presented are different.  City of Louisville v. Louisville Prof'l Firefighters Ass'n*, 813 S.W.2d 804, 806 (Ky.1991) (*quoting Newman v. Newman*, 451 S.W.2d 417, 419 (Ky.1970)).

*Smith v. Bob Smith Chevrolet, Inc.*, 275 F. Supp. 2d 808, 813 (W.D. Ky. 2003)(emphasis added). Collateral estoppel "dictates that once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *N.L.R.B. v. Kentucky May Coal Co., Inc.,* 89 F.3d

---

[5] To be clear, though the court finds that the Plaintiffs' claims in this action are not time barred, it does not necessarily hold that legislative reapportionment claims filed pursuant to Section 1983 must be filed within one year of the previous election.

1235, 1239 (6th Cir. 1996) (citing *N.A.A.C.P., Detroit Branch v. Detroit Police Officers Ass'n,*

821 F.2d 328, 330 (6th Cir.1987)). For collateral estoppel to preclude the relitigation of an issue,

four requirements must be met:

> (1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding; (2) determination of the issue must have been necessary to the outcome of the prior proceeding; (3) the prior proceeding must have resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*Id.*

Neither *res judicata* nor collateral estoppel operate to bar the Plaintiffs' challenge to the

2002 legislative redistricting plans on federal equal protection grounds, since this issue has not

been previously litigated in any court.  As has been discussed, *Fischer IV* expressly limited its

consideration to the propriety of the 2012 electoral districts under state law.  In the words of the

Kentucky Supreme Court, "this Court concludes that House Bill 1 (2012), the reapportionment

act of 2012, is facially unconstitutional in violation of Section 33 of the Kentucky Constitution,

as construed by *Fischer v. State Board of Elections,* 879 S.W.2d 475 (Ky.1994)."  *See Fischer*,

2012 WL 952983, at *1.  To make the matter more clear, the court added "Our holding that

House Bill 1 is unconstitutional is based not upon federal law, but upon Section 33 of the

Kentucky Constitution."  *Fischer IV*, 366 S.W.3d 911.  As the court did not undertake to

consider on the merits whether the 2002 legislative districts were unconstitutional on federal

16

equal protection grounds, these Plaintiffs are not barred by the doctrines of *res judicata* or collateral estoppel from raising the federal claims for the first time in this court.[6]

The Kentucky Supreme Court did, however, make reference to the 2002 lines when it fashioned its remedy in *Fisher IV*.  As previously detailed, the *Fischer IV* court upheld the injunction of the Franklin Circuit Court, which prohibited any elections from taking place under the 2012 lines.  As a result, the Kentucky Supreme Court stated, "This means that the 2012 elections will be conducted using the districts as enacted in the 2002 Ky. Act and codified in KRS 5.200, *et seq.*"  *Id.* at 917.  The Defendants argue that because this conclusion was incorporated in the Kentucky Supreme Court's judgment, the *Rooker-Feldman* doctrine precludes this court from considering it.  [R. 75-1 at 37; R. 84 at 9; R. 86 at 10].

"The *Rooker–Feldman* doctrine bars lower federal courts from conducting appellate review of final state-court judgments because 28 U.S.C. § 1257 vests sole jurisdiction to review such claims in the Supreme Court." *Berry v. Schmitt*, 688 F.3d 290, 298 (6th Cir. 2012) (citing *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 291, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005)).  This doctrine "applies only where a state-court loser initiates an action in federal district court, complaining of injury caused by a state court judgment, and seeks review and rejection of that judgment." *Id.* (citing *In re Cook,* 551 F.3d 542, 548 (6th Cir.2009)).

As an initial matter, it should be reiterated that the Kentucky Supreme Court's opinion in no way endorses the federal constitutionality of the 2002 legislative districts such that a determination of this court that they are invalid under the Constitution of the United States would

---

[6] Nor can it be said that the Plaintiffs of *Fischer IV* were required to bring any federal claim against the 2002 lines in *Fischer IV* in order to preserve them.  At the time the action was initiated, the 2002 lines had been replaced by the

serve as a reversal of the decision of that court.  On the contrary, the Kentucky Supreme Court recognized the LRC's objection to using the 2002 lines on the basis that they were unconstitutional and stated, "Although we do not doubt the LRC's population deviation numbers among the 2002 districts, these are the only legislative districts capable of implementation at this juncture." *Fischer IV*, 366 S.W.3d at 917.  The court went on to explain that in light of the approaching elections "practically speaking, it is now too late to conduct the 2012 elections under the Bill's districts." *Id*.  From the express words of its opinion, it is clear that the Kentucky Supreme Court saw the 2002 electoral districts only as a temporary and imperfect result of its decision that was unavoidable for practical reasons.  The opinion could hardly support a conclusion that the Kentucky Supreme Court adjudicated the issue of the constitutionality of the 2002 electoral districts.

However, even if the argument could be made that the Kentucky Supreme Court's opinion in *Fischer IV* established the 2002 lines as constitutionally sufficient for the 2012 elections, nothing in the opinion could be construed as extending its judgment any further. Importantly, the court recognized that "despite the resulting *temporary* imbalanced representation, ensuring the orderly process of the 2012 elections requires the 2002 redistricting plan remain in effect, as ordered by the trial court." *Id.* at 919 (emphasis added).  The Plaintiffs have made clear that the claims underlying their motion for summary judgment were not based on a state-court judgment relative to the 2012 elections, but are for "declaratory and *prospective* injunctive relief to bar Defendants' use of the 2002 legislative maps in *future* elections.  [R. 88 at 12] (emphasis in the original).  The Sixth Circuit Court of Appeals has in similar cases, "declined

---

2012 districts, which were rightfully the subject of their claim.

to apply *Rooker–Feldman* to claims for prospective relief."  *Berry*, 688 F.3d at 300 (citing *Hood v. Keller,* 341 F.3d 593 (6th Cir. 2003)).  For example, the Court has held that "*Rooker–Feldman* did not apply because the plaintiff did not 'demand to set aside the verdict or the state court ruling,' but instead '[sought] injunctive and declaratory relief prohibiting' future enforcement."  *Id.* (quoting *Hood*, 341 F.3d at 593 (6th Cir. 2003)).  Therefore, due to the nature of the issues decided in the Kentucky Supreme Court, as well as the nature of relief sought by the Plaintiffs in this motion, *Rooker-Feldman* operates as no bar.

C

In applying the Equal Protection Clause analysis to the circumstances of this case, the relevant population figures at issue are not in dispute.  According to the 2010 Census, Kentucky has a population of 4,339,367 people, which marks an increase of almost 300,000 people (7.36%) over the past ten years.  [R. 67-3 at 5].[7]  The population figures indicated that the growth was not uniformly spread throughout the state, as the growth of 32 counties exceeded the statewide average, while 36 counties lost population.  [*Id.* at 6].  For example, Boone County experienced a 38.17% increase in population while Breathitt County experienced a 13.8% decrease.  [*Id.*]  Overall, Kentucky's five most populous counties, Jefferson, Fayette, Kenton, Boone, and Warren, accounted for 40% of the Commonwealth's total population growth over the past ten years. [R. 67-1 at 2].

To determine the maximum deviation percentages that are relevant to the Equal Protection Clause analysis, the court must:  (1) calculate the ideal legislative district by dividing

---

[7] These population figures are derived from the uncontested report of the Plaintiffs' expert William S. Cooper, who based his analysis on the data generated by the 2010 United States Census.

the total population by the number of legislative districts; (2) identify the districts of the

challenged plan with the largest deviations above and below the ideal legislative district; and (3)

measure the difference between the deviations of those districts.[8]  *See Conner*, 431 U.S. at 416-

17, 97 S.Ct. 1828, 53 L.Ed.2d 465 (1977); *Brown*, 462 U.S. at 838-43; *Mahan*, 410 U.S. at 318-

19, 326.  Pursuant to its constitution, Kentucky's population is to be apportioned among 100

seats in the House of Representatives and 38 seats in the Senate.  Ky. Const. § 33.  Therefore,

considering a total population of 4,339,367, the ideal population size for a House and Senate

district is 43,394 and 114,194 respectively.  This is the same conclusion reached by the Kentucky

Supreme Court, the Franklin Circuit Court, and all of the parties in *Fischer IV*.   366 S.W.3d at

909.

Under the 2002 redistricting plan, House District 60, which includes Boone County, now

encompasses of total population of 61,922, which deviates 42.70% above the ideal house district

population of 43,394. [R. 67-23 at 11].[9]  In contrast, House District 43, which includes part of

Jefferson County, contains a population of just 35,580, which deviates 18.01% below the ideal

house district. [*Id*. at 10].  Combined, this constitutes a maximum deviation of 60.71% in the

Kentucky House of Representatives.  As constituted under the 2002 reapportionment plan,

Senate District 11, which includes Boone, Gallatin, and Kenton counties, encompasses a total

---

[8] Though this is the method of calculating the percentage relevant to the federal equal-protection analysis, it bears noting that a different computation has been employed by Kentucky state courts for purposes of the 5% Rule derived from the Kentucky Constitution.  To determine whether the 5% Rule had been violated, the Kentucky Supreme Court in *Fischer IV* simply calculated the population figure for the ideal district and then determined whether any of the plan's districts deviated either above or below that number by 5%.  *Fischer IV*, 366 S.W.3d at 905 ("We find that House Bill 1 does not comply with the *Fischer II* 5 percent rule because at least one district in both the House and Senate exceeds 5 percent population deviation from the ideal district.").

[9] The population figures of this exhibit are derived from the uncontested report of James S. Horton, the G.I.S. Specialist for the Boone County Planning  Commission, who based his analysis on the 2010 U.S. Census.

population of 137,257, which deviates 20.20% above the ideal senate district population of

114,194.  [*Id*. at 12].  In contrast, Senate District 29, which includes Breathitt, Floyd, Knott, and

Letcher counties, contains a population of only 94,194, which deviates 17.51% below the ideal

senate district.  *Id*. Combined, this constitutes a maximum deviation of 37.71% in the Kentucky

Senate.  As is evident from these resulting percentages, which are not contested by the parties,

the 2002 legislative reapportionment plan that is currently in force in Kentucky is

malapportioned well above the 10% maximum deviation required for a finding that the plan is

presumptively unconstitutional under the Equal Protection Clause of the Fourteenth Amendment.

However, the Defendants argue that the 2002 plan is the product of an "honest and good

faith effort to redistrict," and that the resulting deviation is justified under the rational state policy

of preserving county integrity.  [R. 75-1 at 9-11; R. 84 at 6; R. 86 at 3].  County integrity, of

course, has been recognized by the United States Supreme Court as a rational and legitimate state

policy that may justify deviations from what would ordinarily be considered the tolerable limits.

*Brown*, 462 U.S. at 843 (citing *Abate v. Mundt*, 403 U.S. 182, 185, 91 S.Ct. 1904, 1906-07, 29

L.Ed.2d 399 (1971)).[10]   This policy is enshrined in the Kentucky Constitution, and the General

Assembly as well as the state courts have consistently labored over time to protect the county

subdivision from being unnecessarily fractured.  However, even acknowledging the rationality of

this legitimate state policy, the deviations arising from the plan must forward this policy and be

free from the "taint of arbitrariness."  *Id*.  The reality of the present circumstances is that the

---

[10] As recognized by the Defendants, in *Brown* the Supreme Court upheld a maximum deviation of 89%.  462 U.S. at 846.  However, the Court limited the scope of its holding by focusing on the unique circumstances at issue in the state of Wyoming and the unusually limited nature of the challenge brought by the Plaintiffs.  Unlike the Wyoming defendants in *Brown*, these Kentucky Defendants have not sufficiently justified their plan's unconstitutional deviation from the acceptable limits, irrespective of how much greater than 10% it might now be.

maximum deviation of over 60% in the House of Representatives and nearly 40% in the Senate are not minor deviations that have narrowly missed the appropriate threshold in a legitimate attempt to preserve the integrity of Kentucky's counties.  Instead, the LRC itself argued in *Fischer IV* that the 2002 lines significantly deviated from the ideal districts, and the Kentucky Supreme Court stated that the 2002 districts were being used for no other reason than that they were "the only legislative districts capable of implementation" after the 2012 reapportionment plan had been declared unconstitutional shortly before the 2012 elections.  366 S.W.3d at 917.  These deviations have resulted from the failure of the Kentucky General Assembly to timely enact a constitutional plan for legislative reapportionment, which is not a rational and legitimate justification for the gross deviations of Kentucky's current electoral districts.

D

The Plaintiffs request that the court grant their motion for summary judgment and formally enter a declaratory judgment that the 2002 electoral districts currently in force in Kentucky are unconstitutional and enter a permanent injunction barring their use in any future election.  [R. 67 at 1].  The Defendants argue that this matter is not susceptible to decision by declaratory judgment or permanent injunction. [R. 75-1 at 7; R. 84 at 5; R. 86 at 7].

As an initial matter, it should be noted that the Supreme Court has authorized federal district courts to take remedial action when state legislative districts are found to be unconstitutionally malapportioned.  *Reynolds*, 377 U.S. at 585.  In fact, the action requested by the Plaintiffs is similar to that approved by the Supreme Court in *Reynolds*, where the district court alerted the parties to the unconstitutional nature of the districts currently in place, allowed the General Assembly to enact new reapportionment plans with this guidance, and then

22

conducted a trial to either find these plans constitutional or craft a temporary plan to govern the upcoming elections.  *Id*. at 586.  Additionally, as noted by the Plaintiffs, other three-judge district courts have fashioned similar relief to similarly situated plaintiffs. *See Honsey v. Donovan*, 236 F. Supp. 8, 15-16 (D. Minn. 1964) (then-Circuit Judge Harry Blackmun writing for a three-judge district court, holding in1964 that apportionment plan enacted in 1959 and based on updated 1950 census figures was unconstitutional); *Flateau v. Anderson*, 537 F. Supp. 257 (S.D.N.Y. 1982). 458 U.S. 1123 (1983)(invalidating a 1982 an apportionment scheme enacted in 1974 based on 1970 census data).

Courts generally consider the following factors in determining whether it is appropriate to enter declaratory judgment:

> (1) whether the judgment would settle the controversy; (2) whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata"; (4) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction; and (5) whether there is an alternative remedy that is better or more effective.

*Scottsdale Ins. Co. v. Roumph*, 211 F.3d 964, 968 (6th Cir. 2000).  Though it is somewhat remarkable the parties disagree that the 2002 legislative lines are unconstitutional under the Equal Protection Clause, voluminous adversarial briefs on the matter indicate that a judgment on the issue would settle that particular part of this controversy and helpfully clarify these important legal issues ahead of the approaching special legislative session.  There is currently no action pending in the Kentucky state courts, and this opinion has taken care to demonstrate that any declaration would not induce friction with previous state court rulings. The alternative remedies

suggested by the Plaintiffs, to either revive the 2012 plan or simply abstain from doing anything, would either needlessly promote more friction with the state courts or constitute a complete abdication of the duties required of this court.  As it is difficult to conceive of a more effective remedy, declaratory judgment is appropriate in this case.

"A plaintiff seeking a permanent injunction must demonstrate that it has suffered irreparable injury, there is no adequate remedy at law, 'that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted,' and that it is in the public's interest to issue the injunction." *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006) (quoting *eBay Inc., et al. v. MercExchange, LLC,* 547 U.S. 388, 126 S.Ct. 1837, 1839, 164 L.Ed.2d 641 (2006)).  In this case, the Plaintiffs have shown that legislative malapportionment has and continues to cause them irreparable injury in the form of vote dilution, for which there is no remedy at law.  The substantial deviations of the electoral districts from constitutional acceptability tilt the equities in favor of the Plaintiffs and overwhelmingly demonstrate that injunctive relief is in the best interest of the public.  Further, in contrast to the characterization of the Defendants, the Plainitffs requested injunctive relief would merely operate to constrain *enforcement* of the legislative electoral districts, rather than compel legislative action on the part of the General Assembly.

Therefore, there being no genuine dispute of material fact that the 2002 state legislative electoral districts, which are currently in place in Kentucky, are so malapportioned that the voting power of some citizens of the Commonwealth is diluted in violation of the Equal Protection Clause of the Fourteenth Amendment, we  hereby declare the 2002 districts invalid

under the Constitution of the United States of America and permanently enjoin any further elections from being held pursuant to those districts.

E

Nearly as important as what this court does hold is what it does not.  In reaching the aforementioned conclusion, the court makes no determination that the 2012 elections are in any way constitutionally infirm by virtue of the fact that they were conducted pursuant to the 2002 Reapportionment Rlan.  In their complaint, the *Brown* Plaintiffs did seek "money damages for past constitutional violations by Defendants in failing to redistrict in a constitutional manner in time for the May, 2012 primary and November, 2012 general elections."  [R. 1 at 18].  However, this was their only claim related to the 2012 elections, and it was expressly withdrawn without prejudice at the scheduling conference.  [R. 50 at 35-38].[11]  This court again recognized the effectiveness of that withdrawal in a subsequent Order. [R. 48 at 3-4].

In a lengthy and well-reasoned motion, the Legislative Research Commission has sought dismissal of the 2012 election claims with prejudice, and it may very well be that the dismissal of these claims with prejudice would have been appropriate had they not already been withdrawn. [R. 68].  However, "[s]ince those claims were withdrawn before the court adjudicated them, there is now nothing left for the Court to dismiss, either with prejudice or without."  *White v. Integrated Elec. Tech., Inc*., CIV.A. 11-2186, 2012 WL 893437, at *1 (E.D. La. Mar. 15, 2012); *see also*, *Strax v. Commodity Exch., Inc.,* 524 F. Supp. 936, 938 (S.D.N.Y. 1981) ("[D]efendants

---

[11] Specifically, at the scheduling conference, counsel for the *Brown* Plaintiffs stated that, "my clients are more concerned with the 2014 election process.  The past damages or anything else, we are willing – in fact we indicated in a filing late yesterday that we are willing, frankly, to forego certain claims because we want to make sure…that what this action is all about is conducting 2014 elections in a timely and orderly manner with constitutional maps."). [R. 50 at 35-38].

request that the court decide their motions to dismiss the withdrawn claims with prejudice. However, since the claims have been withdrawn, the motions to dismiss them are moot."). Therefore, though the Legislative Research Commission's motion shall be denied as moot, nothing in this Opinion shall operate to disturb the 2012 elections that were conducted pursuant to the 2002 electoral districts.

In addition, by its decision herein the court does not in any way seek to enjoin the Kentucky General Assembly from accomplishing its stated goal of enacting a constitutional plan of reapportionment in the August 19, 2013 special legislative session.  In fact, the clear motivations of the court in issuing this opinion in advance of the General Assembly's special legislative session is to articulate the requirements of the Equal Protection Clause and conclusively determine whether the 2002 electoral lines constitute a viable fallback option if the General Assembly were to be unsuccessful in agreeing on a new plan for reapportionment. *Reynolds*, 377 U.S. at 556.  After all, the most desirable outcome of this case for all parties is for the Kentucky General Assembly to enact a constitutional plan for state legislative reapportionment, thereby accomplishing the admittedly difficult task primarily allocated to them as the state legislative body.  The court's approach is sufficiently restrained to allow the General Assembly to do just that.

However, the court remains resolute that the method of procedure outlined in the Scheduling Order is appropriate.  [R. 49].  The entry of this Order does not fully resolve this case nor terminate the court's jurisdiction.  Following the special legislative session, the parties shall have the opportunity to amend their pleadings, make final dispositive motions, and, if necessary, proceed to trial in hopes of ensuring that constitutional legislative districts are in place in

26

advance of the November 4, 2013 residency requirement of Section 32 of the Kentucky Constitution.[12]  To be clear, in no previous Order has the court specifically held that the November 4, 2013 residency deadline is a date by which the General Assembly is bound by the United States Constitution to have a new reapportionment plan in place, and it does not do so herein.  While the Supreme Court has suggested that delaying beyond decennial reapportionment is constitutionally suspect, neither it nor the Kentucky Supreme Court have affixed a definite time by which states must pass reapportionment legislation.  *Reynolds*, 337 U.S. at 584.  However, this court has chosen November 4, 2013 as the target date for resolution of this matter for the practical purposes of:  (1) allowing the legislature sufficient time to meet in the August 19, 2013 special session to make another attempt at reapportionment; (2) accommodating the residency requirement of Section 32 of the Kentucky Constitution, which if not honored could be applied punitively in the redistricting process; (3) ensuring that constitutional districts can be implemented in time for the May 2014 primary elections; and (4) reserving a period of time for appeal or further meeting of the General Assembly should the defendants or the legislature be dissatisfied with any decision of this court.

The Kentucky Secretary of State informs the court that any electoral districts to be implemented for the May 2014 primary elections must be in place no later than January 28, 2014.  [R. 81 at 4].  She also notes that the court's Scheduling Order would allow for all of the necessary constitutional and statutory prerequisites to conducting an election to be met in

---

[12] Section 32 of the Kentucky Constitution sets forth the qualifications to be a senator or representative in the Commonwealth, and states that a candidate must have been a resident of the district in which he is running as a candidate for a year prior to the election.

advance of the 2014 primaries.  [*Id*.]  Therefore, the court shall continue to follow the process previously set forth in its Scheduling Order, which shall ensure that, whether by legislatively enacted maps of the Kentucky General Assembly or remedial action of this court, the votes of the citizens of the Commonwealth of Kentucky shall all carry equal weight for the elections of 2014.

III

Accordingly, it is hereby **ORDERED**, as follows:

(1)       The Plaintiffs' Joint Motion for Summary Judgment [R. 67] is **GRANTED**;

(2)       The 2002 state legislative electoral districts, which are currently in place in the Commonwealth of Kentucky, are **DECLARED** Unconstitutional under the Equal Protection Clause of the Fourteenth Amendment;

(3)       The Secretary of State of Kentucky and the Kentucky Board of Elections are **PERMANENTLY ENJOINED** from administering further elections pursuant to those districts;

(4)       The Legislative Research Commission's Motion to Dismiss 2012 Elections Claims [R. 68] is **DENIED**, as moot.


This 16th day of August, 2013.