UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
COVINGTON DIVISION

| | |
|---|---|
| KENNY BROWN, *et al.*, | ) |
| Plaintiffs | ) Case No. 2:13-cv-00068- DJB-GFVT-WOB |
| v. | ) |
| COMMONWEALTH OF KENTUCKY, *et al.*, | ) |
| Defendants. | ) |
| and | ) |
| MARTIN HERBERT, *et al.*, | ) |
| Plaintiffs, | ) (Consolidated Action Case No. 2:13-cv-00025-DJB-GFVT-WOB) |
| v. | ) |
| KENTUCKY STATE BOARD OF ELECTIONS, *et al.*, | ) |

### STATEMENT OF SENATOR ROBERT STIVERS CONCERNING THE CONSTITUTIONALITY OF THE SENATORIAL DISTRICT PLAN IN HB 1

Pursuant to the June 27, 2013, Scheduling Order [Doc. 49], the parties had until September 5, 2013, to "file any final statements on contentions regarding plans passed during the Extraordinary Legislative Session scheduled to commence on August 19, 2013". In conformity with this Court's Order, defendant, Senate President Robert Stivers ("Senator Stivers"), by

counsel, tenders hereby his summary statement and contention that the Senatorial District Plan in House Bill 1 ("HB 1") is constitutional.[1]

## I. BACKGROUND

On August 23, 2013, the Kentucky General Assembly passed HB 1, which contained newly drawn legislative districts for the House of Representatives and the Kentucky Senate based on 2010 census data. The vote in the Kentucky Senate was 35-2 in favor of passage of HB 1.[2] No competing floor amendments were presented and no objections were raised to the Senatorial District Plan in HB 1 by members of the Kentucky Senate. On August 23, 2013, Governor Steve Beshear signed HB 1 into law. That action concluded the five-day extraordinary session of the General Assembly. HB 1 contained an emergency clause and became effective immediately upon the Governor's signature. HB 1 also contained a severability clause pursuant to which the Senatorial District Plan and the House District Plan in HB 1 are to be considered separate enactments.[3] As such, this memorandum focuses only on the Senatorial District Plan.

The Senatorial District Plan is constitutional. It complies with the Equal Protection Clause of the United States Constitution governing district equality and Section 33 of the Kentucky Constitution concerning county splitting. In summary, the 38 districts in the Senatorial District Plan have an overall deviation of 11.41% (-6.57% smallest district to +4.45% largest district) and split the mathematically minimum number of counties. Only one district exceeds the

---

[1] This memorandum is not tendered in response to any challenge or action. It is filed to comply with the Court's Order and to advise the Court of Senator Stivers' contention that the Senatorial District Plan in HB 1 is constitutional. In so doing, Senator Stivers does not waive and expressly reserves any and all rights including the rights to supplement and amend and to defend, justify and further explain the actions of the Kentucky Senate should any challenges or other questions be presented in this or in any other venue.

[2] One Senator did not vote.

[3] Section 104, HB 1 provides: "The General Assembly intends that the Senatorial District plan and the Representative District plan in this Act be considered separate enactments, and if one district plan is for any reason held invalid by a court of competent jurisdiction, such judgment shall not affect, impair, or invalidate the remaining district plan, and to this end the provisions of this Act are intended to be severable."

5% deviation from the ideal district size. That district is the smallest district in the Senatorial District Plan and is 1.57% less than the 5% deviation from the ideal population size. Unlike a district which *exceeds* the ideal size and where voters are arguably underrepresented, this district has a slightly lower population concentration resulting in a *de minimis* effect on the other 37 districts of .042%. If this one district is not taken into account, the Senatorial District Plan has a population deviation of approximately 8%. The 1.57% variance was necessary to further legitimate state interests.

## II.   ANALYSIS SUPPORTING CONSTITUTIONALITY

### A.   Population variance is permissible if serving a legitimate state interest.

The United States Supreme Court has held that if there is a good faith effort to make districts identical in population, deviations are allowed if done for the purpose of furthering a legitimate state goal. *Karcher v. Daggett*, 462 U.S. 725, 740 (1983). According to the *Karcher* Court:

> *White* v. *Weiser* demonstrates that we are willing to defer to state legislative policies, so long as they are consistent with constitutional norms, even if they require small differences in the population of congressional districts. See *412 U.S., at 795-797*; cf. *Upham* v. *Seamon*, 456 U.S. 37 (1982); *Connor* v. *Finch*, 431 U.S. 407, 414-415 (1977). Any number of consistently applied legislative policies might justify some variance, including, for instance, making districts compact, *respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives*. As long as the criteria are nondiscriminatory . . . these are all legitimate objectives that on a proper showing could justify minor population deviations.

*Karcher*, 462 U.S. at 740 [Emphasis added]. Although *Karcher* was evaluating the constitutionality of deviations in congressional redistricting, the Supreme Court has also specifically allowed greater than normally allowable population deviations for state

legislative redistricting where the excessive deviation is done for the purpose of furthering a legitimate state interest.

> This Court first recognized that the Equal Protection Clause requires both houses of a bicameral state legislature to be apportioned substantially on a population basis in *Reynolds* v. *Sims*. In so doing, it suggested that in the implementation of the basic constitutional principle -- equality of population among the districts -- more flexibility was constitutionally permissible with respect to state legislative reapportionment than in congressional redistricting. *Id*., at 578. Consideration was given to the fact that, almost invariably, there is a significantly larger number of seats in state legislative bodies to be distributed within a State than congressional seats, and that therefore it may be feasible for a State to use political subdivision lines to a greater extent in establishing state legislative districts than congressional districts while still affording adequate statewide representation. *Ibid*. *Another possible justification for deviation from population-based representation in state legislatures was stated to be:*
>
> *'That of insuring some voice to political subdivisions, as political subdivisions. Several factors make more than insubstantial claims that a State can rationally consider according political subdivisions some independent representation in at least one body of the state legislature, as long as the basic standard of equality of population among districts is maintained.* Local governmental entities are frequently charged with various responsibilities incident to the operation of state government. In many States much of the legislature's activity involves the enactment of so-called local legislation, directed only to the concerns of particular political subdivisions. And a State may legitimately desire to construct districts along political subdivision lines to deter the possibilities of gerrymandering. . . .' *Id*., at 580-581.

*Mahan v. Howell*, 410 U.S. 315, 321 (1973) [Emphasis added]. The Senatorial District Plan recognizes those legitimate state interests.

### B. Preserving political subdivisions serves a legitimate state interest.

In *Mahan v. Howell, 410 U.S. 315* (1973), the United States Supreme Court upheld the constitutionality of population variations in a Virginia state legislative redistricting plan where the legislature's plan for apportionment of the House of Delegates reasonably advanced the state policy of respecting the boundaries of political subdivisions. The *Mahan* Court held that the

Equal Protection Clause required a state to make an honest and good faith effort to construct districts as nearly equal in population as was practicable. *Id.* at 324-325. There, the maximum percentage variation from the ideal district population was 16.4%, with one district being overrepresented by 6.8% and another being underrepresented by 9.6%. With one exception, the delegate districts followed political jurisdictional lines of the counties and cities. *Id.* at 319. Uncontroverted evidence offered in the District Court was that the legislature's plan, subject to minor qualifications, produced the minimum deviation above and below the norm, keeping political boundaries intact. *Id.* at 326. The United States Supreme Court found that the constitutionality of Virginia's legislative redistricting plan was not to be judged by the more stringent standard applicable to congressional reapportionment.[4] Instead, the Court recognized that the Equal Protection Clause takes into account honest and good faith efforts to construct legislative districts in both houses of its legislature as nearly equal in population as is practicable in which some divergences are constitutionally permissible when based on legitimate considerations incident to the effectuation of a rational state policy. *Id.* at 324-325. In that case, maintenance of political subdivision lines was recognized as a legitimate state policy. *Id.* at 325-326. While cautioning that the Virginia plan was "approaching tolerable constitutional limits", the Supreme Court held that it did not exceed them. *Id.* at 329. The Court made note that the "relatively minor variations present in the Virginia plan contrast sharply with the larger variations in state legislative reapportionment plans that have been struck down by previous decisions of this Court. *See e.g., Reynolds* v. *Sims, supra; Swann* v. *Adams, supra*; and *Kilgarlin* v. *Hill*, 386 U.S. 120 (1967)." *Id.* On page 11-12 of its Memorandum Opinion & Order, entered August 16, 2013 [Doc. 97], this Court approvingly acknowledged the rationale of the *Mahan*

---

[4] The Supreme Court reversed a federal panel which had declared the legislatively enacted map unconstitutional, and drew a map with approximately 10% deviation, but which did not respect political subdivisions in many instances. *Id.* at 319-320.

Court, stating that: "Using this analysis the Court has upheld a plan with a justified maximum deviation of 16.4%, but noted that 'this percentage may well approach tolerable limits.'" A deviation far less than 16.4% is justified under the Senatorial District Plan since preservation of political subdivisions is not only a legitimate state interest, it is required to the maximum extent possible. *Legislative Research Comm'n v. Fischer*, 366 S.W.3d 905, 913 (Ky. 2012).

### C.   Preventing pairing of incumbents serves a legitimate state interest.

Not only is county integrity a permissible state interest, avoiding incumbent pairing is likewise a recognizable state interest. "Any number of consistently applied legislative policies might justify some variance, including ... avoiding contests between incumbent Representatives." *Karcher*, 462 U.S. at 740. Likewise, as stated by the United States Supreme Court in *Bush v. Vera*, 517 U.S. 952, 964 (1996):

> [W]e have recognized incumbency protection, at least in the limited form of "avoiding contests between incumbent[s]," as a legitimate state goal. See *Karcher v. Daggett,* 462 U.S. 725, 740, 103 S.Ct. 2653, 2663, 77 L.Ed.2d 133 (1983); *White v. Weiser,* 412 U.S. 783, 797, 93 S.Ct. 2348, 2355–2356, 37 L.Ed.2d 335 (1973); *Burns v. Richardson,* 384 U.S. 73, 89, n. 16, 86 S.Ct. 1286, 1294, n. 16, 16 L.Ed.2d 376 (1966); cf. *Gaffney v. Cummings,* 412 U.S. 735, 751–754, and 752, n. 18, 93 S.Ct. 2321, 2330–2332, and 2331, n. 18, 37 L.Ed.2d 298 (1973).

### III.   CONCLUSION

State legislative redistricting plans are to be viewed with more leniency than congressional plans -- which may contain deviations from the ideal population district if tailored to advance a legitimate state interest. *Mahan,* at 321. To this end, the Senatorial District Plan adheres to the requirements of the Equal Protection Clause while, at the same time, advancing legitimate state interests by: (1) representing a small deviation (11.41% overall deviation compared to *Mahan* where the overall deviation was 16.4%) caused by a single district with a *de*

*minimis* effect on the other 37 senate districts;[5] (2) splitting the mathematically minimum number of counties; and (3) preventing the pairing of incumbents.

Senator Stivers contends that the Senatorial Districting Plan conforms with the constitutional requirements of the Constitution of the United States as interpreted and applied by the United States Supreme Court, the Constitution of Kentucky as interpreted and applied by the Kentucky Supreme Court  and  with the directions afforded the parties by this Honorable Court.

Respectfully submitted,

*/s/ Stanton L. Cave*
_____
Stanton L. Cave, Esq.
LAW OFFICE OF STAN CAVE
P.O. Box 910457
Lexington, KY 40591-0457
Telephone: (859) 309-3000
Facsimile: (859) 309-3001
Email: stan.cave@insightbb.com
*Special General Counsel to Senate President Robert Stivers in his Official Capacity*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 5, 2013, the foregoing was served via the Court's CM/ECF electronic filing and service system.

*/s/ Stanton L. Cave, Esq.*
_____
Stanton L. Cave, Esq.

---

[5] Again, "[T]he showing required to justify population deviations is flexible - the greater the deviation, the heavier the burden." *Deem v. Manchin*, 188 F.Supp.2d 651, 656 (N.D.W.Va. 2002).  In *Deem*, the overall deviation of 10.92% was characterized by the Court as "slight." *Id.* at 656.